UNITED STATES OF AMERICA
(EPA), Plaintiff,

and

Supporters to Oppose Pollution, Inc.,
Intervenor–Plaintiff,

v.

(1) ENVIRONMENTAL WASTE CON-
TROL, INC., d/b/a Four County Land-
fill; (2) Steven W. Shambaugh; (3)
James A. Wilkins; and (4) West Hold-
ing Company, Defendants.

No. S87–55.

United States District Court,
N.D. Indiana,
South Bend Division.

March 29, 1989.

As Corrected April 17, 1989.

Robert Oakley, F. Henry Habicht, Frank Bentkover, Sam Boxerman, Environmental Enforcement Section, Land & Natural Resources Div., U.S. Dept. of Justice, Anna Thode, Office of Enforcement & Compliance Monitoring, U.S. Dept. of Justice, Washington, D.C., Victor A. Franklin, Asst. Regional Counsel, U.S. E.P.A., Region V, Chicago, Ill., Andrew A. Baker, Jr., Asst. U.S. Atty., Hammond, Ind., Clifford D. Johnson, Asst. U.S. Atty., South Bend, Ind., for the U.S.E.P.A.

John C. Hamilton, South Bend, Ind., Charles Tebutt, Syracuse, N.Y., for Supporters to Oppose Pollution, Inc.

George W. Pendygraft, George Plews, Indianapolis, Ind., James H. Pankow, South Bend, Ind., for all defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause came before the court for trial without intervention of jury commencing December 5, 1988. Following thirty-one days of evidence and argument, the court now enters this memorandum opinion intended to comply with Fed.R.Civ.P. 52(a).

The case involves several issues of law on which no court has ruled before. The United States Environmental Protection Agency ("EPA") and a citizens' group known as Supporters to Oppose Pollution, Inc. ("STOP") claim that federal statutes and regulations have been violated in the operation of a hazardous waste disposal facility known as the Four County Landfill. The EPA and STOP bring their claims under the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq. ("RCRA"), and its implementing regulations. The court holds that the EPA has proven that the Landfill has operated illegally since November 8, 1985 and so can operate no longer in its present status. Further, hazardous waste constituents buried at the Landfill have been released into the groundwater and air. Based on those and other violations of federal law, as well as the history of the Landfill's operation, the court concludes that the Landfill should be closed permanently, that a civil penalty of $2,778,000 should be assessed against the defendants, and that the defendants should be ordered to implement a plan of action to correct their release of hazardous waste constituents into the groundwater.

In Part I of this memorandum, the court sets forth the claims brought by the EPA and STOP and describes the location and geography of the Four County Landfill, the relationship between the defendants, and the regulatory history of the Landfill. In conjunction with the Landfill's regulatory history, Part I of the memorandum also discusses the general regulatory scheme of RCRA.

Part II of the memorandum discusses the defendants' various technical challenges to the suit. In Part II, the court concludes: (A) that it has jurisdiction over the EPA's suit although Indiana is an "authorized state" for purposes of RCRA enforcement; (B) that STOP's asserted failure to give notice to the defendants or to the State of Indiana does not deprive the court of jurisdiction over its claims; (C) that the doctrines collectively described as "primary jurisdiction" do not preclude consideration of the claims brought by the EPA and STOP; and (D) that principles of collateral estoppel do not preclude the claims brought

by the EPA and STOP, notwithstanding an earlier agreed order in state administrative proceedings.

Part III addresses whether defendant Stephen Shambaugh may be held liable under RCRA as an "operator" of the Landfill although a corporate defendant also is an operator, and the court determines that he may be held liable.

Part IV of the memorandum addresses the EPA's claims.

Part IV-A addresses the EPA's claim that the Landfill has lost its interim status (its basis for operation pending final determination of its application for a permit to operate) because the certificate of compliance the defendants filed pursuant to RCRA was false. In Part IV-A-1, the court concludes that the mere filing of a certificate does not satisfy RCRA. The certificate must have been true.

In Part IV-A-2, the court holds that the Landfill's certificate was false because its insurance coverage was insufficient to meet the financial responsibility requirements that applied at the time of the certification. In reaching that conclusion, the court rejects the defendants' arguments that its insurance coverage amounted to the level the EPA maintains was required, determines that the EPA's interpretation of the regulatory requirements is correct, rejects the defendants' argument that the EPA is estopped from enforcing the regulations because of misinformation provided to the Landfill's insurance agent over the EPA's "hot line", and rejects the defendants' argument that its good faith constitutes a defense to the EPA's claim.

In Part IV-A-3, the court concludes that the Landfill's certificate of compliance was false because its groundwater monitoring system was inadequate at the time of its certification in November, 1985. In reaching that conclusion, the court rejects the defendants' argument that the regulations upon which the EPA relies were inapplicable because the Landfill was in "assessment mode" rather than "detection mode", rejects the defendants' argument that a state administrative order and subsequent state inaction prevented them from complying with the regulations, rejects the defendants' argument that their groundwater monitoring wells actually were in the best location to detect migrating hazardous waste constituents, and rejects the defendants' argument that the EPA has mischaracterized the "waste management area" for purposes of placement of monitoring wells. The court also concludes that one monitoring well critical to compliance with the regulations was inadequate under the regulations because it was sealed improperly.

Part IV-B of the memorandum discusses the EPA's claim that the defendants violated RCRA by placing hazardous waste in unlined cells for a period of several months. The court earlier held, on summary judgment, that the defendants had violated that provision.

In Part IV-C of the memorandum, the court addresses the EPA's contention that the Landfill's groundwater monitoring system failed, even in 1988, to satisfy RCRA requirements. In that portion of the memorandum, the court holds that because of defects in the depth and construction of the defendants' monitoring wells, and because of the defendants' failure to determine both the extent of the uppermost aquifer and the permeability of the materials beneath the Landfill, the defendants have violated that RCRA regulation requiring an adequate groundwater monitoring system.

In Part IV-D of the memorandum, the court finds that hazardous waste constituents have been released into the groundwater beneath the Four County Landfill and that corrective action is required.

Part V of the memorandum addresses the additional claims raised by the intervenor, STOP.

Part V-A addresses STOP's various claims that hazardous waste constituents have been released into the environment beyond the Four County Landfill's boundaries. In that portion of the memorandum, the court finds that STOP has not proven that hazardous waste constituents have left the landfill site through the groundwater, but that STOP has proven that hazardous

waste constituents have been spread to areas surrounding the Four County Landfill by wind dispersal and by surface water leaving the landfill site after coming into contact with hazardous waste.

The remaining portions of Part V address, and reject, STOP's other claims. In Part V–B, the court discusses STOP's claim that the defendants improperly accepted ignitable waste. Part V–C analyzes STOP's claim that the defendants improperly accepted free liquids. Part V–D addresses STOP's contention that the defendants handled barrels of hazardous waste negligently. Part V–E discusses STOP's claim that the defendants improperly accepted hazardous waste that was not listed on the manifests that accompanied the waste. In each of these parts, the court concludes that STOP has not proven its claim by a preponderance of the evidence.

Part VI addresses the penalties to be imposed on the defendants for the violations that are found to have occurred. In that portion of the memorandum, the court determines that the Four County Landfill must be closed immediately because its failure to have sufficient insurance and an adequate groundwater monitoring system in November, 1985 ended its right to continue to operate under "interim status", that is until its final application for a permit is granted. The court also determines in Part VI that the seriousness of the violations and the defendants' poor performance record warrant closing the Four County Landfill permanently. In Part VI, the court also concludes that the defendants must undertake a corrective action plan to address the release of hazardous waste constituents into the groundwater, must pay civil penalties amounting to $2,778,000, and must pay the reasonable attorney fees and expenses incurred by STOP.

## I. BACKGROUND

The EPA initiated this action pursuant to the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, addressing a hazardous waste landfill known as the Four County Landfill ("the Landfill") located in Fulton County, Indiana. Pursuant to 42 U.S.C. § 9613(i), the court allowed intervention by a citizens' organization known as Supporters to Oppose Pollution, Inc., or "STOP".

The four defendants are the Landfill's alleged owners and operators. Environmental Waste Control, Inc. ("Environmental Waste") is an Indiana corporation that operates the Landfill. West Holding Company, an Indiana corporation, owns all Environmental Waste stock and the land on which the Landfill is located. James A. Wilkins is president of West Holding Company and until recently owned the land on which the Landfill is located. Stephen W. Shambaugh is president of Environmental Waste, vice-president of West Holding Company, and until recently was the sole shareholder of Environmental Waste. The court will refer to the defendants collectively as "EWC".

### A. The EPA's Claims

The EPA's second amended complaint states four claims for relief. In its first claim, the EPA contends that the Landfill should be closed, at least temporarily, because the Landfill lost its interim status to operate a land disposal facility on November 8, 1985, and since then has been operating illegally. The EPA seeks civil penalties and an order closing the Landfill until its final application for a permit to operate is finally resolved. In the second claim, the EPA alleges that EWC violated RCRA's "minimum technology" requirements by disposing of hazardous wastes in areas not equipped with liners and required equipment between May 8, 1985 and August 19, 1986. In this claim, the EPA seeks civil penalties. The third claim alleges that the Landfill's groundwater monitoring system does not comply with applicable regulations; the EPA seeks civil penalties and injunctive relief requiring the defendants to bring that system into compliance. With respect to each of these claims, the EPA seeks civil penalties of $25,000 per day of violation.

The fourth claim alleges that a release of hazardous waste or hazardous waste constituents has occurred at the Landfill and

asks the court to order a corrective measures study to determine the steps needed to deal with that release.

### B. STOP's Claims

STOP joins in the EPA's four claims, but, unlike the EPA, seeks nothing short of permanent closure. Most of STOP's additional claims are based on allegations that EWC has allowed hazardous waste or hazardous waste constituents to be released into the environment through the air, groundwater, and surface water. STOP contends that EWC failed to place cover over hazardous wastes after the wastes were deposited in the Landfill; that EWC has failed to install and implement a proper system for control of runoff from hazardous waste areas and run-on that flows onto hazardous waste areas; that EWC has allowed the integrity of the Landfill's run-on and runoff control systems to be impaired; and that the Landfill has discharged contaminated water into the waters of the State of Indiana.

STOP also claims that EWC improperly accepted ignitable and self-combustible materials; that EWC improperly received uncontainerized liquid hazardous wastes; that Landfill personnel have handled containers of hazardous waste negligently, allowing the containers to rupture and leak; and that EWC has accepted loads of hazardous waste without the detailed chemical analysis required by regulations.

### C. The History of the Landfill's Regulation and Ownership

#### 1. Location and Geography

The Four County Landfill is located near the communities of Culver, DeLong, and Leiters Ford in Fulton County, Indiana. The site on which the Landfill is located consists of approximately 61.5 acres astride State Road 17. The area surrounding the Landfill is rural and agricultural, consisting of open fields, wetlands, wooded lots and cultivated land, and year-round and seasonal homes. No hazardous waste generating industry is located near the Landfill.

The Tippecanoe River runs less than one mile north-northeast from the Landfill; Kings Lake lies directly east of the Landfill. Three residences with domestic wells are located within 600 feet of the site; several more private wells that provide drinking water for local residents and water for domestic stock and farming are within one mile of the Landfill. The regional terrain is hilly, composed of sediments derived from past glacial action. The highly variable size and distribution of glacially derived sediments can affect the direction and velocity of groundwater flow. The earth below the Landfill is directly relevant to this action, but discussion of that geology is deferred to the pertinent portion of the opinion.

#### 2. Relationship Between the Defendants

Mr. Wilkins and his father first began operating a landfill on the Four County Landfill site in 1973. When the Wilkins' landfill began operations, it was authorized to receive only non-hazardous wastes. After 1978, the State of Indiana required disposal facilities to separate general refuse from "separate area waste" consisting of commercial and industrial wastes, which included what now is designated "hazardous waste". The Landfill did not, and was not required to, maintain records of the location within the facility of individual loads of "separate area waste". Beginning in 1980, with occasional exceptions, the Landfill began to dispose only of hazardous wastes; late that year, the Landfill began to record placement of waste within the waste management area.

Mr. Wilkins acquired the land on which the Landfill is located by way of quitclaim deed from his mother in 1978. On November 3, 1988, about a week after the court found him to be an "owner" for RCRA purposes, *United States v. Environmental Waste Control, Inc.*, 698 F.Supp. 1422, 1430 (N.D.Ind.1988), he deeded the property to West Holding Company in exchange for half the stock of West Holding Company. Mr. Wilkins testified that he transferred the property to West because of prior confusion his ownership interest caused customers, regulators and others, but the

court finds his explanation unconvincing. The transfer's only reasonable purpose was to shield Mr. Wilkins from post-transfer liability under RCRA.

Mr. Shambaugh formed EWC with Douglas Johnson in 1978. On October 1, 1978, Mr. Shambaugh and Mr. Johnson signed a ten-year lease with Mr. Wilkins that allowed Mr. Johnson and Mr. Shambaugh to operate a hazardous waste landfill on the Wilkins land. In March, 1985, Mr. Johnson transferred all his interest in the Landfill, including his EWC stock and his rights and duties under the lease, to Mr. Shambaugh.

Mr. Shambaugh has been president of EWC since its creation. EWC has had no directors; its only other officers have been Mr. Johnson (who served as vice-president from 1978 to 1985) and Mr. Shambaugh's wife (who served as secretary for a period of time). Mr. Wilkins has held no office with, and has owned no shares in, EWC.

Mr. Shambaugh has been actively involved in the Landfill's day-to-day activities. He shares final responsibility with Mr. Wilkins for virtually all decisions concerning the Landfill's operations, other than the locations at which waste is to be placed. In 1985, when a downturn in the Landfill's economic fortunes led to a layoff of most of the Landfill's employees, he even operated heavy machinery at the Landfill.

In November, 1988, Mr. Shambaugh transferred his EWC stock (consisting of all the shares of EWC) to West Holding Company in exchange for the half of West shares Mr. Wilkins did not receive. Although Mr. Shambaugh testified at trial, he tendered no explanation for that transfer. The court finds that his purpose must have been the same as Mr. Wilkins': to shield himself from liability under RCRA. Neither Mr. Shambaugh nor Mr. Wilkins contributed cash to West, although Mr. Wilkins contributed certain equipment used in the Landfill's operation.

### 3. RCRA and the Four County Landfill

RCRA establishes a comprehensive federal regulatory program applicable to the generation, transportation, storage, treatment, and disposal of hazardous waste.[1] RCRA and its implementing regulations required all persons who generate, transport, treat, store, or dispose of hazardous waste to notify the EPA of such activity by August 10, 1980. 42 U.S.C. § 6930.

#### a. Interim Status

A hazardous waste facility may be operated only in accordance with a permit. 42 U.S.C. § 6925(a). Because the EPA could not issue permits to all hazardous waste applicants before RCRA became effective, hazardous waste facilities that were in existence on November 19, 1980 benefit from a "grandfathering" provision: such a facility could obtain "interim status" to continue operation until the EPA or an authorized state takes final action with respect to the facility's permit application. 50 Fed.Reg. 38,946. A facility must satisfy certain conditions to obtain interim status, including the filing of timely notice to the EPA that the facility treats, stores, or disposes of hazardous waste and the filing of an application for a hazardous waste permit. 42 U.S.C. § 6925(e). This application, the first stage of a two-stage process, has come to be described as the "Part A application" stage. *Northside Sanitary Landfill, Inc. v. Thomas*, 804 F.2d 371, 373 (7th Cir.1986); *United States v. Conservation Chemical Co. of Illinois*, 660 F.Supp. 1236, 1237 (N.D.Ind.1987).

A facility is granted interim status if the EPA Administrator finds no reason to believe that an existing facility's Part A application does not meet the disclosure requirements of 40 C.F.R. § 270.13. Such a facility is treated as having been issued a permit upon the filing of a Part A application and the giving of proper notice of its hazardous waste activities. 40 C.F.R. § 270.70.

---

**1.** The Resource Conservation and Recovery Act of 1976 is a multi-faceted approach toward solving the problems associated with the 3–4 billion tons of discarded materials generated each year, and the problems resulting from the anticipated 8% annual increase in the volume of such waste. House Report No. 94–1491, at 2, U.S.Code Cong. & Admin.News 1976, pp. 6238, 6239.

EWC obtained interim status in 1980. On August 18, 1980, EWC notified the EPA that it was disposing of hazardous wastes at the Landfill. On November 18, 1980, EWC submitted Part A of an application for authorization to treat, store, or dispose of hazardous waste at the Landfill. Accordingly, EWC was accorded interim status pending final administrative disposition of its permit application, allowing it to operate its facility. *See* 42 U.S.C. § 6925(a), (e)(1); 40 C.F.R. §§ 270.10, 270.70(a).

Since then, EWC has disposed of hazardous wastes within the meaning of 42 U.S.C. § 6903(5) at the Landfill, including those containing barium, cadmium, chromium, lead, mercury, certain waste water treatment sludges [2], emission control dust or sludge from secondary lead smelting [3], certain emission control dust and sludges from the primary production of steel in electric furnaces [4], spent solvent trichloroethylene and still bottoms from the recovery of spent trichloroethylene, spent solvent acetone and still bottoms from the recovery of spent acetone solvent, spent solvent creosols and still bottoms from the recovery of spent solvent creosols, and spent toluene solvent. The Landfill received more than 16,000 cubic yards of hazardous waste in 1986; from January 1 to July 21, 1987, the Landfill reported receiving about 30,000 cubic yards; the defendants thereafter ceased reporting the volumetric measurement of wastes received. The presence of hazardous wastes at the Landfill constitutes disposal within the meaning of RCRA. 42 U.S.C. § 6903(33).

### b. Regulation of Interim Status Facilities

Congress authorized the Administrator of the EPA to promulgate regulations establishing performance standards for interim status facilities. 42 U.S.C. § 6924. These regulations are codified at 40 C.F.R. Part 265.

RCRA authorized the EPA to approve state regulations that are substantially equivalent to the federal interim status regulations. 42 U.S.C. § 6926. Following approval, the state enforces its regulations in lieu of the federal regulations. 42 U.S.C. § 6926(c). On August 18, 1982, the EPA granted Indiana Phase I interim authorization to promulgate interim status regulations. Indiana received final authority to promulgate interim status regulations on January 31, 1986.[5] Accordingly, owners and operators who have interim status to operate under 42 U.S.C. § 6925(e) in the State of Indiana generally must comply with the standards and requirements of Title 320, Article 4.1–22 of the Indiana Administrative Code (now codified at 329 I.A.C. 3)[6] in operating hazardous waste facilities.

The EPA, however, retains authority to enforce violations of Subchapter III of RCRA in Indiana. The delegation to Indiana of final authority to promulgate interim status regulations did not include responsibility for any of the provisions added to RCRA by the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), which include the provision concerning loss of interim status. 42 U.S.C. § 6925(e)(2);

---

**2.** The presence of cadmium, nickel, hexavalent chromium, and cyanide renders such sludges toxic. The defendants' records for 1981, 1982, 1983, and 1985 disclose that over 5.4 million pounds of such sludge were disposed in the Landfill.

**3.** The presence of calcium, lead, and hexavalent chromium renders such wastes toxic. In 1981, 1982, 1983, and 1985, the defendants reported disposal of 36,000 pounds of this material.

**4.** The presence of calcium, lead, and hexavalent chromium renders such waste toxic. The defendants have disposed of more than 37 million pounds of such material.

**5.** According to one commentator, the EPA had granted final authorization to the enforcement programs of twenty-five states and the District of Columbia by August, 1985. Developments in the Law, *Toxic Waste Litigation,* 99 Harv.L.Rev. 1458, 1476 n. 56 (1986).

**6.** At final argument in the trial of this case, counsel agreed that the Indiana regulations pertinent to this case differ in no material respect from the federal regulations; accordingly, the court will limit its citation of regulations to the federal regulations, while recognizing that the Landfill's operation may have been controlled by virtually identical state regulations.

*Northside Sanitary Landfill, Inc. v. Thomas,* 804 F.2d at 382–383.

40 C.F.R. § 265.147 required owners and operators of hazardous waste facilities to meet certain financial responsibility requirements to establish financial assurance for liability to third parties. 42 U.S.C. § 6924(*o* )(1)(A) required owner-operators of existing landfills who conduct lateral expansion to install two or more liners and a leachate[7] collection system above and between the liners; 42 U.S.C. § 6936(b) made this requirement applicable to interim status facilities with respect to waste received after May 8, 1985.

#### c. Certification and the Part B Application

Before Congress amended RCRA in 1984, a hazardous waste facility was not required to submit a "Part B application" seeking a final determination of its permit application until six months after the EPA requested it to do so. In 1984, Congress decided that interim status should not be allowed to last indefinitely. Accordingly, the 1984 amendments provided that by November 8, 1985, owners or operators of land disposal facilities that had been granted interim status were required to file a Part B application and certify that the facility was in compliance with all applicable groundwater monitoring and financial responsibility requirements. 42 U.S.C. § 6925(e)(2). A facility's failure to satisfy these requirements would result in termination of its interim status on November 8, 1985. On November 7, 1985, EWC filed with the EPA its certificate of compliance with applicable interim status groundwater monitoring and financial responsibility re-

quirements. EWC also filed its Part B application.

## II. JURISDICTION

The court has jurisdiction pursuant to 42 U.S.C. § 6928 and 28 U.S.C. §§ 1331, 1345, and 1355. Venue is proper in this court; the Landfill is located within the Northern District of Indiana.

EWC, however, raises several challenges to the court's jurisdiction. The court must address each of the defendants' theories challenging subject matter jurisdiction because jurisdiction is a matter that is to be determined at any stage of a proceeding, *Darryl H. v. Coler,* 801 F.2d 893, 907 n. 13 (7th Cir.1986); *Jackson v. Consolidated Rail Corp.,* 717 F.2d 1045, 1055 (7th Cir. 1983), *cert. denied* 465 U.S. 1007, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984).

### A. The EPA's Claims in an Authorized State

■ EWC has asserted throughout this litigation that because the State of Indiana was conferred with the statutory authorization to promulgate interim status regulations, the EPA lacks authority to bring this suit. 42 U.S.C. § 6926. EWC maintains that the EPA lacks authority to determine issues of groundwater monitoring and financial assurance because these matters are now controlled exclusively by state law.[8] As noted above, the EPA's first claim alleges loss of interim status because the Landfill's certification of compliance with groundwater monitoring and financial assurance requirements was false. The EPA's third claim alleges that EWC has failed to implement a groundwater monitoring program capable of determining the Landfill's impact on the quality of the

---

**7.** " 'Leachate' means any liquid, including any suspended components in the liquid, that has percolated through or drained from hazardous waste." 40 C.F.R. § 260.10. Leachate from hazardous waste is itself a hazardous waste.

**8.** At the conclusion of the trial, EWC raised an additional argument that it has a due process right to have its fate decided by an administrative agency. The only case cited provides no support for that authority; *Indiana Environmental Management Board v. Bremen,* 458 N.E.

2d 672 (Ind.Ct.App.1984), simply held that Indiana's Administrative Adjudication Act entitled the plaintiffs, who lived near the landfill involved in that case, to certain procedural rights. The fundamental requirements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). Through this trial, EWC has received the process due it.

groundwater in the uppermost aquifer underlying the facility.[9] EWC has not argued that the EPA's second and fourth claims are outside the court's jurisdiction.

EWC also asserts that the court's jurisdiction is impeded because Indiana's enforcement referral to the EPA was improper. According to the 1985 Memorandum of Agreement between Indiana and the EPA, the EPA could take enforcement action only after it had determined that the state had not taken "timely and appropriate action". EWC argues that no provision in the Agreement justifies any type of referral to the EPA and further argues that the EPA made no determination that Indiana had not taken "timely and appropriate" action on the matters contained in the EPA's amended complaint. EWC also argues that Indiana did not authorize the enforcement referral. Because EWC has never specified the claims to which this argument is directed, the court must assume that it is intended to apply to the entire amended complaint.

### 1. The First Claim: Loss of Interim Status

EWC has argued repeatedly that the EPA has no authority to determine whether the Landfill complies with the groundwater monitoring program requirements or the financial assurance requirements of the 1984 amendments known as HSWA because state law now governs those requirements. This argument is no stranger to this litigation. EWC raised this argument in its unsuccessful summary judgment motion, then renewed the argument at the close of the case.

In the summary judgment ruling, the court held that the EPA had the authority under 42 U.S.C. § 6928 to proceed on the issues of groundwater monitoring and financial assurance requirements alleged in its first claim. *United States v. Environmental Waste Control, Inc.*, 698 F.Supp. at 1435–1438. Although authorized to promulgate interim status regulations, Indiana has no authority to enforce any provisions found in the Hazardous and Solid Waste Amendments of 1984; loss of interim status is a provision contained in those amendments. Although jurisdiction is a matter that is to be determined at any stage of a proceeding, EWC has presented no new authority or argument to persuade the court to depart from its pretrial ruling finding jurisdiction over the EPA's first claim.

At trial, however, EWC raised a separate attack on the EPA's ability to take enforcement action for the RCRA violations alleged in the EPA's amended complaint. EWC contends that Indiana improperly referred this matter to the EPA for enforcement under the 1985 Memorandum Agreement between Indiana and the EPA because: (1) the assistant state agency commissioner who signed the referral letters had no authority to make a referral that only the Commissioner could make; and (2) under the Agreement, the EPA could take enforcement action only after it determined that the State had not taken "timely and appropriate action".

The referral at issue came from David Lamm, Assistant Commissioner for Solid and Hazardous Waste Management, Department of Environmental Management. The referral, dated July 26, 1986, informed the EPA that the Landfill apparently had violated minimum technology requirements of the 1984 amendments known as HSWA and falsely certified compliance with the groundwater monitoring requirements and financial assurance requirements. (EPA Exh. 36). This document was designated an "enforcement referral". Mr. Lamm reasserted his request for enforcement action in a referral letter dated June 10, 1987. (STOP Exh. 47).

The 1985 Memorandum of Agreement provided only that the EPA may take enforcement action "upon determining that the State has not taken timely and appropriate enforcement action". (EWC Exh. IIIII, p. 26). EWC maintains that the EPA did not determine whether the State had taken "timely and appropriate action". In support of this argument, EWC points to language found in the more recent 1988

---

**9.** As to the meaning of "uppermost aquifer", see note 33, *infra*.

Memorandum of Agreement between the EPA and Indiana: "EPA will take enforcement action only upon determining that the State has not taken timely and appropriate action or upon request of the State." (EPA Exh. 38, p. 26).

In denying EWC's summary judgment motion, the court held that the EPA had the authority under 42 U.S.C. § 6928 to proceed on the issues of groundwater monitoring and financial assurance requirements alleged in its first claim. 698 F.Supp. at 1435–1438. Section 6928(a) authorizes the EPA to bring an independent enforcement action, even in a RCRA authorized state. *United States v. Conservation Chemical Co. of Illinois*, 660 F.Supp. at 1244. *See United States v. Allegan Metal Finishing Co.*, 696 F.Supp. 275, 282 (W.D.Mich.1988). The sole restriction on this enforcement authority is that the EPA must notify the state before commencing any action. 42 U.S.C. § 6928(a)(2). Section 6928 "explicitly reserves federal authority in the face of an authorized state program." *Wyckoff Co. v. Environmental Protection Agency*, 796 F.2d 1197, 1201 (9th Cir.1986). EWC has not challenged the sufficiency of the EPA's notice to Indiana. Instead, EWC contends that this enforcement proceeding is improper because it was triggered by a referral contrary to a written agreement or by the wrong person. That argument finds no support in the statute; 42 U.S.C. § 6928(a) neither creates a need for referral by a state nor designates the state official who must make such a referral.

Further, Indiana, although authorized to promulgate interim status regulations, has no authority to enforce any provisions found in the 1984 amendments known as HSWA. Determining the loss of interim status is a provision found in the 1984 amendments. Indiana could not have determined whether the Landfill lost its interim status. It is difficult to see how Indiana's allegedly improper referral of a matter within the EPA's exclusive enforcement authority could affect the EPA's right to act under HSWA.

### 2. The Second Claim: Minimum Technology Requirements

The EPA's second claim alleges violations of RCRA's minimum technology requirements. This issue was also contained in the referral for enforcement from Indiana to the EPA. For the same reasons stated above, the court is vested with jurisdiction under § 6928(a). The minimum technology provision is a product of the 1984 amendments known as HSWA and a matter not delegated to the state for enforcement. Accordingly, any challenge to Indiana's attempted enforcement referral to the EPA is immaterial.

### 3. The Third Claim: Groundwater Monitoring Requirements

The third claim of the EPA's amended complaint alleges that EWC failed to implement a groundwater monitoring program capable of determining the Landfill's impact on the quality of the groundwater in the uppermost aquifer underlying the facility in violation of 40 C.F.R. § 265.90(a).

Again, EWC relies upon the 1985 Memorandum of Agreement between Indiana and the EPA which provided that the EPA could take enforcement action only after determining that the State did not take timely and appropriate action. EWC asserts that the EPA did not determine whether Indiana had taken "timely and appropriate action".

The EPA does not suggest that the matters raised by its third claim arise under the 1984 HSWA provisions; the third claim, unlike the first and second claims, is not within the EPA's exclusive administrative jurisdiction. This does not defeat the district court's jurisdiction, however. Although the EPA may not have administrative authority over the violation alleged in the third claim, *see Northside Sanitary Landfill, Inc. v. Thomas*, 804 F.2d 371, 42 U.S.C. § 6928 vests jurisdiction in the district court to entertain an enforcement action directed at violations of RCRA. Rather, the proper inquiry is whether the contractual agreement between Indiana and the EPA controls when such an enforcement action can occur.

The 1985 Memorandum of Agreement provides no interpretation of "timely and appropriate action". William Muno, the Chief of the Enforcement Branch for the EPA's Region V, testified that the EPA's interpretation of "timely and appropriate" action under the 1985 Memorandum of Agreement requires formal state action within ninety days of discovery of violation, and a notice of violation or warning letter is not a formal action. The record before the court does not suggest that Indiana, the other party to the Agreement, has ever objected to either the EPA's interpretation of the Agreement or the EPA's enforcement action. Mr. Muno stated that the institution of this action demonstrates that the EPA had made such a determination.

Indiana addressed the allegations of the EPA's third claim in Notice of Violation V–209, contained in a letter dated October 11, 1985 (STOP Exh. 17). Notice of Violation V–209 alleged a failure to implement a program capable of determining the facility's impact on groundwater, constituting a violation of 40 C.F.R. § 265.90. EWC's principal consultant, Michael Johnson, testified that the state had taken no further action on V–209. EWC argues that the June, 1985 administrative order resolving Notice of Violation N–128 [10] incorporated the violations contained in V–209, but introduced nothing to support that contention. Indiana took no formal enforcement action on V–209, and the EPA commenced this suit based, in part, upon the allegations contained in V–209, pursuant to 42 U.S.C. § 6928. Indiana has taken no action, in its proceedings to determine whether a final permit should be issued to the Landfill, that is inconsistent with the EPA's enforcement proceedings. Finally, to eliminate the possibility that EWC will face apparently inconsistent directives from state and federal regulators, the EPA has stipulated that if its third claim is proven, the court should order implementation of the groundwater monitoring plan Indiana recently approved pursuant to the administrative order in Notice of Violation N–128.[11]

Nothing in the referral procedure deprives the court of its subject matter jurisdiction under 42 U.S.C. § 6928. *See United ed States v. Conservation Chemical Co. of Illinois,* 660 F.Supp. at 1244–1245. The court has subject matter jurisdiction over the EPA's third claim.

4. The Fourth Claim: Corrective Action

The EPA's fourth claim is based upon the Administrator's determination that a release has occurred at the Landfill. On June 5, 1987, the Regional Administrator, Valdas Adamkus, sent EWC a Determination of Release of Hazardous Waste into the Environment. (EPA Exh. 12).

Section 6928(h) vests the court with subject matter jurisdiction. Once the Administrator determines that there is or has been a release of hazardous waste into the environment from a hazardous waste disposal facility, the Administrator may commence a civil action in the "United States district court in the district in which the facility is located for appropriate relief ..." 42 U.S.C. § 6928(h)(1). This provision was enacted as part of the 1984 amendments known as HSWA to allow the EPA to seek corrective action for release of hazardous wastes through either an administrative order or court order. *United States v. Clow Water Systems,* 701 F.Supp. 1345 (S.D.Ohio 1988); *see United States v. Indiana Woodtreating Corp.,* 686 F.Supp. 218 (S.D.Ind.1988). The court has subject matter jurisdiction to entertain the allegations of the EPA's fourth claim.

*B. STOP's Failure to Give Notice*

EWC suggests that STOP failed to give timely notice as required of citizen groups by 42 U.S.C. § 6972(b), and that STOP's failure to comply with this provision deprives the court of subject matter jurisdiction over STOP's claims.

---

**10.** The order resolving Notice of Violation N–128 is discussed in detail in Part II–D–2–a of this memorandum.

**11.** On July 28, 1988, Indiana approved the groundwater monitoring plan submitted by Four County Landfill. (EWC Exh. 5, Mot. for Partial Summary Judgment).

### 1. Notice Is Not Jurisdictional in Hazardous Waste Claim

 On July 8, 1987, STOP moved to intervene pursuant to 42 U.S.C. § 6972. The EPA responded by noting that intervention under this statutory provision was inappropriate, but directed STOP to the provisions of 42 U.S.C. § 9613(i). STOP filed an amended motion to intervene pursuant to § 9613(i) on October 21, 1987. The EPA chose not to oppose STOP's intervention as long as STOP introduced no matters extraneous to the claims already before the court. The court granted the amended motion to intervene on November 6, 1987, and STOP's complaint was deemed filed on November 13, 1987; its amended complaint was filed on November 29, 1988. EWC sought dismissal of STOP's claims because those claims exceeded the scope of the EPA's conditional accession to the intervention, but the court found that EWC had no standing to raise that argument. *See United States v. Environmental Waste Control, Inc.*, 698 F.Supp. at 1440–1441. It was not until STOP had completed the first portion of its closing argument that EWC challenged the court's jurisdiction on these grounds in its "Preliminary Tender of Supplementary Authority".[12]

If the notice issue is not jurisdictional, EWC has waived it by failing to raise it in a timely manner. Indeed, if the issue is not jurisdictional, it is doubtful that one could say the issue has been raised at all. No motion has been filed; EWC simply alluded to the issue on the tenth page of their supporting authorities.

If the matter of notice is jurisdictional, however, the indefensible untimeliness of the issue is of no moment. Subject matter jurisdiction may be raised at any stage of the proceedings. *Principal Mutual Life Insurance Co. v. Juntunen*, 838 F.2d 942, 944 (7th Cir.1988). For that matter, it is immaterial that EWC still has filed no motion to dismiss STOP's claims for want of subject matter jurisdiction due to failure to give notice; the court must inquire into its jurisdiction whenever it is called into doubt. *Kanzelberger v. Kanzelberger*, 782 F.2d 774, 777 (7th Cir.1986).

STOP offers a simple answer to this challenge to its participation in this suit: notice is not required for intervention. 42 U.S.C. § 9613(i), under which STOP was permitted to intervene, provides:

> In any action commenced under this chapter or under the Solid Waste Disposal Act [42 U.S.C. § 6901 *et seq.*] in a court of the United States, any person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situated that the disposition may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented by existing parties.

RCRA's intervention provision, 42 U.S.C. § 6972(b)(1), provides that any person may intervene as of right in any action under § 6972(a)(1)(A). Neither § 6972(b)(1) nor § 9613(i) condition intervention on notice to any party by the prospective intervenor. The intervention provision of § 6972(b)(1) is separate from the notice provision, § 6972(b)(1)(A). Because STOP intervened, it contends, *no notice requirement governed it.*

This approach is too facile. Under circumstances not presented here, a citizen group need not give notice before intervention. An intervenor might present no new claims; notice of claims already pending would be a pointless act. STOP's role in this case, however, has exceeded that of a mere intervenor. STOP has presented its own claims and sought relief beyond that sought by the EPA. STOP's additional claims must be viewed more properly as

---

**12.** Midway through the trial, the court informed counsel that, in light of the extensive pretrial briefing already done, the court would not allow the submission of post-trial briefs in lieu of final argument. The court indicated that it would allow counsel to submit lists of citations of authority concerning new issues that had arisen during trial. Because EWC did not file its list of citations of authority until after counsel for the EPA and STOP had completed the opening portion of their final arguments and because EWC's citations raised new issues, the court granted the EPA and STOP leave to address the new material in post-trial submissions.

having been in the nature of a citizen's suit under § 6972(a)(1)(A), which contains certain notice requirements. While STOP should not be penalized for having intervened in an existing enforcement action rather than filing a separate suit, neither may it evade notice requirements by doing so. Accordingly, the court cannot accept STOP's facially attractive argument that it needed to give no notice to participate in this action.

EWC has not specified the notice provision STOP allegedly failed to meet. RCRA contains a provision that conditionally allows citizens to commence an action against "any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). No action may be commenced under § 6972(a)(1)(A) less than sixty days after giving notice to the Administrator, the state in which the alleged violation occurred, and to any alleged violator. The statute contains an important exception, however:

> ... except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subchapter III of this chapter [42 U.S.C. §§ 6921–6934] ...

42 U.S.C. § 6972(b)(1)(A). If the action contains allegations concerning hazardous waste management under 42 U.S.C. §§ 6921–6934, then, the action may be brought immediately after notification to those parties.

STOP's original and amended complaints each alleged violations of 42 U.S.C. § 6928. Accordingly, STOP was not required to give sixty days' notice to the EPA, Indiana, and EWC.[13] STOP was required to give notice before bringing suit, but the statute sets forth no minimum notice period.

The elimination of the sixty-day notice requirement concerning hazardous waste management resulted from the 1984 amendments known as HSWA. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074 (1st Cir.1986) (addressing retroactivity of elimination of sixty-day requirement). No reported decision addresses whether the resultant notice requirement—one that apparently can be satisfied by notice a day or an hour before filing suit—for such cases is a jurisdictional matter or merely a condition precedent to suit. Indeed, the Seventh Circuit has not addressed directly whether any of the notice provisions of § 6972(a)(1)(A) are jurisdictional or merely a condition precedent to suit. In *Highland Park v. Train*, 519 F.2d 681 (7th Cir.1975), *cert. denied* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976), however, the court addressed a virtually identical sixty-day notice provision in the Clean Air Amendments to the National Environmental Protection Act and concluded that the notice requirement is jurisdictional. *See also Evansville v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008 (7th Cir.1979), *cert. denied* 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980) (same result under Federal Water Pollution Control Act). The *Highland Park* court reasoned:

> The legislative history of section 304 shows ... that Congress intended to provide for citizens' suits in a manner that would be least likely to clog already burdened federal courts and most likely to trigger governmental action which would alleviate any need for judicial relief. It was in response to these concerns that the statutory notice provisions were included in section 304. Congress's intention would be frustrated if the statutory mandate of section 304(b) were ignored.

519 F.2d at 690–691 (footnotes omitted). The Ninth Circuit echoed these thoughts twelve years later in holding RCRA's sixty-day notice provision jurisdictional. In *Hallstrom v. Tillamook County*, 844 F.2d 598, 600–601 (9th Cir.1987), *cert. granted,*

---

**13.** The statute might be construed to require one day's notice for claims under 42 U.S.C. §§ 6921–6934, but requires sixty days' notice for claims within the same complaint alleging violations of other RCRA provisions. The court does not so construe the statute. In any event, STOP's notice, discussed in the following subsection of this memorandum, preceded the filing of its intervenor's complaint sufficiently to meet even a sixty day requirement.

— U.S. ——, 109 S.Ct. 1526, 103 L.Ed.2d 832 (1989), the court reasoned that Congress intended to provide a non-adversarial period in which environmental conflicts might be resolved administratively. Litigation, the court held, "should be a last resort only after other efforts have failed." 844 F.2d at 601. *Accord, Walls v. Waste Resource Corp.*, 761 F.2d 311, 317 (6th Cir. 1985) (notice provisions "were intended to give the EPA an opportunity to resolve issues regarding the interpretation of complex environmental standards by negotiation, unhindered by the threat of an impending lawsuit"); *Garcia v. Cecos International, Inc.*, 761 F.2d 76, 81 (1st Cir. 1985) ("Notice from potential private plaintiffs gives the EPA and the state an opportunity to investigate the alleged violation.").

This rationale vanishes, however, when the requisite notice with respect to hazardous waste may be satisfied by notice only a day, or perhaps even an hour, before filing suit. Environmental disputes concerning hazardous waste management are most unlikely to be resolved administratively within a single day. Accordingly, the court concludes that RCRA's notice requirement is not a jurisdictional matter when the alleged violation involves hazardous waste management,[14] and EWC cannot raise the issue at this stage of the proceedings.

2. Adequate Notice Was Given

■■■ In any event, the record before the court discloses that those entitled to notice under the statute had ample notice of the violations undergirding STOP's claims.

In *Hallstrom v. Tillamook County*, 844 F.2d at 600, the Ninth Circuit noted that with respect to RCRA's sixty-day notice provision, the circuits have split between the "pragmatic approach" of the Second, Third, Eighth, and District of Columbia Cir-

cuits, and the "jurisdictional prerequisite approach" of the First, Sixth, Seventh (and now the Ninth) Circuits. The "pragmatic approach" allows post-filing notice. For example, in *Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton*, 644 F.2d 995 (3rd Cir.1981), the district court had allowed notices to be given after the filing of suit and stayed the action until the notices were given and the sixty days had passed. The court, relying on an earlier Third Circuit case approving that practice, *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231 (3rd Cir.1980), *cert. denied* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981), affirmed the district court's action. Similarly, in *O'Leary v. Moyer's Landfill, Inc.*, 523 F.Supp. 642 (E.D.Pa.1981), the court found post-filing notice sufficient when the defendants were not called on to defend the claims until more than sixty days had elapsed from the notice.

The Seventh Circuit's jurisdictional view of the notice requirement would preclude such an approach, but the cases adopting the "jurisdictional" approach under RCRA have addressed only the timing, and not the adequacy, of the notice. *See, e.g., Garcia v. Cecos International, Inc.*, 761 F.2d 76 (plaintiff had amended his complaint after removal to allege RCRA violations; court concluded that § 6972 required notice sixty days before the filing of suit, rather than a delay of sixty days after post-filing amendment); *Highland Park v. Train*, 519 F.2d at 681 (no notice whatsoever).

As to the sufficiency of the notice, the reported cases consistently have found that sufficient notice was given if the requisite parties had "notice-in-fact" of the alleged violations. For example, in *Proffitt v. Commissioners, Township of Bristol*, 754 F.2d 504 (3rd Cir.1985), the plaintiff showed that the county health officials had

---

14. The Ninth Circuit implied such a distinction in *Hallstrom v. Tillamook County*, 844 F.2d 598, 600–601:

Strict application of the [sixty day] notice requirement is supported by an exception within § 6972 which waives the 60 day notice requirement if the alleged violation involves hazardous waste. 42 U.S.C. § 6972. This

provision makes clear that Congress considered the 60–day notice requirement and intended that it apply in all cases, except those involving hazardous waste.

In *Highland Park*, the court noted that the statute at issue there had certain exceptions to the notice requirement, which did not apply to the circumstances of the case. 519 F.2d at 690 n. 3.

reported the alleged violations to the state agency and the EPA, and the plaintiff had visited the EPA and the state agency several times in the months before suit to discuss environmental problems at the defendant's facility. The Third Circuit deemed this "notice-in-fact" sufficient.

In *Fishel v. Westinghouse Electric Corp.*, 617 F.Supp. 1531, 1536 (M.D.Pa. 1985), the defendant contended that it received insufficient notice because the notice did not specify the regulations allegedly violated, the persons responsible for the violations, or the dates of the violations. The court held that the notice, which provided adequate information concerning the nature of the alleged violations, was sufficient. The court also noted that the EPA and the state agency had been investigating such violations at the defendant's facility for several months before the notice. Accordingly, the court refused to dismiss the suit on notice grounds. *See also Brewer v. Ravan*, 680 F.Supp. 1176, 1181 (M.D. Tenn.1988); *Utah State Department of Health v. Ng*, 649 F.Supp. 1102 (D.Utah 1986) (series of letters between the plaintiff state agency and the defendants constituted notice-in-fact to the defendants).

There must be some notice to the defendant and the agencies, and oral notice to some will not suffice. In *Reeger v. Mill Service, Inc.*, 593 F.Supp. 360 (W.D.Pa. 1984), the plaintiffs conceded they had given the defendants no written notice, but argued that nothing more than their oral complaints to the state agency and the EPA should be required because written notice would be useless. The court rejected the argument and dismissed the suit. The plaintiffs in *McCastle v. Rollins Environmental Services*, 514 F.Supp. 936 (M.D. La.1981), do not appear to have realized that their complaint stated claims under RCRA and so had given no pre-filing notice to the EPA or the state. The court held that the complaint's allegations brought it within the scope of RCRA and dismissed the complaint for want of notice. The plaintiffs moved for reconsideration, arguing that the state agency, which acts in the EPA's stead, had received actual notice of the suit three days after the suit was filed.

The court rejected that argument, distinguishing the Third Circuit's "pragmatic approach" cases.

The defendant and the agencies must have actual notice; that they should have known of the alleged violations is insufficient. In *Walls v. Waste Resource Corp.*, 761 F.2d 311 (6th Cir.1985), the plaintiffs had alleged that the defendants, the state, and the EPA had had constructive notice for more than sixty days, but apparently did not explain the basis for that allegation. The court deemed the allegation insufficient to establish actual notice and affirmed the dismissal.

By these standards, all necessary recipients of notice had notice-in-fact of STOP's claims. STOP's motion to intervene was not granted until almost four months after STOP served its proposed complaint on the EPA and EWC. STOP was not a party to the suit during those four months. The EPA and EWC had ample notice of STOP's intended claim through receipt of the proposed complaint nearly four months before it was filed.

To suggest that the state agency did not have notice-in-fact of STOP's claims would be to ignore the record STOP has presented. Much of STOP's case consisted of observations and reports by state inspectors and correspondence between the state agency and EWC concerning violations such as STOP alleges; the state agency even considered intervening in the EPA's suit. (STOP Exh. 50). Indeed, as is discussed in sections that follow, EWC argues that the state agency had addressed or was addressing the very allegations STOP raises here. Indiana, although not served with STOP's proposed intervenor's complaint, had notice-in-fact of the violations STOP asserts.

Accordingly, even if RCRA's minimal notice provision in citizens' suits concerning hazardous waste management is deemed jurisdictional, STOP satisfied its requirements.

### 3. Ancillary Jurisdiction

 Even were the court to hold that STOP failed to satisfy a jurisdictional no-

tice requirement with respect to those of its claims that exceeded the EPA's claims, the court would exercise its ancillary jurisdiction over those claims.

When the right to intervene is absolute, no independent ground of federal jurisdiction need be shown to support the intervention; the intervention is properly regarded as coming within the court's ancillary jurisdiction. 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 24.18[1], at 24–198 (1987).

Section 9613(i) gives STOP the right to intervene if its interest relating to the subject matter of the action is so situated that the disposition of the action may, as a practical matter, impair or impede STOP's ability to protect that interest. No right to intervene exists if the President or the state shows that existing parties adequately represent the intervenor's interest, but § 9613(i) does not require the intervenor to prove the converse. The EPA chose not to object to STOP's intervention and the court placed no conditions upon STOP's intervention.[15] As discussed above, STOP was not required to give pre-filing notice of its claims to the extent those claims did not exceed the scope of the EPA's claims.[16]

STOP's claims consist of alleged additional RCRA violations. RCRA contains no provision for citizen intervention in enforcement proceedings in authorized states. *Middlesex County Board of Chosen Freeholders v. New Jersey Dept. of Environmental Protection*, 645 F.Supp. 715, 719 (D.N.J.1986). In response to the court's inquiry in final argument, counsel were unable to inform the court whether Indiana law allows citizen intervention in such actions. Even if Indiana law provides for such intervention, however, nothing in RCRA or the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, suggests that states may restrict the broad statutory intervention rights of citizens by allowing intervention in state enforcement proceedings.

Accordingly, even if STOP's additional claims were subject to jurisdictional notice provisions of RCRA, dismissal is not required. Through the court's ancillary jurisdiction, matters raised by the case can be adjudicated even if an independent basis for jurisdiction is absent. 7C C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure* § 1917, at 460–461 (1986). The exercise of ancillary jurisdiction promotes judicial economy and fairness. The EPA filed this enforcement action alleging that the defendants violated provisions of RCRA. STOP's additional claims, while different in nature, allege violations of RCRA; according to STOP witnesses, some of those claims have gone unresolved for some time. All alleged RCRA violations are contained in the same lawsuit.

The exercise of ancillary jurisdiction would offend no Congressional purpose. As is discussed above, the notice requirements contained in RCRA exist to afford state and federal administrative agencies the opportunity to address citizens' complaints before federal fora are called upon to act. *Hallstrom v. Tillamook County*, 844 F.2d at 600. The state and federal agencies had ample opportunity to act before STOP intervened; indeed, EWC premises its collateral estoppel argument on the proposition that Indiana already has acted. That the EPA already had instituted this

---

**15.** In *Amoco Oil Company v. Dingwell*, 690 F.Supp. 78, 84 (D.Me.1988), the court held that the conditions for intervention under § 9613(i) are the same as those in Fed.R.Civ.P. 24(a)(2): the motion must be timely; the intervenor must have a significantly protectable interest relating to the subject of the action that might be impaired if the action were decided without their participation; and their interest may be inadequately represented by existing parties. The record reflects that STOP's membership included surrounding property owners who sought permanent closure based on claims that hazard-

ous waste constituents have been released into the environment beyond the Landfill's boundaries. The EPA did not attempt to prove release into the surrounding area and sought no permanent closure.

**16.** The condition that no extraneous claim be raised was placed upon STOP by the ERA in its response to STOP's motion to intervene. Once STOP added further claims, the EPA never objected, so the court never addressed the propriety of the additional claims.

suit demonstrates the EPA's opportunity to act.

With these principles in mind, the court finds subject matter jurisdiction exists over all of STOP's claims.

### C. Primary Jurisdiction

■ EWC argued in its summary judgment motion that the court should invoke the doctrine of primary jurisdiction on the first and third claims of the EPA's amended complaint. EWC argued that the court should accord deference to the Indiana agency's actions against the Landfill because of that agency's technical and extensive experience on the specific issues found in those claims. The court disagreed. *United States v. Environmental Waste Control, Inc.*, 698 F.Supp. at 1439–1440. The court's pretrial ruling only addressed EPA's claims; EWC lodged no primary jurisdiction challenge to STOP's claims until STOP began to present its evidence. EWC objected to the introduction of any evidence related to claims that were subject of ongoing state court or state administrative proceedings. The court deferred ruling on the primary jurisdiction issue, overruled EWC's objections, and allowed STOP's evidence to be introduced.

The doctrine of primary jurisdiction was created by courts and is designed to guide a court in determining whether or when it should refrain from or postpone the exercise of its jurisdiction so that an agency may first determine a question. K. Davis, *Administrative Law Treatise* § 22.1, at 81 (1983). The doctrine usually does nothing more than "allocate power between courts and agencies to make initial determinations", which usually does not affect final determinations. *Id.* at 82.

The term "primary jurisdiction" may be a "verbal coat of too many colors", *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 39, 73 S.Ct. 67, 70, 97 L.Ed. 54 (1952) (Frankfurter, J., dissenting and describing "jurisdiction"), in that it encompasses four major, but distinguishable, doctrines: primary exclusive jurisdiction, true primary jurisdiction, statutory exemptions, and agency immunizations. M. Botein,

*Primary Jurisdiction: The Need for Better Court/Agency Interaction*, 29 Rutgers L.Rev. 867, 868 (1976). "Primary exclusive jurisdiction" deprives the court of all power over a case except the very limited power to review an agency's determination. "True primary jurisdiction" affords an agency the initial opportunity to consider a legal issue or find facts, but the court retains the power to render a judgment. *Id.* EWC's assertions involving EPA's and STOP's claims could only fall, if at all, within the boundaries of these two doctrines.

#### 1. The EPA's Claims

EWC has argued throughout these proceedings that the claims advanced by the EPA's amended complaint were matters that Indiana has addressed or should address. EWC contends that if the court does not withhold judgment on the EPA's claims, the Landfill will be subjected to inconsistent determinations.

At the summary judgment stage, the court held that application of the doctrine of primary jurisdiction was inappropriate in this case. *United States v. Environmental Waste Control, Inc.*, 698 F.Supp. at 1438–1440. The court determined, first, that Indiana was not empowered to resolve the loss of interim status issues presented in the first claim of the EPA's amended complaint; second, that the third claim was an enforcement matter that fell within the provisions of the 1985 Memorandum of Agreement between the EPA and Indiana; and third, that the agency to whose expertise the court would defer is the very agency that initiated this action.

EWC maintains that *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), and *Bradford School Bus Transit, Inc. v. Chicago Transit Authority*, 537 F.2d 943 (7th Cir. 1976), *cert. denied* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977), require the court to withhold judgment on claims that are subject to any past or present state administrative agency actions. EWC has not, however, articulated or cited to any authority indicating that the primary jurisdiction doctrines on which they rely impli-

cate a federal court's deferral to a state administrative agency in an action brought under federal law. Cases cited by EWC do not convince the court that the doctrines so apply. *See Montgomery Environmental Coalition Citizens Coordinating Committee on Friendship Heights v. Washington Suburban Sanitary Commission,* 607 F.2d 378 (D.C.Cir.1979) (court invoked doctrine due to ongoing EPA administrative action involving a NDPES permit that would determine the permit and amount of discharge to be allowed at the defendant's facility); *Clark Oil Co. Inc. v. Texaco, Inc.,* 609 F.Supp. 1373 (D.C.Del.1985) (court stayed Economic Stabilization Act suit against a private defendant to allow Department of Energy to make an initial determination); *Illinois Council on Long Term Care v. Miller,* 579 F.Supp. 1140 (N.D.Ill.1983) (court invoked doctrine to allow the Secretary of Health and Human Services to determine whether amended medicare reimbursement plan formulated by State was adequate and reasonable).

*Far East Conference* held that the issue presented was within the Federal Maritime Board's exclusive jurisdiction and not subject to adjudication by a district court. 342 U.S. at 576–577, 72 S.Ct. at 495–496. *Bradford School Bus Transit* involved a federal agency which had, subsequent to the pending lawsuit, established complaint procedures and remedies for complaints such as the one presented in the action. In *United States v. Conservation Chemical Co. of Illinois,* 660 F.Supp. at 1245, the court addressed the issue briefly, but noted that the state agency had placed its action "on hold" pending the outcome of the federal suit.

Indiana is not authorized to determine the issues raised by the first, second, and fourth claims of the EPA's complaint. No evidence has been submitted to indicate that a state agency has resolved any of those issues or would have any authority to do so. The EPA would not appear to have the authority to resolve the third claim through its own administrative procedures, *Northside Sanitary Landfill, Inc. v. Thomas,* 804 F.2d 371, so deference to the EPA would be pointless on that claim. The Indiana agency could address the third claim administratively (and may feel it did so by referring it to the EPA for enforcement), but this court cannot review the Indiana agency's administrative determinations. Under either true primary jurisdiction or primary exclusive jurisdiction, the court is to retain the power to review the determination of the agency to which the court defers. EWC has advanced no theory under which this court could review the Indiana agency's determinations. EWC has not convinced the court that the doctrines of primary exclusive jurisdiction or true primary jurisdiction should be invoked with respect to the EPA's claims.

### 2. STOP's Claims

At trial, EWC argued for the first time that because Indiana is pursuing or already has resolved all claims independently advanced by STOP, the court should invoke the doctrine of primary jurisdiction in regard to STOP's claims. EWC appears to argue that the state agency has exclusive primary jurisdiction over the matters raised in STOP's amended complaint. As noted above, the court deferred ruling on the issue during trial, overruled the defendants' objections, and admitted evidence on STOP's claims. A different analysis governs this argument because STOP added claims beyond those pressed by the EPA. Nonetheless, the primary jurisdiction doctrines are no more applicable to STOP's claims than to the EPA's claims.

As noted above, STOP intervened in this action pursuant to the 1986 amendments to CERCLA, 42 U.S.C. § 9613(i). STOP could have brought its own action against the defendants in district court under 42 U.S.C. § 6972 because the EPA was not pursuing any action to remedy the additional violations STOP alleges.

In *Middlesex County Board of Chosen Freeholders v. New Jersey,* 645 F.Supp. 715, a citizen group withstood a motion to dismiss an action filed against a state agency and others for alleged ongoing RCRA violations that posed imminent and substantial danger at a landfill site. The *Middlesex* court determined that Congress did

not contemplate that RCRA suits would be brought in state courts, and that the legislative history of RCRA indicated that state proceedings relating to a waste disposal site could proceed simultaneously with a federal citizen suit under RCRA relating to the same site. 645 F.Supp. at 719.

EWC has offered no authority for its proposition that the primary jurisdiction doctrines apply to claims brought by citizen groups in federal court. One court has said that if the primary jurisdiction doctrines apply at all to citizens' claims, it should be invoked "sparingly where it would serve to preempt a citizens' suit". *Merry v. Westinghouse Electric Corp.*, 697 F.Supp. 180, 182 (M.D.Pa.1988). In *Merry*, the plaintiffs brought an action under CERCLA, RCRA, and the Clean Water Act. The defendants urged the court to invoke the doctrine of primary jurisdiction and defer to the EPA for its expertise. The court refused to do so because the EPA's inaction was the catalyst for the citizens' decision to file suit. The court held that when a citizens' group or the federal government brings an enforcement action in a state with permit issuance authority, the primary jurisdiction doctrine should be used with great care. Otherwise, delay by the state or federal government could frustrate the congressional intent of broadened enforcement.

Testimony and exhibits introduced by STOP rang with frustration at the ongoing alleged violations occurring at the Landfill and STOP members' repeated attempts to get Indiana to act; STOP's additional claims would lie within the administrative enforcement authority of Indiana rather than the EPA. *Northside Sanitary Landfill, Inc. v. Thomas*, 804 F.2d 371. As noted above, EWC has provided no authority for the proposition that federal courts should defer to state agencies in suits based on federal law. Further, RCRA and CERCLA granted citizen groups neither administrative enforcement authority nor the right to intervene in state administrative enforcement proceedings. RCRA and CERCLA provided citizen groups only with broad rights to bring their own federal actions and to intervene in federal actions.

To deprive STOP the opportunity to bring its claims in this proceeding would thwart the legislative intent behind the RCRA and CERCLA provisions for citizen intervention; STOP would be foreclosed from the only avenue of relief provided by federal law.

### D. Collateral Estoppel

EWC argues that the doctrines of res judicata and collateral estoppel bar certain of the EPA's claims and all of STOP's additional claims. EWC contends that those claims were resolved in an agreed state administrative order entered into between EWC and the Environmental Board of the State of Indiana in June, 1985, in that agency's Cause N–128.

#### 1. Waiver

■ EWC raised the collateral estoppel defense in its answers to the EPA's amended complaint and STOP's amended complaint. The pretrial order, however, does not appear to have preserved the defense with respect to STOP's claims. At page 35 of the pretrial order, EWC contended,

> EPA is estopped from proceeding with its claim against the Four County Landfill due to prior actions indicating acceptance of the State of Indiana's resolution of claims against the operations of the Four County Landfill.

The pretrial order contains no reference to an estoppel defense with respect to STOP's additional claims; the defense did not reappear as to STOP's claims until EWC filed its supplemental citation of authority during final argument. *See* 6 C. Wright and A. Miller, *Federal Practice and Procedure* § 1526, at 596 (1971) (pre-trial order controls subsequent course of the action and court "need not consider any matter that is not embodied in it").

STOP did not respond to the collateral estoppel argument in its post-trial supplemental response; whether its silence reflects a belief that the issue was waived by its absence from the pretrial order is unclear. In its post-trial supplemental response, the EPA argues that it is not collaterally estopped from litigating specific

groundwater monitoring violations because the agreed administrative order did not address specific groundwater monitoring violations and, further, that the EPA may pursue its own enforcement action in a federal district court despite any agreed administrative order between a party and an authorized state.

Because of counsel's in-trial uncertainties as to whether the pretrial order had been approved, because the collateral estoppel issue properly was raised at least with respect to some of the claims, and because principles of collateral estoppel do not bar the claims in this case in any event, the court declines to hold that EWC has not preserved the collateral estoppel defense.

### 2. Governing Principles

 Once an issue is actually litigated and determined, that determination is conclusive in subsequent suits based on a different cause of action but involving a party or privy to the prior litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). Collateral estoppel bars relitigation of factual questions or mixed questions of law and fact. *See Brown v. Felsen*, 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979).

EWC's collateral estoppel theory is developed incompletely in the record before the court. The court assumes the argument is based on the agreed administrative order in Cause N–128. If EWC relies on other proceedings,[17] it has failed to satisfy its burden of proving the existence of such proceedings. Indiana's Notice of Violation

No. V–209 was admitted into evidence, but all testimony, including that of EWC's chief consultant, indicates that Indiana has taken no final action on that notice. STOP sought to introduce evidence concerning an action pending in the Indiana courts, but EWC successfully excluded those exhibits from evidence.[18]

The fundamental policy underlying the doctrines of res judicata and collateral estoppel is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ..." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Because neither the EPA nor STOP were parties in the state administrative proceeding in Cause N–128 and the claims presented here differ from those presented there, the rules of collateral estoppel, rather than res judicata, govern the preclusion issue in this case.[19] *See Kerr–McGee Chemical Corp. v. Hartigan*, 816 F.2d 1177, 1180 (7th Cir.1987).

The requirements for issue preclusion under collateral estoppel principles have been summarized as follows:

As useful a summary as any may be that issue preclusion arises in a second action on the basis of a prior decision when the same "issue" is involved in both actions; the issue was "actually litigated" in the first action, after a full and fair opportunity for litigation; the issue was "actually decided" in the first action, by a disposition that is sufficiently "final," "on the

---

**17.** In its "Preliminary Tender of Supplemental Authority" filed during closing arguments, EWC cited cases "[i]n support of EWC's contention that EPA and STOP are collaterally estopped or otherwise barred from relitigation of claims that EWC's groundwater monitoring did not meet interim status requirements or other RCRA claims otherwise resolved by other prior proceedings such as Cause N–128." No "other prior proceedings" have been specified.

**18.** STOP sought to introduce a complaint and answer from a pending state suit to prove certain admissions by EWC concerning the Landfill's capacity for more hazardous waste. STOP sought to argue, from inferences supported by other evidence, that the Landfill had exceeded,

or soon would exceed, its permitted capacity. From that, STOP sought to argue that the court should consider, in exercising its equitable discretion in determining the ultimate remedy, that the Landfill could accept only a small amount of hazardous waste in the future. Because EWC's request to increase the permissible capacity presently pends in the state administrative bodies, the court declined to admit the evidence pursuant to Fed.R.Evid. 403; relevancy would depend upon the court's ability to predict the outcome of the state proceedings concerning an increase in capacity.

**19.** Further, the issue of res judicata was not raised in the pretrial order.

merits," and "valid"; it was necessary to decide the issue in disposing of the first action, and—in some decisions—the issue occupied a high position in the logical hierarchy of abstract legal rules applied in the first action; the later litigation is between the same parties or involves nonparties that are subject to the binding effect or benefit of the first action; the role of the issue in the second action was foreseeable in the first action, or it occupies a high position in the logical hierarchy of abstract legal rules applied in the second action; and there are no special considerations of fairness, relative judicial authority, changes of law, or the like, that warrant remission of the ordinary rules of preclusion.

18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4416, at 137–138 (1981) (footnotes omitted).[20] EWC bears the burden of so showing, *United States v. Athlone Industries, Inc.,* 746 F.2d 977, 983 (3rd Cir.1984); Fed. R.Civ.P. 8(c), and has failed to meet that burden with respect to many items.

#### a. Same "Issue"

One claiming collateral estoppel must show, as a threshold matter, that the suit at bar presents the same issue that was resolved in an earlier proceeding. EWC has made no such showing. It does not appear that the administrative order in Cause N–128 would preclude any issues the EPA and STOP present in this action. On close analysis, it is apparent that EWC does not seek protection of the rules of collateral estoppel, but rather seeks immunity from suit by anyone but the State of Indiana based on future violations.

The administrative order in Cause N–128 (STOP Exh. 12) was entered in June, 1985. The order was based upon findings of certain regulatory violations that had occurred at the Landfill; necessarily, those violations occurred before June, 1985. The Indiana agency found that:

(1) EWC had not taken additional groundwater samples to determine whether earlier detections of significant differences in total organic carbon ("TOC") levels between the upgradient and downgradient samples were due to laboratory error (STOP Exh. 12, ¶ 6a) and failed to notify the Regional Administrator in writing of confirmation of such differences (STOP Exh. 12, ¶ 6b), although EWC had achieved compliance with those requirements by the time of the agreed administrative order (STOP Exh. 12, ¶ 6r);

(2) EWC had not satisfied several of the requirements with respect to development of a sufficient groundwater assessment plan pursuant to 40 C.F.R. § 265.93(d)(2) through (5) after notification of significant differences in TOC levels (STOP Exh. 12, ¶ 6c); [21]

(3) EWC had not evaluated groundwater surface elevations as required for a groundwater assessment plan (STOP Exh. 12, ¶ 6d) or described a response to that evaluation (STOP Exh. 12, ¶ 6e);

(4) the closure and post-closure plans submitted by EWC were deficient in several respects (STOP Exh. 12, ¶¶ 6f, 6h, 6i, 6j, 6k, 6l, 6m); [22]

---

**20.** The American Law Institute states the rule more succinctly: "When an issue of fact or law is actually litigated and determined by a valid final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1982).

**21.** Among the shortcomings Indiana found were the failure to provide sufficient information to define the contaminant plume, failure to provide a schedule of implementation, failure to determine the rate, extent or concentrations of migration of hazardous waste or hazardous waste constituents, and failure to implement an assessment plan.

**22.** Among the defects found in the closure plan was the failure to prepare a written estimate of the cost of closing the facility. The state found that the cost estimates were inaccurate in light of the Landfill's calculated design capacity. (STOP Exh. 12, ¶ 6h). EWC also had failed to provide for submission of a plat indicating the locations and dimensions of landfill cells or other disposal areas with respect to permanently surveyed benchmarks. (STOP Exh. 12, ¶ 6k).

(5) EWC had failed show compliance with the requirement of maintenance of a runoff management system capable of collecting and controlling at least the water volume resulting from a 24–hour, 25–year storm, 40 C.F.R. § 265.302(b), and the operation of collection and holding facilities associated with run-on and runoff control, 40 C.F.R. § 265.302(c) (STOP Exh. 12, ¶ 6g), and was not controlling run-on into the working face, 40 C.F.R. § 265.302(a) (STOP Exh. 12, ¶ 6p);

(6) EWC had not kept a sufficient record of manifests of deliveries of hazardous waste to the facility (STOP Exh. 12, ¶ 6n);

(7) EWC had not made available for inspection since October, 1984, the portion of the operating record locating each hazardous waste deposit in the facility as required by 40 C.F.R. § 265.74(a); [23]

(8) cover in the " 'wet/winter' area next to the on-site road at the northwest corner of last year's fill" was insufficient to satisfy 40 C.F.R. § 265.31 (STOP Exh. 12, ¶ 6q).

As a result of these findings, Indiana fined EWC and ordered certain steps to be taken to remedy the violations.

Some of the topics of the claims in this case overlap the types of violations found in the agreed administrative order in Cause N–128: STOP contends that EWC has violated regulations concerning run-on and runoff control, and EWC was found to have violated such regulations in paragraphs 6g and 6p of the agreed order; STOP contends that EWC has violated requirements concerning manifests, and EWC was found to have violated that regulation in paragraph 6n of the agreed order; STOP contends that EWC failed to apply sufficient cover to prevent dispersal into the air and surface water, and EWC was found to have violated that regulation in paragraph 6q of the agreed order; STOP and the EPA argue that EWC has not evaluated adequately the groundwater elevations at the Landfill, and the Indiana

agency found, in paragraph 6d of the agreed order, that EWC had failed to do so.

That the EPA and STOP allege violations of the sort found in the agreed order in Cause N–128 does not, however, preclude the presentation of those issues. To the extent the EPA's claims are similar to issues resolved by the agreed order, the EPA's claims relate to violations that allegedly occurred after the agreed order was entered. The EPA contends that the groundwater elevations at the Landfill were evaluated insufficiently as late as 1988, not just in or before 1985. The June, 1985 administrative order did not address, and could not have addressed, violations occurring after June, 1985. Post–1985 violations simply were not issues in Cause N–128, and the rules of collateral estoppel apply only to issues addressed in the earlier action. *United States v. International Building Co.*, 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953).

EWC essentially argues that as long as it is in compliance with the remedial steps provided by the agreed administrative order (or, perhaps more accurately, as long as Indiana takes no further action based on the violations giving rise to the agreed administrative order), it is absolved from responsibility for later violations, at least at the hands of any party other than Indiana. EWC seeks to expand the doctrine of collateral estoppel into areas heretofore unimagined and, by any definition, illogical. A party found to have violated the law yesterday is not thereby rendered immune as to tomorrow's violations; even an injunctive decree does not abrogate the law so as to forgive tomorrow's violations.

STOP did not confine its evidence to events occurring after June, 1985, although the bulk of its evidence addressed alleged violations occurring after the agreed order. STOP's contentions in the pretrial order are worded broadly, but the court does not understand STOP to be seeking relief for violations occurring before the agreed order. The court views STOP's evidence con-

---

**23.** As is discussed in Part IV–B below, hazardous waste was being placed illegally in unlined cells at the Landfill in June, 1985.

cerning alleged violations before June, 1985 as going to the matter of relief in the event violations are found to have occurred after June, 1985.

When STOP's case is so viewed, it seems that STOP, rather than EWC, is entitled to any benefits of the collateral estoppel rules. Had Indiana found that EWC had not committed certain violations, collateral estoppel principles might preclude STOP from asserting that those violations had occurred.[24] Indiana did not so find, however; Indiana found that EWC had violated regulations concerning runoff and run-on control, manifests and cover. If collateral estoppel applies at all to STOP's claims, it would seem that it should preclude the defendants from denying those violations.

### b. Actual Final Decision on the Merits

One claiming collateral estoppel must show that the previous decision was an actual final decision on the merits of the issue. EWC's showing with respect to Cause N–128 falls short.

First, the agreed order on which EWC relies was entered by a state administrative agency. State law determines the preclusive effect of the state's administrative agencies' determinations or actions. *United States v. Bliss*, 667 F.Supp. 1298, 1307 (E.D.Mo.1987). The Indiana Supreme Court has approved four criteria for use in determining whether an administrative determination should estop subsequent litigation: (1) whether the issues sought to be estopped were within the agency's statutory jurisdiction; (2) whether the agency acted in a judicial capacity; (3) whether both parties had a fair opportunity to litigate the issues; and (4) whether the decision of the administrative tribunal could be appealed to a judicial tribunal. *McClanahan v. Remington Freight Lines*, 517 N.E. 2d 390, 394 (Ind.1988).

As noted in Part II–A–1 of this memorandum, issues created by the 1984 amendments to RCRA were not within the state agency's jurisdiction; accordingly, the state agency's determination cannot estop EPA's and STOP's claims based on those amendments. As noted in the preceding paragraphs, the parties cannot be deemed to have had a fair opportunity to litigate alleged violations that had not yet occurred. Finally, EWC has made no showing as to whether the agency's decision could be appealed to a judicial tribunal.

Further, the agency's decision was an agreed order, which EWC describes as a consent decree. Consent decrees, which reflect both a contract between the parties and the exercise of judicial power, are not treated as judicial decrees for all purposes. *Local No. 93, International Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519, 525, 106 S.Ct. 3063, 3074, 3077, 92 L.Ed.2d 405 (1986). A court accepting a consent decree need not decide the merits of the action, *Kaspar v. Board of Election Commissioners of Chicago*, 814 F.2d 332, 338 (7th Cir.1987), and may award relief against a party that admits no wrongdoing. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975). Indeed, parties' compromises may produce a consent decree specifically intended to avoid litigation of the issues presented by the case. *See United States v. Armour & Co.*, 402 U.S. 673, 681–682, 91 S.Ct. 1752, 1757– 1758, 29 L.Ed.2d 256 (1971); *Kasper Wire Works, Inc. v. LECO Engineering & Machine, Inc.*, 575 F.2d 530, 539 (5th Cir. 1978). Because such an approach produces the antithesis of findings reached after a full and fair opportunity to litigate the issue to be precluded, special rules govern the applicability of collateral estoppel rules to consent decrees.

Indiana's courts do not appear to have considered the preclusion effect of a consent decree in more than a century. *See Fletcher v. Holmes*, 25 Ind. 458 (1865) (consent decree valid although facts would not

---

24. Collateral estoppel precludes only issues that actually were litigated in the earlier proceeding. *Brubaker v. King*, 505 F.2d 534, 538 (7th Cir. 1974). Accordingly, the court need not consider whether Indiana might have considered and re- jected other alleged violations by EWC. The agreed administrative order itself reflects none, and the defendants have presented no other evidence indicating that EWC prevailed on any issue.

support judgment). Under the modern view of the law, however, a consent decree generally is treated as a final judgment on the merits and accorded res judicata effect. *United States v. Fisher,* 864 F.2d 434, 439 (7th Cir.1988); *United States v. Athlone Industries, Inc.,* 746 F.2d at 983 n. 5 (3rd Cir.1984). *Amalgamated Sugar Co. v. NL Industries, Inc.,* 825 F.2d 634, 639 (2nd Cir.1987), a case cited by EWC, so holds, but that case dealt with claim preclusion, not issue preclusion. In most circumstances, however, consent agreements are intended to preclude further litigation only on the claim presented, not on any of the issues presented. 18 C. Wright, A. Miller and E. Cooper, *Federal Practice and Procedure* § 4443, at 385 (1981). The Restatement states that,

> In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, [collateral estoppel rules do] not apply with respect to any issue in a subsequent action. The judgment may be conclusive, however, with respect to one or more issues, if the parties have entered an agreement manifesting such an intention.

Restatement (Second) of Judgments § 27, comment e (1982). A leading treatise states that consent judgments are res judicata to causes of action contained therein, but should not be given conclusive effect under the doctrine of collateral estoppel unless it was the parties' specific intent to do so. 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* ¶ 0.443[3] (1988).

The parties' intent with respect to the agreed administrative order in Cause N–128 is not easily ascertained. Paragraph 19 of the order provides, "This Agreed Order will have no force or effect until it is approved by the Board, and timely compliance with the terms of this Agreed Order shall constitute a final resolution of this cause." Assuming that some future preclusion was intended—an assumption not easily made in light of that language—evidence introduced at trial indicates that EWC did not come into compliance with the terms of paragraph 3 of the order until sometime in 1988, well after institution of this suit. The evidence introduced at trial indicates nothing with respect to compliance with paragraphs 5–8 of the order.

For all of the foregoing reasons, the court concludes that EWC has made an insufficient showing that the agreed administrative order in Cause N–128 constitutes the type of actual final decision on the merits required for issue preclusion.

*c. Nonparties Subject to Binding Effect of First Action*

As noted above, one claiming the benefit of collateral estoppel must show that "the later litigation is between the same parties or involves nonparties that are subject to the binding effect or benefit of the first action ..." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4416, at 138 (1981). EWC relies upon cases that have adopted the emerging rule that a non-party may be bound by an earlier judgment if a party to the earlier litigation is so closely aligned with its interests as to be its "virtual representative". *United States v. ITT Rayonier, Inc.,* 627 F.2d 996, 1003 (9th Cir.1980); *Nether Providence–Swarthmore Alliance of Civil Associates, Inc. v. Quinby,* 1988 WL 75973, 1988 U.S. Dist. LEXIS 7348 (E.D.Pa.1988); *Sierra Club v. Block,* 576 F.Supp. 959 (D.Ore.1983); *cf.* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4457 (1981) (criticizing the emerging rule). The EPA seeks to meet the argument head on, citing district court cases holding that a state consent order does not bar the EPA from seeking federal relief for the same violations. *United States v. Town of Lowell,* 637 F.Supp. 254 (N.D.Ind.1985); *United States v. Cargill, Inc.,* 508 F.Supp. 734 (D.Del.1981). As noted above, STOP did not respond to EWC's closing arguments on collateral estoppel.

The court need not determine whether the Indiana agency was the "virtual representative" of the EPA or STOP. A federal court must give a state court judgment (assuming the order in Cause N–128 to be such) the same preclusive effect it would receive in the courts of the state in which it

was rendered; accordingly, the court must examine Indiana law to determine the preclusive effect of the order in Cause N–128. 28 U.S.C. § 1738; *Migra v. Warren City School Dist. Bd. of Education,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415–416, 66 L.Ed.2d 308 (1980); *Morris v. Spratt,* 768 F.2d 879, 882 (7th Cir.1985); *Hurt v. Pullman, Inc.,* 764 F.2d 1443, 1447 n. 4 (11th Cir.1985); *Russell v. United States,* 626 F.Supp. 1217, 1220 (S.D.Ind. 1986).

Indiana's courts have specifically declined to adopt any modification to the traditional rules requiring identity of parties for collateral estoppel purposes. *Burtrum v. Wheeler,* 440 N.E.2d 1147, 1153 (Ind.Ct. App.1982); *State v. Speidel,* 181 Ind.App. 448, 392 N.E.2d 1172, 1176 n. 4 (1979). The "virtual representative" test upon which EWC relies simply is not a part of Indiana law. The *Speidel* court explained that a plea of collateral estoppel under Indiana law rule is binding only on parties to the action and persons in privity with them and explained that a "privy" is one who acquires an interest in the subject matter of a judgment through or under one of the parties, such as by inheritance, succession, or purchase, and one tied to a party through that party's legal representative capacity as, for example, trustee, executor, administrator, guardian, conservator, or similar fiduciary. *State v. Speidel,* 392 N.E.2d at 1176–1177 and n. 5. STOP has not acquired any interest in the Indiana agency's "judgment" against EWC, and the Indiana agency did not act as STOP's fiduciary in the administrative proceeding.

The EPA might be deemed a party to the state administrative action under Indiana's collateral estoppel rules by virtue of 42 U.S.C. § 6926(d), which provides, "Any action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator under this subchapter." Arguably, the Indiana agency acted as the EPA's legal represent-

ative as a matter of law. Because the EPA alleges violations outside the state agency's jurisdiction or that occurred after the agreed administrative order, however, the court need not resolve that issue.

### 3. Conclusion

For the foregoing reasons, the court concludes that EWC has failed to demonstrate that principles of collateral estoppel preclude any of the issues raised by the claims made by the EPA and STOP.

### III. THE LANDFILL'S OWNERS AND OPERATORS

■ Having determined that no jurisdictional impediment prevents this suit, the court next must determine which defendants properly may be held to answer the claims. The pertinent provisions of RCRA apply to "owners" and "operators" of hazardous waste storage sites. 40 C.F.R. § 260.10 defines the terms:

> "Operator" means the person responsible for the overall operation of a facility.
>
> "Owner" means the person who owns a facility or part of a facility.

Environmental Waste, Mr. Shambaugh, Mr. Wilkins, and West Holding Company each are a "person" within the meaning of 42 U.S.C. § 6903(15) and 40 C.F.R. § 260.10.

The EPA's second amended complaint sought to hold Environmental Waste responsible as the Landfill's operator and Mr. Wilkins responsible as the facility's owner, and the court has found them to be so responsible. *United States v. Environmental Waste Control, Inc.,* 698 F.Supp. at 1430. EWC's contentions in the pretrial order indicate a denial that Mr. Wilkins is an owner or operator (Pretrial order, at 17–18, ¶ 5), but the court already ruled to the contrary in the summary judgment order. EWC has offered no new evidence or argument to challenge that holding. The EPA also seeks to hold West Holding Company responsible as the facility's owner, and West plainly acquired that status through Mr. Wilkins' conveyance of the property to West. The EPA seeks to hold Mr. Shambaugh responsible as the Land-

fill's operator, and Mr. Shambaugh denies that he is an operator of the Landfill.

Mr. Shambaugh renews his earlier argument that there can be but one operator of a facility under RCRA. He notes that 40 C.F.R. § 260.10 speaks of *"the* person responsible ..." From this, he concludes that a facility can have no more than one operator and Environmental Waste, not he, is that person with respect to the Landfill. He cannot be held liable merely as a corporate officer of the operator. If injunctive relief is granted, only Environmental Waste, not he, can comply with the order. He notes that no other court has held that a facility can have more than one operator for purposes of RCRA.

Mr. Shambaugh moved for summary judgment on these grounds, and the court rejected them. *United States v. Environmental Waste Control, Inc.,* 698 F.Supp. at 1429–1430. Mr. Shambaugh has presented no further argument that persuades the court that the earlier entry was wrong. While Mr. Shambaugh correctly notes that no other court has held that a facility can have more than one operator for RCRA purposes, neither does he cite any contrary holding. Mr. Shambaugh does not appear to dispute that Mr. Wilkins was an owner, and thus subject to injunctive relief under RCRA, when he owned the land upon which the Landfill was located; like Mr. Shambaugh, Mr. Wilkins could not alone comply with an injunction requiring, for example, the installation of additional groundwater monitoring wells. The court stands by, and adopts, the reasoning set forth in the summary judgment ruling:

> ... it is difficult to believe that if three persons operated a hazardous waste facility as a joint venture on property owned by four other persons, only two of the persons (one as an owner, another as an operator) could be liable for civil penalties under Section 3008 of RCRA. Not every act will render a person an operator, but the court is unpersuaded that no more than one person may be an operator with respect to a given hazardous waste facility.

698 F.Supp. at 1429.

While holding, on the summary judgment motions, that the Landfill could have more than one operator for purposes of RCRA, the court declined to grant the EPA's summary judgment motion seeking a declaration that Mr. Shambaugh was an operator of the Landfill. That holding awaited resolution in light of the evidence at trial. That evidence convinces the court that if any facility can have more than one operator, the EPA and STOP have shown Mr. Shambaugh to be an operator of the Four County Landfill.

The government places its initial reliance upon the November 7, 1985 certificate of compliance to the EPA made necessary by 42 U.S.C. § 6925(e)(2). Mr. Shambaugh signed that certificate below the two certifications identifying him as "operator of Four County Landfill ..." (EPA Exh. 70). Michael Johnson, a consultant employed by Environmental Waste who prepared the certification, testified that the description of Mr. Shambaugh as operator was simply his mistake, and Mr. Shambaugh testified that he signed that certification in his representative capacity as President of Environmental Waste, but such a limitation appears nowhere on the certification.

It would seem inappropriate to hold a person potentially liable for millions of dollars in civil penalties and corrective actions based on nothing more than a failure to identify one's signature as being in a representative capacity. The record before the court, however, provides considerably more evidence that Mr. Shambaugh is, and always has been, an operator of the Landfill within the meaning of RCRA.

First, the November 7, 1985 certification itself presents more than a mere omission of Mr. Shambaugh's representative capacity. It affirmatively identifies Mr. Shambaugh in three places as the operator of the Landfill: in addition to the two certification statements, the first paragraph under "FACILITY INFORMATION" states, "Name of Facility Owner/Operator: James A. Wilkins, as owner; Stephen W. Shambaugh, as operator." More tellingly, the certification, which was required to be filed on the Landfill's behalf to preserve its in-

terim status, makes no reference to any role of Environmental Waste apart from providing the letterhead for the certification.

When Mr. Wilkins conveyed a leasehold interest in the land on which the Landfill is located, he leased it to Mr. Shambaugh and Mr. Johnson. Mr. Shambaugh executed the lease in his own name, not in any representative capacity, and conceded that he was personally liable under the lease (EPA Exh. 17, ¶ 8). The lease anticipated assignment to Environmental Waste, but provided that such assignment would not release Mr. Shambaugh from his obligations under the lease.[25] In 1985, when Mr. Johnson sought to disassociate himself from the Landfill,[26] he conveyed his interest in the Wilkins lease to Mr. Shambaugh in exchange for Mr. Shambaugh's personal guarantee of Environmental Waste's contractual payments to Mr. Johnson and personal promise to perform all of Mr. Johnson's obligations under the lease (EPA Exh. 18).

Mr. Shambaugh testified that he and Mr. Wilkins have exercised co-equal control over the Landfill, to which he now devotes all of his business time. Mr. Shambaugh testified in his deposition that he could think of nothing Mr. Wilkins does at the Landfill that he does not also do.[27] Mr. Shambaugh and Mr. Wilkins each are paid $200,000 per year for their work with the Landfill. At trial, Mr. Shambaugh testified that he and Mr. Wilkins jointly decide on who the Landfill will hire; Mr. Shambaugh personally has principal say in selecting consultants, accepting or rejecting their advice, purchasing equipment, and deciding whether improvements will be carried out; he devotes all of his business time to the operation of the Landfill and spends five to six hours a day, four days a week there. When funds were short in 1985, Mr. Shambaugh operated heavy equipment at the Landfill. Mr. Shambaugh personally was a named insured on the Landfill insurance policy in effect on November 7, 1985.

Further, Mr. Shambaugh personally guaranteed an open-ended loan to Environmental Waste from Resources Unlimited, Inc. That loan began at $250,000 with all payments deferred for two years; the balance now is approximately $300,000, but has been as high as $1,000,000. Through that loan agreement, which was to last twelve years, Resources Unlimited also became the Landfill's exclusive broker for waste, became entitled to a twenty percent commission, obtained the right to deposit its own hazardous waste at the Landfill at

---

**25.** Paragraph 8 of the lease provided:

8. That Lessees shall have the right to assign this lease to ENVIRONMENTAL WASTE CONTROL, INC., an Indiana corporation, but that notice of any such assignment shall be rendered to Lessor and the names of officers, directors and shareholders of said corporation shall be made known to Lessor and that despite any assignment, the covenants foregoing shall continue to be binding on the said DOUGLAS M. JOHNSON and STEPHEN K. SHAMBAUGH.

EPA Exh. 17.

**26.** EPA Exhibit 19, the agreement whereby Mr. Johnson surrendered his EWC stock to EWC, recited, *inter alia:*

WHEREAS, Johnson is employed by the Corporation and has been so employed for numerous years, and;

WHEREAS, Johnson is a stockholder in said Corporation, and;

WHEREAS, the Corporation has experienced a substantial reduction in its volume of business, and;

WHEREAS, EWC is unable to meet various site standards imposed by the Indiana Environmental Control Board and by the EPA, a Federal agency, upon hazardous waste businesses, and;

WHEREAS, the Corporation cannot meet all of its salary and operating expense obligations, and;

WHEREAS, Johnson wishes to discharge his obligation to the Corporation, and to minimize his personal responsibility in connection with the legal obligations imposed by the State of Indiana and the Federal Environmental Protection Agency ...

Mr. Johnson, apparently on the same day he surrendered his shares of stock to Environmental Waste, also assigned the shares to Mr. Shambaugh by way of a handwritten instrument providing, "Because of the potential liability of the stock ownership and the unsure future operation of E.W.C., Inc. a value of One Dollar ($1.00) has been placed upon this transfer of rights and shares of stock." EPA Exh. 20.

**27.** Doyle Flory, the Landfill's field superintendent, also so testified in his deposition, although he was able to think of things at trial that Mr. Shambaugh does not do.

reduced rates, and received a right of first refusal should the Landfill be sold, with a right to share the proceeds of any sale to a third party in excess of $8,000,000. Mr. Shambaugh, with Mr. Wilkins, personally agreed to hold harmless and indemnify Resource Unlimited in the event the Landfill is placed on the "Superfund" list or given a clean-up order.[28]

Mr. Shambaugh has been more involved in the Landfill's day-to-day operation, finances, and operation than has any other person. He has personally guaranteed its leases, its obligations under those leases, and its loans. He controls, with Mr. Wilkins,[29] the Landfill's operation. He is an operator of the Four County Landfill for purposes of the enforcement provisions of RCRA.

## IV. THE EPA'S CLAIMS: LIABILITY

As noted above, the EPA makes four claims for relief; the first of those claims has two bases. STOP also raises nine additional claims. Because most of those claims invoke the court's equitable discretion in determining the penalties to be imposed if violations are found, the court first addresses the violations that the EPA and STOP allege and then turns to the issue of penalty.

### A. Loss of Interim Status

The EPA's argument that the Landfill lost its interim status on November 8, 1985 begins with the 1984 Hazardous and Solid Waste Amendments to RCRA, which added restrictions designed to minimize further land disposal of hazardous wastes and to address problems at existing land disposal

sites. 130 Cong.Rec. S13818–13819; 130 Cong.Rec. H11130–11142. The 1984 amendments added the following provision:

In the case of each land disposal facility which has been granted interim status under this subsection before November 8, 1984, interim status shall terminate on the date twelve months after November 8, 1984, unless the owner or operator of such facility—

(A) applies for a final determination regarding the issuance of a permit under subsection (c) of this section for such facility before the date twelve months after November 8, 1984; and

(B) certifies that such facility is in compliance with all applicable ground water monitoring and financial responsibility requirements.

42 U.S.C. § 6925(e)(2). A land disposal facility that has neither interim status nor a final permit may not operate. *Vineland Chemical Co. v. United States Environmental Protection Agency*, 810 F.2d 402 (3rd Cir.1987).

The parties do not dispute that EWC applied in a timely manner for final determination of its permit application and filed a certificate of compliance with applicable groundwater monitoring and financial responsibility requirements. The EPA contends, however, that the certificate of compliance was false on both counts and hence a nullity. Accordingly, the EPA contends, the Landfill's interim status terminated on November 8, 1985 (twelve months after the date stated in the statute) and, because the Landfill has no final permit, the Landfill cannot operate. EWC denies that its certification was false and contends that, in any

---

28. STOP elicited evidence that Resources Unlimited is owned by an entity known as The Heritage Group, which also owns EMS Laboratories, a firm that EWC retains for its chemical analyses. STOP appeared to seek an inference that EMS Laboratories' work for EWC was suspect because of this connection. The EPA also contracts with EMS Laboratories for chemical analyses, however. The court has not drawn the inference STOP appears to seek, and finds no unreliability in EMS reports as a result of its indirect ties to the Landfill.

29. EWC notes that despite Mr. Wilkins' involvement in the Landfill's operation, the EPA has

not alleged or argued that Mr. Wilkins is an operator; EWC appears to believe that this somehow undercuts the EPA's contention that Mr. Shambaugh is an operator: "Such selective application of the law is fast becoming an EPA trademark in this case, and bespeaks the real lack of substance of their claim." Defendants' Trial Brief, at 86. EWC's argument does not explain why, if Mr. Wilkins already is on the RCRA hook as an owner, the EPA should waste further judicial resources in trying to prove him an operator as well.

event, the filing of a certification in good faith satisfies the statute.

State and federal authorities have denied EWC's Part B application for a final permit; EWC is in the process of appealing those denials. A facility may continue to operate under its interim status (if any) during the pendency of such an appeal. The propriety of the denial of EWC's Part B application is not in issue in this case. The proceedings with respect to that application are pertinent only insofar as they disclose that the Landfill has no final permit. Accordingly, if the Landfill lacks interim status, it has no basis to continue operation.

### 1. Certification vs. Compliance

At final argument, EWC argued that 42 U.S.C. § 6925(e)(2) requires only certification of compliance, not compliance itself. EWC certified its compliance in a timely manner and contends it did so in good faith. Accordingly, EWC argues that even if it was not in actual compliance with financial responsibility and groundwater monitoring requirements, its certification of compliance precluded loss of interim status under § 6925(e)(2).

Even before November 8, 1985, the EPA adopted the position that § 6925(e)(2) required both compliance and certification. 50 Fed.Reg. 38,946–49 (Sept. 25, 1985) (EPA Exh. 73). When engaging in statutory construction, a court shows great deference to the interpretation of the agency responsible for its administration, *Environmental Protection Agency v. National Crushed Stone Association*, 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980), as long as the agency's interpretation is reasonable and does not conflict with expressed Congressional intent. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 463, 88 L.Ed.2d 419 (1985). The EPA's interpretation is reasonable. *See Vineland Chemical Co. v. United States Environmental Protection Agency*, 810 F.2d at

409. If EWC is correct, Congress simply intended to flood the EPA with meaningless certifications and not to assure compliance with regulations governing hazardous waste.

42 U.S.C. § 6925(e)(2) required facilities such as the Landfill to be in compliance with applicable financial responsibility and groundwater monitoring requirements by November 8, 1985. If the Landfill was not in such compliance on that date, its certification to the contrary did not satisfy the statutory requirement.

### 2. Insurance Coverage

On November 7, 1985, when Environmental Waste, Mr. Wilkins, and Mr. Shambaugh certified compliance with applicable interim status financial responsibility requirements, they were insured under a policy issued by St. Paul Surplus Lines Insurance Company ("St. Paul") covering the period from June 28, 1985 to June 28, 1986. St. Paul issued a certificate intended to show the defendants' (other than West, of course, which did not then exist) compliance with those interim status requirements as of November 8, 1985. That certificate stated, as did the policy's declarations page, that coverage was provided for both sudden accidental and non-sudden accidental occurrences in the amount of $3,000,000 per occurrence and $6,000,000 annual aggregate.[30]

The EPA contends that regulations in effect on November 8, 1985 required insurance for both sudden and non-sudden occurrences. EWC was required to obtain insurance against sudden occurrences in the amount of $1,000,000 per occurrence with an annual aggregate of at least $2,000,000. 40 C.F.R. § 265.147(a). EWC was required to obtain insurance against non-sudden occurrences in the amount of $3,000,000 per occurrence with an annual aggregate of $6,000,000. 40 C.F.R. § 265.147(b). In all, then, EWC was required to obtain insurance against a total of $8,000,000 for sudden and non-sudden

---

**30.** At trial, the EPA also argued that the policy failed to satisfy regulatory requirements because it expressly excluded fire and explosion from coverage for sudden accidental occurrenc-

es. Because this issue was not raised in the pretrial order, however, the court declines to address it.

occurrences. EWC's St. Paul policy fell $2,000,000 short.

EWC raises several arguments in opposition to this claim. It contends that the policy conformed even with the regulations as interpreted by EPA; that the regulations did not clearly require insurance in excess of $6,000,000; that the EPA is estopped from enforcing that regulation against EWC; and that it acted in good faith in attempting to comply with the regulations. EWC also argues that it had adequate insurance before this suit was brought and that there is no precedent for loss of interim status under the circumstances of this case.

### a. Developments After November 8, 1985

EWC notes that its insurance policies since June 28, 1986 have provided adequate policy limits; the EPA and STOP so stipulated. EWC has not articulated precisely where it believes this argument leads, however. The court must determine the adequacy of the Landfill's insurance coverage as of November 8, 1985. Insurance coverage after the date made critical by the 1984 amendments known as HSWA is irrelevant to determination of the truthfulness of EWC's November 7, 1985 certificate of compliance.

EWC also contends that no claim was made on the St. Paul policy between November 7, 1985 (the date of the certification) and June 28, 1986 (the last date of the allegedly insufficient coverage) and that, accordingly, no damage has resulted from any inadequate insurance coverage. Again, however, it is unclear where EWC believes this argument should lead. The 1984 amendments required owners and operators to certify compliance with financial assurance requirements, not to survive a period of underinsurance. Accordingly, while EWC did not specifically limit this argument to the issue of penalty, the court will so view it and defer further discussion to Part VI of this opinion.

### b. Extent of the Landfill's Actual Coverage

As is discussed below, EWC disputes that applicable regulations required an aggregate $8,000,000 in insurance coverage in November, 1985. EWC also contends, however, that even if the regulations did so require, its insurance coverage satisfied the regulations.

#### (1) Endorsement 3

 Item VI of the Declarations Page of the St. Paul policy defined the limits of liability as $3,000,000 for any one claim and $6,000,000 aggregate for the policy period or annual period, whichever is shorter. Section VI of the body of the policy incorporated Item VI of the Declarations Page. EWC, however, points to Endorsement 3 to the policy, effective June 28, 1985, which provided as follows:

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS AGREED THAT THE INSURER WILL ISSUE CERTIFICATE(S) OF LIABILITY INSURANCE ATTESTING TO THE INSURED'S COMPLIANCE WITH LOCAL, STATE OR FEDERAL ENVIRONMENTAL FINANCIAL RESPONSIBILITY OBLIGATIONS.

IT IS FURTHER AGREED THAT:

1. THE ISSUANCE OF SUCH CERTIFICATES SHALL IN NO WAY BE INTERPRETED TO MODIFY THE TERMS, CONDITIONS AND OBLIGATIONS BETWEEN THE INSURED AND THE INSURER UNDER THIS POLICY.

2. THE INSURED SHALL REIMBURSE THE COMPANY FOR ANY AND ALL AMOUNTS ASSESSED AGAINST, INCURRED BY OR PAID BY THE COMPANY ON BEHALF OF THE INSURED:

A. UP TO AND INCLUDING THE AMOUNT OF DEDUCTIBLE AS STATED IN ITEM VII OF THE POLICY DECLARATIONS AND/OR

B. WHICH DO NOT FALL WITHIN THE COVERAGES AFFORDED BY THE POLICY, TO WHICH THIS ENDORSEMENT FORMS A PART.

3. AS RESPECTS THE LIMIT OF LIABILITY STATED IN ITEM VI OF THE POLICY DECLARATIONS:

A. WHEN A CERTIFICATE(S) OF LIABILITY INSURANCE IS/ARE ISSUED, THE LIMITS OF LIABILITY STATED THEREIN FOR EACH OCCURRENCE/ANNUAL AGGREGATE SHALL BE AVAILABLE UNDER THIS POLICY FOR COVERAGE OF ENVIRONMENTAL IMPAIRMENT LIABILITY IN ACCORDANCE WITH THE APPLICABLE LOCAL, STATE OR FEDERAL ENVIRONMENTAL FINANCIAL RESPONSIBILITY OBLIGATIONS AND WILL NOT BE AVAILABLE FOR OTHER COVERAGES AFFORDED BY THIS POLICY. HOWEVER, THE TOTAL LIMITS OF LIABILITY AS STATED IN ITEM VI OF THE POLICY DECLARATIONS ARE APPLICABLE TO ALL COVERAGES AFFORDED UNDER THE POLICY AND ARE THE MAXIMUM LIMITS AVAILABLE TO THE INSURED UNDER THIS POLICY.

EPA Exh. 5.

EWC reasons that if the law required any insurance in excess of that provided by the original St. Paul policy, Endorsement 3 provided it. EWC relies principally upon *Winecoff v. Nationwide Mutual Ins. Co.*, 223 Tenn. 267, 444 S.W.2d 84 (1969), in which an automobile insurance policy carried language similar to that found in Endorsement 3 to the St. Paul policy:

This policy does not comply with motorists' financial responsibility laws of your state unless there is a premium charge shown for Coverages C(1) and C(2).

\*　　\*　　\*　　\*　　\*　　\*

The limits of the Company's liability under Coverages C(1) and C(2) shall comply with the limits of liability required under any applicable motor vehicle financial responsibility law.

When certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this Policy under Coverages C(1) and C(2) shall comply with the provi-

sions of such law to the extent of the coverage required by such law.

During the pendency of his coverage, the insured moved from North Carolina, which required insurance of at least $5,000, to Tennessee, which required insurance of at least $10,000. The Tennessee Supreme Court interpreted the policy to provide coverage up to $10,000, holding that any contrary interpretation would conflict with the policy's provision that the coverage complies with the limits required by Tennessee law.

The St. Paul policy, however, differs in four important respects from the policy involved in *Winecoff.* First, the main text of Endorsement 3 does not state that the policy coverage "shall conform" with regulatory requirements, but rather that the insurer would issue a certificate attesting to compliance. Second, the first clause following that text explicitly provides, "The issuance of such certificates shall in no way be interpreted to modify the terms, conditions and obligations between the insured and the insurer under this policy." Third, Endorsement 3 closes with the provision:

However, the total limits of liability as stated in Item VI of the Policy Declarations are applicable to all coverages afforded under the policy and are the maximum limits available to the insured under this policy.

Finally, St. Paul filed a certificate of liability insurance for EWC that recited, "The coverage ... for *sudden accidental occurrences and non-sudden accidental occurrences.* The limits of liability are *$3,000,000 each occurrence, $6,000,000 annual aggregate* exclusive of legal defense costs." Government's Exh. 43 (underlining in original). If anyone intended Endorsement 3 to increase the policy's coverage by a third, it seems to have escaped St. Paul's attention. Endorsement 3 simply obligated St. Paul to issue the certificates of liability insurance attesting to EWC's compliance with financial responsibility obligations. It did not affect the amount of coverage.

### (2) Coverage under Other Policies

EWC made two efforts during the trial to prove that coverage provided by other insurance policies, combined with the St. Paul policy, was sufficient to meet even the EPA's construction of the regulatory requirements.

#### (a) The Pacific Policy

During trial, the court sustained an objection to the admission of one of the policies, which had been issued by Pacific Insurance Company. EWC sought to introduce the Pacific policy on the twenty-eighth day of trial. EWC contended that the Pacific policy, which covered an earlier period, remained in effect due to the insurer's failure to give notice, required by regulations, of the policy's terminations. Following a period of research made brief by the untimeliness of the issue's presentation, the court sustained the objection of the EPA and STOP that the exhibit was irrelevant in light of Part VII–E of the St. Paul policy. The EPA and STOP also complained that the tardiness of the offer prevented them from presenting opposing evidence. The matter of that policy lingers, however, and the court must address it again.

First, in its tender of supplemental authority submitted during final argument, EWC cited four cases "[i]n support of EWC's argument that non-termination of Pacific Indemnity's 1982–1983 policy should be considered by this Court in evaluating EWC's compliance with RCRA financial assurance regulations." Defendants' Preliminary Tender of Supplemental Authority, at 8. The court excluded the exhibit upon which the argument in the defendants' supplemental authority is based. Final argument is an opportunity to discuss the evidence in the case. It is not an occasion for re-arguing the admissibility of evidence; that opportunity was presented to EWC at the time of the offer of the exhibit. EWC did not then cite the cases to which it referred in its supplemental authority.

Three weeks after the trial, EWC filed a "Motion for Reconsideration/Motion for Summary Judgment" asking the court to reconsider its ruling excluding the Pacific policy, admit the policy into evidence, and grant summary judgment to EWC on the basis of that policy and the additional evidence indicating lack of notice of cancellation. The court denied that motion, reserving its statement of reasons to this memorandum.

A post-trial summary judgment motion simply is untimely. *See Williams v. Howard Johnson's, Inc.,* 323 F.2d 102 (4th Cir.1963). One can only wonder what course would be appropriate were a post-trial summary judgment motion deemed timely and a genuine issue of material fact found to exist.

EWC cites no authority for the motion to reconsider, rendering it difficult to identify the standard by which timeliness is to be measured. The appropriate starting place for the timeliness of an evidentiary issue, however, would seem to be Fed.R.Evid. 103(a), which requires, at the least, that arguments for admission of evidence be made before or during, and not after, the trial. *See Evanston Bank v. Brink's, Inc.,* 853 F.2d 512, 516 n. 6 (7th Cir.1988); *Young v. Rabideau,* 821 F.2d 373, 375 (7th Cir.), *cert. denied* —— U.S. ——, 108 S.Ct. 263, 98 L.Ed.2d 221 (1987); *Huff v. White Motor Corp.,* 609 F.2d 286, 290 n. 2 (7th Cir.1979). The court invited citation of authority when the evidence was offered during trial, and the defense failed to offer the authorities now cited. *See Wright v. Hartford Accident & Indemnity Co.,* 580 F.2d 809, 810 (5th Cir.1978) ("Defendant's failure to provide this support when requested by the trial judge precludes it from now arguing for admission of the evidence."). Reconsideration and admission of the evidence today, after the evidence has been completed, would require re-opening a trial that already exceeded six weeks or leaving the EPA and STOP without the opportunity to meet the proof. It would seem that if anyone should suffer from a party's failure to have researched an area thoroughly before offering evidence, it should not be that party's opponents.

The time to present evidence has passed. Without addressing or considering the authorities EWC cites concerning the effect

of the Pacific policy, the court denies EWC's post-trial motion to reconsider and for summary judgment.

### (b) The Comprehensive General Liability Policy

From December 1, 1984 to December 1, 1985, Mr. Shambaugh and Environmental Waste were insured under a comprehensive general liability insurance policy issued by Auto–Owners Insurance Company. (EWC Exh. D–9). The policy provided coverage with limits of $1,000,000 per occurrence for bodily injury and $250,000 per occurrence for property damage liability. It contained no annual aggregate limits. EWC argues that this policy would provide coverage for sudden accidental events which, when combined with the St. Paul policy's coverage for non-sudden accidental events, would satisfy the regulations as interpreted by the EPA.

Examination of the Auto–Owners policy belies this contention, however. It covers no occurrence away from the insured premises; if the sudden accidental event involved property damage, even on the insured premises, the policy would not provide coverage of $1,000,000 per occurrence.

If the regulations required EWC to have coverage of $4,000,000 per occurrence and $8,000,000 per year, as the EPA contends, its coverage was inadequate.

### c. Lack of Regulatory Clarity

■ EWC argues that no $4,000,-000/$8,000,000 requirement clearly appeared in the regulations in effect in November, 1985. The provisions in question were found in consecutive sections of 40 C.F.R. § 265.147. The first, section (a), provided:

> The owner or operator must have and maintain liability coverage for sudden, accidental occurrences in the amount of at least $1 million per occurrence with an annual aggregate of at least $2 million, exclusive of legal defense costs.

Section (b) provided:

> The owner or operator must have and maintain liability coverage for nonsudden, accidental occurrences in the

amount of at least $3 million per occurrence with an annual aggregate of at least $6 million, exclusive of legal defense costs.

The EPA contends that sudden accidental coverage and non-sudden accidental coverage are two different types of coverage, and an owner or operator must have both. Accordingly, minimal insurance coverage under the regulations in November, 1985 would have been $1,000,000 per occurrence/$2,000,000 per year for sudden accidental and $3,000,000 per occurrence/$6,000,000 per year for non-sudden accidental, or a total of $4,000,000 per occurrence/$8,000,000 per year.

EWC contends that the regulation is not as clear as the EPA contends. To the contrary, EWC maintains, the regulation is too ambiguous to be enforceable. *United States v. Cumberland Farms*, 826 F.2d 1151 (1st Cir.1987), *cert. denied* —— U.S. ——, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988); *Rustad v. United States*, 258 F.2d 563 (9th Cir.), *cert. denied* 358 U.S. 898, 79 S.Ct. 222, 3 L.Ed.2d 149 (1958); *United States v. Messner*, 428 F.Supp. 538 (E.D.Pa.1977). EWC raises several arguments in support of its contention that the regulation is ambiguous.

### (1) No Requirement of Aggregation

First, EWC argues that the regulations do not say what the EPA says they do, and the St. Paul policy complies with a proper interpretation of the regulations. In essence, EWC contends that nothing in the regulations then in effect provides for aggregation of the two insurance amounts. When the regulations are so read, EWC maintains, the St. Paul policy complies with the requirement of $3,000,000/$6,000,000 for non-sudden accidental occurrences, and, since the policy provides the same coverage for sudden accidental occurrences, the coverage actually exceeds the mere $1,000,-000/$2,000,000 regulatory requirements.

EWC seeks to ante twice with the same chip. The regulations do not allow an owner or operator to comply with either, but not both, of the regulatory requirements. 40 C.F.R. § 265.147 required the owner or

operator to be covered for as much as $6,000,000 for a year's claims for non-sudden accidental insurance and still have something left over for claims based on sudden accidental occurrences. The St. Paul policy would have nothing left over.

In its supplemental authority submitted during final argument, EWC cites *Link–Simon, Inc. v. Muehlebach Hotel, Inc.*, 374 F.Supp. 789, 794–795 (W.D.Mo.1974), for the proposition that a statutory amendment that leaves out a portion of the former statute is intended to affect the operation of the omitted part so that no liability may be imposed for violation of the omitted portion. Lynne Miller, an expert in environmental insurance, testified that the EPA first proposed financial responsibility requirements for RCRA purposes in 1978 with required coverage of $5,000,000 per incident and $10,000,000 annual aggregate. That proposal was modified in a January, 1981 Federal Register notice to $1,000,000 per occurrence and $2,000,000 annual aggregate for sudden accidental events and $3,000,000 per occurrence and $6,000,000 annual aggregate for non-sudden accidental. As proposed in that 1981 Federal Register notice, the regulations specifically would have required aggregated coverage of $4,000,000/$8,000,000. The regulations twice were delayed for agency review. An April 18, 1982 Federal Register notice proposed further changes, described as being intended for further clarification and to make the requirements more workable and flexible: that notice deleted reference to the requirement of total coverage of $4,000,000/$8,000,000. The regulations proposed in the April 18, 1982 notice were adopted.

The rule relied on in *Link–Simon* has no application to the development of regulations and modifications in those proposals. The proposed regulations were modified substantially in many areas between the January, 1981 and April, 1982 notices. If the regulations were not ambiguous as adopted, the history of their development cannot render them so.

Similarly, the subsequent modification to the regulation, to which EWC points, does not invoke the rule applied in *Link–Simon*. The federal regulations were amended effective September 1, 1988 to make specific reference to the $4,000,000/$8,000,000 aggregate figures. 40 C.F.R. § 265.147(b). Greater clarity was the purpose to be achieved by the amendment. A subsequent decision to clarify does not, however, necessarily mean that the earlier version was too unclear to be enforceable. It does not appear from the record before the court that the amendment was intended to change the financial responsibility requirements; clarification, rather than modification, was the goal. That the regulation was subject to a clarifying amendment does not mean it was ambiguous before the amendment.

The regulation is not ambiguous. Subsection (a) provided that the "owner or operator of a hazardous waste treatment, storage or disposal facility" must maintain insurance "coverage for sudden accidental occurrences in the amount of at least $1 million per occurrence with an annual aggregate of at least $2 million, exclusive of legal defense costs." Subsection (b) required that the "owner or operator of a surface impoundment, landfill, or land treatment facility which is used to manage hazardous waste" must maintain insurance "coverage for nonsudden accidental occurrences in the amount of at least $3 million per occurrence with an annual aggregate of at least $6 million, exclusive of legal defense costs." The Landfill fell within both definitions; it was subject to both provisions for financial responsibility.

### (2) Equivalency of Sudden and Non–Sudden

EWC also contends that policies covering "sudden" and "non-sudden" occurrences may cover the same risk because courts have come to treat the terms as interchangeable. *See, e.g. National Grange Mut. Ins. Co. v. Heritage Ins. Co.*, 650 F.Supp. 1404 (S.D.N.Y.1986); *City of Northglenn v. Chevron U.S.A., Inc.*, 634 F.Supp. 217 (D.Colo.1986); *Jackson Twp. Municipal Utilities Authority v. Hartford Accident and Indem. Co.*, 186 N.J.Super. 156, 451 A.2d 990, 964 (Law Div.1982); *All-*

*state Ins. Co. v. Klock Oil Co.*, 73 A.D.2d 486, 426 N.Y.S.2d 603 (App.Div.1980). Accordingly, EWC argues, "Coverage for 'sudden' and 'non-sudden' occurrences is effectively the same thing. As the terms are legally indistinguishable, EWC's policy met the maximum limit set for either ..." Defendants' Trial Brief, at 21.

This argument might provide good ground for the EPA to change its regulations. It does not, however, provide grounds for "interpreting" the regulations in effect in November, 1985 in such a way as to render a portion of the regulation meaningless. 40 C.F.R. § 265.147 required the owner or operator of a land disposal facility to carry two types of insurance, each with a specific minimum coverage, producing an aggregate minimum coverage. That insurance law and the insurance industry may no longer have recognized a distinction between the two types in 1985 did not relieve those covered by the regulation of the obligation to maintain that aggregate minimum coverage.

### d. Estoppel

■ EWC also argues that the EPA is estopped from enforcing against these defendants the $4,000,000/$8,000,000 aggregate coverage requirement for the period covered by the St. Paul policy. The EPA maintained a "hot-line" telephone inquiry service to provide information about RCRA's requirements to those working in the hazardous waste industry. Nick Rutigliano, Environmental Waste's insurance agent, had found conflicting information concerning the amount of insurance necessary to satisfy RCRA. Accordingly, he called the "hot line" on November 13, 1984 to inquire about coverage requirements and was told that a $3,000,000/$6,000,000 combined sudden and non-sudden accidental occurrences policy would suffice. Mr. Rutigliano did not obtain the name of the person with whom he spoke or send a letter confirming his conversation, although he made a contemporaneous personal note reflecting his understanding of the conversation. (EWC Exh. E). He then obtained the St. Paul policy. EWC contends that the EPA, having told EWC's agent one thing

about the financial responsibility requirements, cannot now enforce another interpretation.

EWC's reliance upon the doctrine of estoppel against the government places them in a challenging legal position. "The general rule is that reliance on misinformation provided by a government employee does not provide a basis for an estoppel", *Crown v. United States Railroad Retirement Bd.*, 811 F.2d 1017, 1021 (7th Cir.1987), particularly when the misinformation is conveyed verbally. *Heckler v. Community Health Services*, 467 U.S. 51, 65, 104 S.Ct. 2218, 2227, 81 L.Ed.2d 42 (1984). That the EPA offered the "hot line" for inquiry is of no moment: "Even detrimental reliance on misinformation obtained from a seemingly authorized government agent will not excuse a failure to qualify for the benefits under the relevant statutes and regulations." *Goldberg v. Weinberger*, 546 F.2d 477, 481 (2nd Cir.1976), *cert. denied* 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977).

EWC cites this court's decision in *McDonald v. Schweiker*, 537 F.Supp. 47 (N.D. Ind.1981), as support for its position, but the representation in that case involved a purely factual matter. Had the misrepresentation been one of law, the court plainly would have reached a different result: "As the laws and regulations are available for the public to examine, the government should not be held responsible for a claimant's failure to protect his own interests by examining for himself whether a government employee's statement of the law is correct or not." 537 F.Supp. at 50.

In *United States v. Fox Lake State Bank*, 366 F.2d 962 (7th Cir.1966), a suit under the False Claims Act, the Seventh Circuit upheld an estoppel claim against the FHA by a bank after the bank acted in reliance upon several conferences with the FHA. The Seventh Circuit later suggested that *Fox Lake* may be appropriate support for an estoppel claim in a suit that does not involve the public treasury:

Unlike the present case, which involves a claim on the public treasury by one not

statutorily entitled to draw on it, *Fox Lake* applied an estoppel to prevent the Government from suing to recover a statutory forfeiture and penalty. We find an important distinction. The invocation of estoppel in the latter circumstance does not result in the receipt of public funds by one not entitled to payment. Instead, the Government is merely barred from enforcing a claim that in fairness it should not be allowed to pursue.... At any time, absent arbitrary and capricious action, it may choose to enforce or not to enforce a right to sue. A congressional mandate to pay statutory benefits only to those so entitled presents a different case. Congress leaves no discretion in the agencies and courts but to limit payment of benefits to those statutorily entitled to them. When we estopped the Government in *Fox Lake,* we merely held that in light of the actions of the FHA it would unfair for the Government to exercise its discretion to sue.

*Gressley v. Califano,* 609 F.2d 1265, 1268 (7th Cir.1979). In *Fox Lake,* however, the government contended that the defendant knowingly submitted false claims. The issue here is *not* whether EWC knowingly misrepresented its insurance coverage, but whether their coverage was adequate. Accordingly, even *Fox Lake* does not provide persuasive authority for placing EWC's estoppel claim, based on oral misrepresentation as to the law, within the range of "narrow circumstances" that have been deemed sufficient to estop the government.

### e. Good Faith

 Before the EPA's 1985 Interim Final Rules, an owner's or operator's good faith effort to obtain insurance was a defense in enforcement actions concerning the insurance requirement. In light of Mr. Rutigliano's call to the EPA "hot line", EWC believed in good faith that it was in compliance with RCRA's financial responsi-

bility requirements and that its certification to the EPA was truthful. On April 2, 1986, a state agency financial assurance officer wrote Mr. Shambaugh about the requirements of the "good faith effort" defense, suggesting that Indiana recognized such a defense even after November 7, 1985.

EWC argues that this court, as a court of equity, should not destroy or penalize a valuable enterprise in the face of clear efforts to comply with a confusing regulation, especially in light of its compliance with the insurance requirements and what EWC describes as a lack of practical harm from any non-compliance in November, 1985.

EWC cites *United States v. Allegan Metal Finishing Co.,* 696 F.Supp. 275 (W.D. Mich.1988), but that case lends no support to the proposition that a good faith effort to comply with financial assurance regulations amounts to compliance. The *Allegan Metal Finishing* court granted summary judgment to the EPA on its claims that the defendant had violated financial assurance requirements despite the defendant's efforts to show the impossibility of obtaining insurance. EWC quoted a portion of the court's holding that "good faith efforts to obtain insurance are clearly admissible with respect to the appropriate civil penalty and possibly with respect to the scope of injunctive relief sought", 696 F.Supp. at 291, but that language does not support a holding that EWC was in compliance with financial assurance requirements due to its asserted good faith.

In denying the EPA's motion for summary judgment on this issue, the court distinguished the two cases upon which the EPA relied. *United States v. Environmental Waste Control, Inc.,* 698 F.Supp. at 1432–1433. One case [31], while alone insufficient to establish the EPA's entitlement to judgment as a matter of law, is instructive. In *Vineland Chemical Co. v. United States*

---

**31.** The EPA also cited *United States v. T & S Brass and Bronze Works, Inc.,* 681 F.Supp. 314 (D.S.C.1988), but that case remains too distinguishable to guide the ruling in this case. The *T & S Brass* court found that the defendant had

not made a good faith effort to obtain insurance; indeed, the defendant had not even applied for insurance until after November 8, 1985.

*Environmental Protection Agency,* 810 F.2d 402, Vineland had certified compliance with some, but not all, financial responsibility requirements by November 8, 1985. Seven weeks later, Vineland attempted to certify that it had been in compliance with all financial responsibility requirements on November 8. The EPA terminated its interim status. The Third Circuit held that the termination was proper because Vineland had not made the certification required by statute. The court deemed it unnecessary to determine whether Vineland actually had been in compliance with the financial responsibility requirements; the failure to certify was ample ground for the EPA's actions. 810 F.2d at 410 n. 5.

If, as *Vineland* held, actual compliance alone is not enough if the certification is insufficient, it is difficult to construct the logic by which inaccurate certification, even if made in good faith, would be sufficient for a facility not in actual compliance.

The court concurs with the *Allegan Metal Finishing* court that EWC's efforts to determine the insurance coverage required by RCRA regulations are pertinent to the scope of relief and penalties. The court further concludes, however, that those efforts, and EWC's good faith in making those efforts, are not relevant to determining whether EWC complied with those regulations.

### f. Conclusion

EWC had insufficient insurance coverage on November 8, 1985. Accordingly, its interim status terminated on that date pursuant to 42 U.S.C. § 6925(e)(2).

### 3. Groundwater Monitoring

State and federal interim-final regulations, promulgated in May, 1980 and in effect in November, 1985, required that a hazardous waste landfill's groundwater monitoring system consist of at least four wells: one well was required to be installed hydraulically upgradient[32] from the limit of the waste management area, while the remaining wells (at least three) were to be installed hydraulically downgradient at the limit of the waste management area. 40 C.F.R. § 265.91(a). More wells may be required at a given landfill if necessary to insure immediate detection of migrating hazardous waste or constituents. The regulation's purpose was to assure the existence of a groundwater monitoring system capable of determining the disposal facility's impact on the quality of groundwater in the uppermost aquifer[33] underlying the facility.

The groundwater monitoring system is intended to provide immediate detection of any release of hazardous waste or hazardous waste constituents into the groundwater. Prompt detection reduces the cost and effort involved in arresting the spread of contaminants and restoring the quality of the groundwater.

As of November 7, 1985, when EWC certified that it was in compliance with regulations concerning groundwater monitoring, the Landfill's groundwater monitoring system consisted of well 6 (designated as the upgradient well) and wells 20, 21, 22, 23S, 23M and 23L (designated as the downgradient wells).

The Landfill had placed its wells pursuant to advice from its retained consultants. In 1983 and 1985, its first consultant, ATEC Associates, Inc., issued reports with test results describing the basis for the well placement. Dames & Moore, another retained hydrogeologic firm, supplemented those reports, then performed further studies in 1986 and 1987, along with additional work by John Bassett of Geosciences Re-

---

**32.** "Hydraulically upgradient" refers to the part of the aquifer from which the groundwater flows before it passes through or past the waste. "Upgradient" in an aquifer is analogous to "upstream" in a river.

**33.** An aquifer is a geologic formation, group of formations, or part of a formation capable of yielding a significant amount of groundwater to wells or springs. The uppermost aquifer is that nearest the natural ground surface and includes lower aquifers that are hydraulically interconnected to that aquifer within the facility's property boundary. 40 C.F.R. § 260.10. A "perched aquifer" generally consists of coarser-grained materials with finer, less permeable materials beneath it, allowing water to build up within it like a reservoir.

search Associates, Inc., a consulting subcontractor.

### a. Placement of the Downgradient Wells

The Landfill's downgradient monitoring wells were not placed at the limit of the area in which waste had been placed. At their closest points, the following wells were the following approximate distances from the deposited waste as designated by EWC [34]:

Well 20 ..........................285 feet
Well 21 ..........................250 feet
Well 22 .......................... 90 feet
Wells 23S, 23M, 23L .......... 60 feet

Even these dimensions assume a direct groundwater flow from the waste management area to the downgradient monitoring wells; regional EPA enforcement officer Joseph Boyle testified that if the groundwater flowed in a northeasterly direction, it would have to travel more than 400 feet from the deposited waste before it reached well 21. Those wells were not at the limit of the waste management area as required by the regulations.

EWC raises four arguments with respect to the wells' placement. First, EWC contends that the regulation cited by the EPA did not apply because the Landfill was in an "assessment mode" rather than a "detection mode". Second, EWC argues that because of an agreed state administrative order, it could not install additional wells without state permission and that permission had not been received by November 8, 1985. Next, EWC contends that the wells were located in a position best calculated to detect releases of hazardous waste constituents. Finally, EWC argues that the EPA has mischaracterized the "waste management" area.

(1) Assessment Mode v. Detection Mode

■ EWC's expert witnesses explained that there are various modes for groundwater monitoring systems. When a facility's monitoring system first is developed, it is in the "detection" mode designed to detect potential problems. The requirements for detection mode are set forth in 40 C.F. R. § 265.91, which contains the requirement that at least three downgradient wells be placed at the limit of the waste management area. 40 C.F.R. § 265.91(a)(2). The facility's owner or operator then must compare the water sampling data drawn from those monitoring wells periodically. If the analyses confirm a significant increase in indicator levels or Ph decrease in downgradient sampling levels in comparison to the upgradient, or "background" sampling levels, the facility must shift into the "assessment" mode. See 40 C.F.R. § 265.93(d).

The "assessment" mode requires the submission and ultimate implementation of "a more comprehensive ground-water monitoring program (than that described in §§ 265.91 and 265.92)". 40 C.F.R. § 265.93(a). The requirements for that "more comprehensive" program, which are set forth in 40 C.F.R. § 265.93(d)(3), make no reference to placement of wells at the limit of the waste management area.

1984 data from the Landfill's groundwater monitoring system disclosed an apparent statistical difference in indicator data. Accordingly, although the Landfill did not concede the accuracy of the data, the "assessment" mode was triggered. On November 1, 1984, ATEC, the Landfill's consultant, prepared an assessment plan that was submitted to Indiana. (EWC Exh. GGGG). That assessment plan and ensuing events led to the April, 1985 installation of wells 23S, 23M, and 23L and also led to an agreed administrative order entered with respect to Indiana Notice of Violation N–128.[35] That administrative order required that the Landfill submit a revised assessment plan and required state agency approval for the placement and installation of further groundwater monitoring wells.

---

**34.** The locations of waste are based upon Mr. Wilkins's recollection and, for more recent years, Environmental Waste records. Mr. Wilkins gave the Task Force a map showing the location of waste on June 11, 1986.

**35.** The findings that gave rise to the agreed administrative order in Cause N–128 are summarized in Part II–D–2–a of these findings.

The Landfill submitted ATEC's revised assessment plan in August, 1985. The Landfill had received no response from the state agency by November 7, 1985, when Mr. Wilkins and Mr. Shambaugh certified compliance with applicable groundwater monitoring requirements. EWC argues that at the time of that certification it was governed, not by the "detection mode" regulation requiring well placement at the limit of the waste management area, but rather by the "assessment mode" regulations, which contain no such requirement concerning well placement.

The court cannot agree that the Landfill's transition into the assessment mode relieved it from the requirement that at least three downgradient monitoring wells be located at the limit of the waste management area. 40 C.F.R. § 265.93(f) provides:

Unless the ground-water is monitored to satisfy the requirements of § 265.93(d)(4), at least annually the owner or operator must evaluate the data on groundwater surface elevations obtained under § 265.92(e) to determine whether the requirements under § 265.91(a) for locating the monitoring wells continues to be satisfied. If the evaluation shows that § 265.91(a) is no longer satisfied, the owner or operator must immediately modify the number, location or depth of the monitoring wells to bring the ground-water monitoring system into compliance with this requirement.

The court does not agree that this requirement to "modify the number, location or depth of the monitoring wells" obviates the need to comply with § 265.91(a)(2), which requires at least three downgradient wells to be located at the limit of the waste management area. The balance of the regulatory scheme demonstrates that continued compliance is required.

Section 265.91(a) sets forth minimum requirements for a groundwater monitoring system. As long as that system detects no statistically significant increase in indicator levels or Ph decrease, continued use of a minimal system of one upgradient well and three downgradient wells might satisfy the regulations. Even § 265.91(a), however, does not provide that four wells will suffice in all instances:

A ground-water monitoring system must be capable of yielding ground-water samples for analysis and must consist of:

(1) Monitoring wells (at least one) installed hydraulically upgradient (i.e., in the direction of increasing static head) from the limit of the waste management area. Their number, locations, and depths must be sufficient to yield ground-water samples that are:

(i) Representative of background ground-water quality in the uppermost aquifer near the facility; and

(ii) Not affected by the facility; and

(2) Monitoring wells (at least three) installed hydraulically downgradient ... at the limit of the waste management area. Their number, locations, and depths must insure that they immediately detect any statistically significant amounts of hazardous waste or hazardous waste constituents that migrate from the waste management area to the uppermost aquifer.

The regulation requires one or more upgradient wells and three or more downgradient wells and sets forth a goal by which the number and location of the wells are to judged. Even in the detection mode, a mere four monitoring wells will not always suffice.[36]

Further, the system required by the "assessment mode" is to be "more comprehensive" than, and not in lieu of, that required by § 265.91(a). 40 C.F.R. § 265.93(a). Nothing in the regulations or in logic indicates that the facility may, upon detection

---

**36.** *See* EPA Exhibit 13B, pp. 2–2 to 2–3:

Although the regulations recognize that for a small site with the simplest hydrogeologic subsurface three downgradient wells and one upgradient well might suffice, the number, depth, and location of wells must ultimately be selected so that the network meets the regulatory performance standard of immediately detecting any migration of statistically significant amounts of hazardous waste or hazardous waste constituents into the uppermost aquifer.

of indicia of migration of hazardous waste constituents, abandon the monitoring wells and the originally required locations. "Assessment mode" requires the facility to do more, not to stop what it had been doing.

In its "Tender of Supplemental Authority" submitted during final argument, EWC cited *Chemical Waste Management, Inc. v. United States Environmental Protection Agency,* 673 F.Supp. 1043 (D.Kan. 1987), as supportive of its claim that detection mode and assessment mode are mutually exclusive conditions. The *Chemical Waste Management* opinion offers no such support, however. The court proffered an excellent, concise explanation of the difference between the two modes:

> There are two stages of monitoring—detection monitoring and assessment monitoring.... Detection monitoring is the initial phase of testing the groundwater for contamination. Detection monitoring utilizes a statistical test to determine whether there may have been a release of hazardous wastes or constituents. The test analyzes data obtained from at least one hydrologically upgradient well and three downgradient wells.... Upon failing detection monitoring, a facility must undergo assessment monitoring, which utilizes additional clinical analysis or perhaps more test wells, and it constitutes a generally more subjective and accurate procedure of determining groundwater contamination.

673 F.Supp. at 1049. Again, to say that assessment monitoring requires "more test wells" is not to say that the facility is absolved from use of the wells required for detection monitoring.

### (2) Permissibility of Installing Other Wells

 EWC further seems to argue that, in any event, the June, 1985 agreed administrative order the Landfill entered into with Indiana's Environmental Management Board in that Board's Cause N–128 precluded EWC's installation of further monitoring wells. That agreed order [37] noted the requirement that the Landfill submit

and implement an assessment plan, Agreed Findings of Fact ¶ 6, and required a three-phase compliance program:

> To adequately achieve compliance with the requirements of 40 CFR, Subpart F, Respondent must install additional wells to address groundwater fluctuations, contaminant movement, and concentration. Drilling, well installation, and development specifications must be submitted and approved, prior to well placement, by the Division. Compliance may be achieved in phases. Phase 1 would be further sampling and analyses for TOC in association with running an organic scan. Phase 2 would be installation of a three well nest at the existing monitoring site number 20. Phase 3 would be installation of additional wells based on results of sampling and analysis in Phases 1 and 2....

STOP Exh. 12, Order ¶ 3. EWC submitted its assessment plan calling for installation of additional wells on August 28, 1985 (EWC Exh. AA–6), but received no response from the state agency until October, 1986, about fourteen months later. That response (STOP Exh. 27) deemed EWC's proposed plan inadequate in certain areas and required further submission. A month before the state response, EWC had retained Dames & Moore to propose additional wells, and Dames & Moore submitted its recommendations in the spring of 1987; EWC forwarded that report to the state together with its revised Part B application on June 30, 1987. A proposed plan finally was adopted in June, 1988.

EWC offers no authority for its implied assertion that a state may have requirements less stringent than the federal regulations. In any event, however, the order in Cause N–128 dealt with development and implementation of the Landfill's assessment plan and not with the adequacy of the monitoring system under § 265.91(a), a topic irrelevant to the assessment plan once it was determined that additional wells were needed. 40 C.F.R. § 265.93(f). The administrative order in Cause N–128 simply was not concerned with the Landfill's detection

---

**37.** The agreed order (STOP Exh. 12) is discussed more fully in Part II–D–2 of this memorandum.

system.[38] The detection system was the topic of Indiana's later Notice of Violation V–209; it was not at issue in Cause N–128. *See* EPA Exh. 35.

When so viewed, there is no unfairness in the EPA's claim that the Landfill was not in compliance with applicable groundwater monitoring requirements on November 8, 1985. The EPA does not contend that the Landfill lost its interim status because its monitoring system failed to satisfy the provisions of § 265.93 concerning the assessment plan; had the EPA so contended, EWC would have had a stronger argument that Indiana's lethargic response to the proposed plan prevented timely implementation. The EPA argues instead that EWC failed to comply with § 265.91(a), which became effective in May, 1980.

EWC consultant Michael Johnson testified that he advised Mr. Wilkins and Mr. Shambaugh that they should review the order in Cause N–128 before making their certification of compliance. Mr. Johnson did not discuss that portion of the EPA's request for certification that provided, with respect to 42 U.S.C. § 6925(e)(2) (which required certification of compliance by November 8, 1985 to prevent loss of interim status):

> Because this is a provision of federal law, an order by any agency that has a compliance date on or beyond November 8, 1985 does not relieve the owner/operator of the obligation to be in physical compliance by the statutory date when the certification is due. You may not interpret or rely on an order or compliance schedule therein as an extension of the November 8, 1985 deadline.

EPA Exh. 71, p. 2.

Further, Mr. Johnson did not recall discussing Indiana's Notice of Violation V–209. That notice was contained in a letter dated October 11, 1985 from the Indiana agency to Mr. Shambaugh and Environmental Control. Notice of Violation V–209

was based on a June 10, 1985 inspection at the Landfill. The notice referred to the following alleged violations: (1) the number, depths and locations of the Landfill's groundwater monitoring wells did not ensure a determination of the facility's impact on groundwater, 40 C.F.R. § 265.90(a); (2) the number, depths and locations of the wells did not provide for the immediate detection of statistically significant amounts of hazardous wastes or constituents, 40 C.F.R. § 265.91(a)(2); (3) the Landfill's documentation did not identify the development and seals used for well 6 and the 23 series, 40 C.F.R. § 265.91(c); and (4) the Landfill's sampling techniques were deficient in several respects, 40 C.F.R. § 265.92(a). Four weeks after receiving that notice, Mr. Shambaugh and Mr. Wilkins certified that the Landfill was in compliance with applicable groundwater monitoring requirements.

The notice in V–209 directed the Landfill to install further wells and specified locations and screen intervals. EWC was not forbidden to install additional wells; indeed, it appears that Indiana demanded that EWC do so.

### (3) Best Location to Detect Migrating Waste Constituents

 The downgradient monitoring wells must be placed so as to "immediately detect any statistically significant amounts of hazardous waste or hazardous waste constituents that migrate from the waste management area to the uppermost aquifer." 40 C.F.R. § 265.91(a)(2). EWC argues that well placement thus becomes a matter of expert interpretation: at a given site, placement of a well removed from the waste management site may better detect migrating constituents.

EWC is correct that a choice must be made concerning monitoring well placement. Evidence introduced at trial indicated that waste constituents most likely begin their migration in the form of a

---

**38.** The administrative order also provided, "The provisions of this Agreed Order shall in no manner constitute an approval of, or acquiescence in, the sufficiency of any information submitted for Part B compliance." STOP Exh. 12, p. 15,

¶ 17. EWC consultant Michael Johnson conceded on cross-examination that the order in Cause N–128 took no position as to whether the Landfill's groundwater monitoring system was defective.

"plume" that spreads as it travels. Monitoring wells placed at the limit of the waste management area may fail to detect a narrow plume of contaminants passing between the monitoring wells. Wells placed a greater downgradient distance from the limit of the waste management area might have a greater chance of detecting the contaminant plume, which is likely to spread as it migrates. The EPA, however, already has made that choice. The preamble to the 1980 regulations indicates that the EPA considered, but rejected, a proposal that the owner or operator should have discretion to place monitoring wells, not at the waste area's perimeter but between the waste area and the facility's boundary:

> Commenters also suggested that the placement of the monitoring wells between the waste boundary and the property boundary be a matter for owner or operator discretion. Two objections were raised to the placement of wells at the solid waste boundary. First, commenters argued that such placement was redundant in light of the requirement for leachate monitoring. Second, commenters suggested that if wells were placed closer to the active portion of the facility, leachate that moved laterally in the soil below the facility would enter the annular space around the monitoring well and quickly pass into the groundwater.

> EPA believes that the monitoring wells should be placed as close to the waste management boundary as possible in order to give a prompt indication of ground-water contamination. This is particularly important since leachate monitoring has been deleted. If significant ground-water contamination occurs before detection, the difficulties of corrective action are made all the more severe. Therefore it is appropriate to place the monitoring wells at the edge of the waste management area to provide early detection.

45 Fed.Reg. 33,192–33,193 (May 19, 1980) (EPA Exh. 30). Accordingly, the regulations rejected the policy argument that monitoring wells should be placed away from the waste area and adopted the requirement that the wells be placed at the limit of the waste management area. *See also Chemical Waste Management, Inc. v. United States Environmental Protection Agency,* 649 F.Supp. at 355 (plaintiff's system of monitoring wells, placed on expert advice, violated regulations due to failure to include three downgradient wells at perimeter of waste management units).

The Landfill's wells may have been located in a position well calculated to detect any release of hazardous waste constituents, but this establishes only that those wells properly could be part of the ground-water monitoring system required by the regulations which establish only minimum requirements. If they were not at the limit of the waste management area, however, they could not alone satisfy the regulatory mandate.

#### (4) Mischaracterization of "Waste Management Area"

■ EWC argues that the EPA has mischaracterized the waste management area at the Landfill. The EPA asked EWC to identify the areas in which waste had been placed, then compared those locations to the monitoring wells' locations. EWC contends that the waste management area described in 40 C.F.R. § 265.91(a) refers not to the locations of existing waste deposits, but rather to the area in which waste is intended to be managed. EWC points to its Exhibits U–1 and AAAAA as indicating the Landfill's waste management area as so defined; those exhibits indicate that approximately seventy percent of the Landfill's total acreage then was intended for ultimate use for the deposit of waste.

Part 265 of 40 C.F.R. deals with interim status facilities such as the Landfill; Part 264 deals with permitted facilities. 40 C.F.R. § 265.91(b) provides two definitions of "the waste management area" for interim status facilities. In the case of a facility consisting of only one surface impoundment, landfill, or land treatment area, the waste management treatment area is described by the waste boundary or perimeter. If the facility consists of more than one surface impoundment, landfill, or land treatment area, the waste manage-

ment treatment area is described by an imaginary boundary line circumscribing the several waste management components. 40 C.F.R. § 264.95(b) defines "waste management area" for permitted facilities as "the limit projected in the horizontal plane of the area on which waste will be placed during the active life of a regulated unit." EWC claims protection of the definition in § 264.95(b).

EWC's argument finds some support in a publication by the EPA. EPA's Exhibit 13B consists of portions of a technical enforcement guidance document issued in August, 1985. That document provides,

> For all practical purposes, the requirements governing well placement are the same for both Part 265 and Part 264 detection monitoring. Whereas the regulatory language differs slightly, a network designed to meet the Part 265 standard should be substantially the same (in terms of well locations and depths) as one designed to meet the Part 264 standard.
>
> \* \* \* \* \* \*
>
> Both programs also include similar language regarding the placement of downgradient wells, although the Part 265 regulations require placement at the "limit of the waste management area," whereas the Part 264 regulations require placement at the "point of compliance" [cf., 265.91(a)(2) and 264.97(a)(2) ]. While worded differently, the physical well location dictated by both programs is, by definition, essentially the same. The regulations define the "waste management area" as "the limit projected to the horizontal plane of the area on which waste will be placed during the active life of a regulated unit" [264.95(b) ]. . . .

EPA Exh. 13B, pp. 3–2 to 3–3.

The technical enforcement guidance document does not have the force of law, and

there is no evidence in the record indicating that the Landfill's wells were placed in reliance upon this language. Indeed, the last of the wells that comprised the Landfill's groundwater monitoring system, as certified in November, 1985, were installed in April, 1985, four months before the guidance document was issued.[39] Further, even the language quoted above from the guidance document was qualified in a footnote with respect to interim status facilities:

> The *Permit Applicant's Manual* further qualifies this definition by noting that for Part 265 systems, EPA will evaluate the areal extent of the waste management area at an expanding facility against the regulatory mandate to choose well locations so as "to immediately detect" the migration of hazardous waste into the uppermost aquifer. For permit applications, EPA will evaluate the proposed waste management area against the policy of designing monitoring programs so as to give an early warning of the release of contaminants. In either case, EPA does not recommend that facility owner propose a waste management area whose limit is geographically remote from the active waste management handling zone. Rather, monitoring wells should be closely associated with the active zone even if this means redefining the waste management area as a facility expands.

EPA Exh. 13B, at p. 3–3 n. 5.

In light of the preamble to the 1980 regulations, the term "waste management area" cannot reasonably be construed for interim status facilities in any manner other than the EPA now proposes. EWC's proposed construction would allow an owner or operator to declare his entire facility to be intended for deposit of hazardous waste. If a facility the size of the Four

---

**39.** Joseph Boyle, a regional EPA enforcement officer, testified that earlier versions of the technical guidance document had been available for several years before 1985 and that the interpretation concerning the siting of monitoring wells had not changed during those years. He also testified that the various predecessors to that document had differing intended audiences,

with some intended for regulators and others for regulated parties. For example, the March, 1985 draft that preceded the August, 1985 draft was distributed only to the EPA regional offices. None of those earlier documents was presented at trial, however, and the record does not disclose that EWC consultants relied on those documents.

County Landfill began its waste deposits in its most remote upgradient portion, the downgradient monitoring wells located at what the facility announced to be the limit of the waste management area could be 1,500 feet from the deposited waste. If the groundwater beneath the facility travelled at a rate of one to two feet per year, as some of EWC's evidence indicated with respect to the Landfill, hazardous waste constituents migrating from the original waste deposits would not reach the monitoring wells for several centuries. Such a delay in detection would not be harmonious with the regulatory requirement and intent that the wells be placed "at the edge of the waste management area to provide early detection." EPA Exh. 30.

### b. The Upgradient Well: Well 6

 Well 6, the well closest to the limit of the waste management area, was designated as the monitoring system's upgradient well in November, 1985. Whether well 6 properly can be described as upgradient is a matter discussed in Part IV–C below. Even assuming, however, that well 6 is upgradient of the waste management area, it was inadequate to satisfy the regulatory requirements for an upgradient well.

First, sampling of well 6 showed concentrations of hazardous constituents. The purpose of an upgradient well is to provide groundwater samples that are unaffected by the facility and thus consist of naturally occurring (or "background") chemical constituents with which samples from downgradient wells may be compared to determine if any migration of hazardous wastes or hazardous waste constituents is occurring. See 40 C.F.R. § 265.91(a)(1)(ii). Well 6 was "affected by the facility" and thus failed to comply with the regulations concerning upgradient wells. 40 C.F.R. § 265.91(a)(1).

Second, well 6 had no annular seal: the space between the well casing and the sides of its bore hole was not sealed or grouted as required to prevent surface water from leaking into the well and contaminating the samples. See 40 C.F.R. § 265.91(c).

### 4. Conclusion: The Landfill Has Lost Its Interim Status

 Despite the November 7, 1985 certification, EWC was not in compliance with applicable financial responsibility and groundwater monitoring requirements in November, 1985. Compliance with those requirements was a prerequisite to continued interim status operation. 42 U.S.C. § 6925(e)(2). Nevertheless, the Landfill continued to receive hazardous waste after November 8, 1985; that continued receipt was unlawful. The Landfill cannot continue to operate under its interim status; it may continue only pursuant to a final permit, which it has not received. See *Vineland Chemical Co. v. United States Environmental Protection Agency*, 810 F.2d 402 (3rd Cir.1987).

The penalty to be imposed for the violation is addressed in Part VI of this memorandum.

### B. Minimum Technology

 The EPA's second claim for relief is based upon the "minimum technology" requirements of the 1984 amendments to RCRA known as HSWA. The court already has found, on the EPA's summary judgment motion, that from May 8, 1985 to approximately August 19, 1986 the Landfill disposed of hazardous waste in cells or trenches without liners and leachate collection systems. *United States v. Environmental Waste Control, Inc.*, 698 F.Supp. at 1435. Before August 19, 1986, hazardous waste was disposed of at the Landfill by the "pit method" or the "trench method". In the pit method, a twenty-five foot by twenty-five foot pit is dug in the ground and waste is placed in the hole, which is covered when full. In the trench method, a trench is dug and gradually extended as waste is deposited. After August 19, 1986, hazardous waste at the Landfill was placed in large lined cells, the first of which was "Cell A", then "Cell B". "Cell C" is now in use.

42 U.S.C. § 6924 requires owners and operators of hazardous waste facilities to meet certain minimum technology standards. Section 6924(*o*)(1)(A) required own-

ers and operators of existing landfills to use two more liners and with a leachate collection system above and below the liners when conducting a "lateral expansion" with respect to waste received after May 8, 1985. Owners and operators were required to notify the EPA of such lateral expansion at least sixty days before receiving any waste for placement in that expansion. 42 U.S.C. § 6936(b)(2). EWC violated both these sections by failing to notify the EPA of its intended lateral expansion and by placing hazardous waste in unlined cells and trenches.

As noted above, on October 26, 1988, the court granted the EPA's motion for partial summary judgment, finding that EWC had violated RCRA's minimum technology requirements through its lateral expansion into unlined cells. At trial, EWC sought to introduce evidence challenging this holding. EWC did not argue that the evidence had been unavailable at the time of the summary judgment proceedings. Instead, EWC argued that hearing the testimony would lead the court to a different conclusion and maintained that since the court had not certified the partial summary judgment ruling as final, it still was entitled to pursue the issue.

The court disallowed EWC's proffered evidence. A court's summary judgment ruling finding a defendant liable on a claim, Fed.R.Civ.P. 56(c), is not so fleeting or evanescent an act that it may be ignored at trial, yielding to evidence not presented in opposition to the summary judgment motion. One opposing a summary judgment motion must, if the movant has made the requisite showing under Rule 56, come forth with evidence sufficient to demonstrate the existence of a triable issue of fact. Fed.R.Civ.P. 56(e); *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–326, 106 S.Ct. 2548, 2552–2555, 91 L.Ed.2d 265 (1986). The motion's opponent may not present some evidence, then, fol-

lowing an adverse summary judgment ruling, present the rest at trial.

Entry of summary judgment on a claim is a more solemn event than EWC suggests. Rule 56 "is not merely a dilatory or technical procedure; it affects the substantive rights of the litigants." 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 2712, at 584 (1983). The court determined at the summary judgment stage that the EPA had demonstrated EWC's violation of the minimum technology requirements and that EWC had failed to demonstrate the existence of a genuine issue of material fact. By trial, the time for EWC to come forth with such evidence had passed.

In final argument, EWC's counsel stated that the defendants had not been allowed to introduce evidence "of the thinking behind" the minimum technology violation which "would have been pertinent to penalty". The evidence was not so offered at trial. EWC stated that it believed the court's summary judgment finding of a violation was wrong and hoped to so show through further evidence. While the court allowed substantial evidence relevant to the penalty to be imposed on the second claim, such as the relocation of the waste to lined cells, the excluded evidence was not offered on the issue of penalty.

Approximately 12,000 cubic yards of the waste that was placed in unlined cells or trenches already have been excavated and redeposited in lined cells [40], and EWC offered in its Part B application to excavate the rest of the wastes and place them in lined cells. EWC argues that elevated construction and other costs make the construction of new cells more expensive than they would have been in May, 1985; that heightened cost, coupled with the cost of relocating the waste from unlined cells, has deprived the Landfill of any supposed financial benefit in using unlined cells for fifteen months. EWC has disposed of waste in lined cells since August, 1986.

---

**40.** Mr. Shambaugh testified that in all about 50,000 cubic yards of waste has been moved and consolidated.

Testimony relevant to the relocation of the waste also includes that of Mr. Shambaugh, who testified that one reason for the relocation of the waste is the defendants' intention to place lined cells throughout the Landfill, and that of Dr. Robert Harris, who testified that leachate from waste in unlined cells or trenches necessarily must reach groundwater.

The fact of the violation was established in the summary judgment proceedings. The penalty for the violation is discussed below in the section on penalties.

### C. Inadequacy of the Present Groundwater Monitoring System

■ The purpose of a hazardous waste landfill's groundwater monitoring system is to detect immediately the migration of hazardous waste or hazardous waste constituents from the waste management area into the environment so that any necessary corrective or remedial action can be taken. Among the major threats a hazardous waste landfill may pose to public health and the environment is the potential that hazardous constituents may escape and contaminate the groundwater beneath the facility. As noted in Part III–B above, the EPA premises its first claim for relief on the inadequacy of the Landfill's groundwater monitoring system on November 8, 1985, the critical date under 42 U.S.C. § 6925(e). The EPA further contends, in its third claim for relief, that the Landfill's groundwater monitoring system failed to protect the environment and human health, as required by RCRA regulations, even by the time this trial commenced.

For the reasons that follow, the court concurs with the EPA's contention. The design, construction, and depth of their groundwater monitoring wells have prevented EWC and its consultants from learning the extent and permeability of the uppermost aquifer, which precludes confident assessment of the groundwater flow's horizontal and vertical direction and ve-

locity. One cannot design a meaningful groundwater monitoring system without knowing the location of the uppermost aquifer and the direction of the groundwater flow. EWC has not acquired that knowledge.

#### 1. Depth and Construction of Monitoring Wells

From November 19, 1981 to May, 1983, the Landfill's groundwater monitoring system consisted of wells 1 through 7. These wells were too shallow to allow collection of groundwater samples from deeper elevations corresponding to the area's major groundwater producing zone. Further, none of the wells had the annular seals required by regulations to prevent the wells' contamination.

In the spring of 1983, ATEC Associates, Inc., a firm retained by EWC[41], installed wells 20, 21 and 22 and discontinued the use of wells 1 through 5 and 7 for groundwater monitoring purposes. In the spring of 1985, ATEC installed a cluster, or "nest", of wells of varying depths known as 23S, 23M and 23L. All of the ATEC wells sample groundwater at depths greater than did wells 1 through 7.

In late 1986 and early 1987, Dames & Moore, another firm retained by EWC, installed additional monitoring wells and piezometers.[42] The new wells were known as 21S, 21L (later replaced by 21La), 24S, 24M, 24L, 27S, 27M, 28S and 28M. The well nest consisting of 24S, 24M and 24L replaced well 6 for upgradient monitoring purposes.

A monitoring well employs a screened portion that is open to the aquifer to allow groundwater to enter the well. A sand and gravel pack is used to surround the screened portion of the well and should extend no more than a few feet above and below the screened portion. A typical pack interval is ten feet. Eight of the Landfill's monitoring wells have sand and gravel packs longer than twenty feet; the sand

---

41. ATEC was the first hydrology consultant that EWC retained. EWC retained ATEC in 1983. Indiana had directed the installation of wells 1 through 7 in 1978.

42. A piezometer is a pipe-like device to measure the elevation of the groundwater in a given location.

pack on well 23L is 92 feet long. Water can enter the well from any point at which it meets the sand and gravel pack. Excessively long sand and gravel packs cause well readings to produce an average groundwater level measurements rather than accurate measurements, which are essential in determining the groundwater flow's vertical gradient and direction. Further, water entering the well through the sand and gravel packs from several levels tends to dilute any contamination entering the well at a given level, causing test results from the well samples to understate, or even fail to detect, contamination.

Because excessively long screened intervals and sand packs can create an average reading, rather than an accurate one, the potentiometric maps developed by EWC's consultants are subject to question with respect to their conclusions concerning horizontal groundwater flow and provide no information concerning the vertical flow, if any. A potentiometric map reflects the elevation of groundwater at several locations; based on that information, one trained in the field can determine the "head" [43] and direction of flow of the groundwater. If the data from the monitoring wells reflects an average, rather than an accurate reading of the groundwater's elevation, however, the conclusions reached from the data may be inaccurate.

2. Failure to Define Uppermost Aquifer

To design a groundwater monitoring system that can detect wastes migrating from the Landfill, it is necessary to characterize the nature of the uppermost aquifer, including the magnitude and horizontal and vertical direction of the groundwater flow and the magnitude of groundwater flow across the landfill site. The proper location and depth of the monitoring wells cannot be determined if the uppermost aquifer is not properly characterized. EWC, and consultants acting on its behalf, have not made soil borings that penetrate to the bedrock to determine that the bedrock is impermea-

ble and thus represents the uppermost aquifer's lower boundary. Unless the uppermost aquifer's lower boundary is known, EWC and its consultants cannot know whether their monitoring wells are located so as to intercept any migrating waste constituents.

The aquifer below the Landfill is the major source of groundwater for the surrounding area. Within a one-mile radius of the Landfill are private wells that provide water for drinking, domestic stock, and agricultural use. Irrigation rigs are used in areas surrounding the Landfill; one such rig might use 50 to 100 million gallons of water in each day of use. The Landfill also adjoins wetlands that support a variety of wildlife. Groundwater below the Landfill discharges into the Tippecanoe River, less than a mile away.

Dr. James Tracy, an experienced hydrologist called as a witness for the EPA, testified that he believed approximately 288 million gallons of water may be found beneath the Landfill at any given moment, depending on the time of year, and 72,000 gallons of groundwater leave the Landfill's boundaries daily.

In late 1986 and early 1987, Dames & Moore performed the first borings that extended below the sand and gravel aquifer that wells 20 and 21 had tapped and encountered a layer of sediments, which Dames & Moore described as the lower confining stratum beneath the sand and gravel aquifer. These two borings, however, do not indicate whether the layer of sediments is found across the entire Landfill property. In the absence of this information and in the absence of further information about the hydraulic properties of the layer of sediments, it cannot be determined that this layer defines the uppermost aquifer; it cannot be determined whether the uppermost aquifer as so defined is hydraulically interconnected with any aquifer below it.

**43.** "Head" is a measure of the energy groundwater possesses at a given point. Head is an indication of the groundwater's potential to move to other locations. The measurement of the head of the groundwater at any given location corresponds to the elevation of the top of a column of water in a piezometer at that location. The higher the water column's elevation, the higher the head.

Such information is critical for groundwater monitoring purposes. Groundwater can flow in one direction in one part of an aquifer and in another direction in another part or at another depth. If the available information is insufficient to define the aquifer, it cannot be determined whether existing monitoring wells draw groundwater from appropriate depths at which waste constituents could be carried more quickly. It also becomes impossible to determine whether groundwater flows in different directions at varying depths, which renders it impossible to know whether a specific monitoring well is upgradient or downgradient from the waste management area.

3. Failure to Determine Permeability

Groundwater flow depends upon two factors: gradient (which reflects the groundwater level elevation and is critical in determining "head") and permeability of the materials through which the groundwater passes or attempts to pass. Permeability describes the extent to which groundwater can pass through materials. Studies introduced into evidence at trial indicate that fairly low gradients mark the Landfill site. Nonetheless, the complexity of the geology underlying the Landfill, with its materials of variable permeability, makes it likely that there are vertical and horizontal flows of widely varying velocities.

The materials underlying the Landfill are heterogenous materials with differing permeability. Those materials were deposited by the repeated advances and retreats of glaciers. Evidence introduced at trial indicates that the materials below the Landfill generally consist of four layers:

(a) A till of fine grain materials interbedded with pockets (or "lenses") of sands and gravel with an average depth of thirty feet.

(b) Below the till is a layer of silty sand, like a lake bottom, with an average thickness of about thirty feet.

(c) Below that sequence is a layer a thick outwash deposit of sand and gravel, with an average thickness of 155 to 160 feet. The depth of this layer is not known with certainty, however, because only one well has penetrated this layer. Gravel is quite permeable. No clear-cut division exists between this unit and the unit above it.

(d) Below that level is a layer of till. Because the single well that penetrated the layer above this unit extended only two feet into this layer, its thickness is unknown.[44]

EWC's boring samples taken during monitoring well drilling have produced relatively little geological data concerning the lower levels. Data maps prepared in 1982 suggest that bedrock in the area of the Landfill is at about a 550 foot elevation, or about 225 feet below ground level. No borings made by EWC have penetrated the bedrock. Site borings at the Landfill to a depth of 214 feet did not encounter bedrock. Of the monitoring wells at the Landfill in autumn, 1988 [45], three were less than fifty feet deep and only one extended more than 150 feet deep. Most of the well depths range from seventy-five to 120 feet.

EWC and its consultants have not taken representative samples from the uppermost aquifer to determine the permeability of the aquifer's various parts. The uppermost aquifer consists of mixtures and gradations of different materials with varying permeability characteristics. Most of EWC's samples were taken from less permeable finger-grained material instead of the more permeable coarser-grained material that comprises most of the uppermost aquifer. Accordingly, EWC has un-

44. The EPA's Task Force Report differs somewhat in its analysis. It describes four levels: (A) a sand a gravel deposit three to five feet deep; (B) a clay deposit thirty to forty feet thick, containing minor sand and gravel and some sand seams five to ten feet thick; (C) sand and gravel of undetermined thickness, generally fining upward to silt; and (D) bedrock. EPA Exh. 4, p. 27.

45. In autumn, 1988, the Landfill began installing wells approved by the Indiana agency for groundwater assessment purposes. By the last week of trial, 106 wells existed at the Landfill. Two of those wells had been capped and were located in what is now cell B; another well that had been capped was located in what is now cell C. The record does not disclose how many wells existed before that project began.

derstated the permeability and rate of flow through most of the uppermost aquifer, and the magnitude of the horizontal and vertical groundwater flow may differ from what EWC has estimated.

The variety of permeability of the materials beneath the Landfill renders it quite difficult to characterize the velocity and direction of groundwater flow. It is, however, EWC that wishes to operate a hazardous waste landfill on the site; it is EWC that bears the burden of characterizing the groundwater flow for purposes of establishing a satisfactory groundwater monitoring system.

The inadequacies detailed above have rendered it impossible to determine the direction of groundwater flow at the Landfill from existing information. Dr. Tracy engaged in a computer-generated "regression analysis" that could not reconcile existing information. At trial, Dr. Tracy convincingly illustrated this point by overlaying several of the potentiometric maps offered by EWC's consultants; when overlain, those maps depicted groundwater flowing in different, and even opposite, directions. A geological study by the Department of the Interior concluded that, "On the basis of available information, no direction of horizontal flow in the till unit can be ruled out." (EPA Exh. 26, p. 4).

#### 4. Conclusion

Because EWC has failed to identify and characterize the uppermost aquifer at the Landfill, which is essential to the establishment of a groundwater monitoring system that can immediately detect the migration of hazardous waste or hazardous waste constituents from the waste management area into the environment, the court finds that it is in violation of 40 C.F.R. § 265.90(a).

### D. Release of Hazardous Wastes

The EPA, in its remaining claim, and STOP, in most of its independent claims, allege that hazardous waste constituents have migrated from the waste deposits at the Landfill. The EPA and STOP part company concerning the extent, effect, and consequences of that migration. The

EPA contends that hazardous waste constituents have been released into the groundwater beneath the Landfill, but does not contend that those constituents have migrated beyond the Landfill's boundaries. The EPA seeks an order requiring development and implementation of a corrective action plan. STOP, on the other hand, contends that hazardous waste constituents have left the Landfill's boundaries through groundwater, surface water, and wind dispersal. STOP seeks the Landfill's closure and appointment of a master to oversee cleanup operations at the Landfill.

Because of the important differences between the EPA's contentions and STOP's contentions concerning release, the court addresses in this section only the EPA's allegation (in which STOP joins) that hazardous waste constituents have been released into the groundwater beneath the Landfill. STOP's separate allegations of off-site migration through ground and surface waters and air are addressed in the section that follows.

When the EPA Administrator determines that there is or has been a release of hazardous wastes into the environment from a hazardous waste disposal area, he or she may commence a civil action for appropriate relief, including a temporary or permanent injunction requiring the owner or operator of the facility to take any corrective action necessary to protect human health or the environment. 42 U.S.C. § 6928(h). The EPA's fourth claim is such an action.

The Administrator made such a finding with respect to the Landfill on June 5, 1987. (EPA Exh. 12). EWC challenges the validity of that finding contending that Regional Administrator Valdas Adamkus did not personally make the determination. EWC apparently relies on the deposition testimony of EPA official Jonathan Adenuga (EWC Exh. PP–18), who testified that on the basis of the summary in the Task Force's report he prepared the document determining that a release had occurred and Mr. Adamkus signed the document without change. Mr. Adenuga testified that he did not discuss the Task Force report with Mr. Adamkus. Regional EPA

enforcement officer James Boyle, however, testified that Mr. Adamkus reviewed the Task Force report.

The regional administrator's determination is entitled to a presumption of regularity. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Such a presumption may be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); *West Chicago Illinois v. United States Nuclear Regulatory Commission,* 701 F.2d 632, 648–649 (7th Cir.1983); *United States v. Clow Water Systems,* 701 F.Supp. at 1356 (defendants presented no evidence to suggest that regional administrator's decision was in any way arbitrary, capricious, or unsupported by evidence). Mr. Adamkus' determination that there had been a release relied principally on the Task Force report. The Administrator's finding articulated the basis for his decision, and EWC has come forth with no evidence that he was required to conduct a personal investigation or inquiry. The Administrator is empowered to issue an order requiring corrective action "on the basis of any information". 42 U.S.C. § 6928(h)(1). Mr. Adamkus did not act arbitrarily or capriciously in issuing his determination that hazardous wastes had been released into the environment.

Samples of groundwater from the Landfill's monitoring wells have been analyzed by EWC's consultants from 1979 until trial, by the EPA's Hazardous Waste Groundwater Task Force Evaluation of the Four County Landfill in 1986 [46], and by Indiana in 1987 and 1988. EWC's self-monitoring reports and the EPA's Task Force noted the presence of organic hazardous constituents in the groundwater beneath the Landfill up to 1986; the Task Force also report-

ed the presence of chloroform, carbon tetrachloride, and 1,1 dichloroethane. In 1987 and 1988, benzene, carbon tetrachloride, chloroform, 1,2 dichloroethane, tetrachloroethane, and 1,1,2 trichloroethane were reported by EWC's self-monitoring reports and state agency reports to have been found in the groundwater beneath the Landfill.

EWC argues that its self-monitoring data is unreliable. *See, e.g.,* EWC Exh. PP–23 (deposition of Babu Parachuri). It notes that its laboratories placed certain limitations upon their reports. Nonetheless, the Landfill was required to conduct self-monitoring, which is very important in the regulatory scheme; regulators rely on such data in reviewing RCRA facilities. EWC hired laboratories to conduct those analyses. EWC's arguments that their agents performed too poorly to give weight to their reports [47] necessarily rings hollow. Nonetheless, the self-monitoring data detected certain hazardous waste constituents in the Landfill's monitoring wells, and sampling by the Task Force and Indiana supplemented that data. Even if the self-monitoring data is discounted somewhat, the court remains convinced that hazardous waste constituents have been found in the Landfill's monitoring wells.

The Task Force found hazardous waste constituents in wells 2, 5 and 7. The Landfill had discontinued the use of those wells as part of its groundwater monitoring system in 1983, but that discontinuance does not affect the import of the discovery of hazardous waste constituents in those wells.

Trichloroethylene, tetrachloroethylene, toluene, carbon tetrachloride, cresols, and benzene are constituents of hazardous wastes that EWC's records report having been placed in the Landfill and were detect-

---

**46.** The EPA has not taken groundwater samples at the Landfill since the Task Force did so in 1986.

**47.** For example, Dr. Robert Harris, a biochemist who testified for EWC, noted that,

There is no quality assurance/quality control (QA/QC) information presented for the Land-

fill's self-monitoring data. . . . It is a generally accepted principle that where conflicting data exist and one set of the data has proper QA/QC and the other does not, it is appropriate to give more weight to the data with proper QA/QC.

EWC Exh. BBBB, ¶ 13.

ed in groundwater beneath the Landfill.[48] Benzene is a known human carcinogen; it is associated with leukemia. Carbon tetrachloride, chloroform, 1,2 dichloroethane, tetrachloroethylene, and trichloroethylene are probable human carcinogens.[49] Cresols, 1,1 dichloroethane, naphthalene, and toluene are toxic to humans, but are not known carcinogens.

In all but one instance, the highest levels detected of the known and probable carcinogens substantially exceeded the maximum contaminant levels ("MCLs") established pursuant to the Safe Drinking Water Act. 40 C.F.R. §§ 141.12. MCLs are designed to take into consideration treatment technologies, economics, and protection of human health. The court deems the MCLs relevant, not solely to show the immediacy of any threat to human health, but also to show the extent of any release. The following levels of carcinogens were detected, in terms of parts per billion:

| Carcinogen | Concentration Detected | MCL |
| --- | --- | --- |
| Benzene | 41 | 5 |
| Carbon Tetrachloride | 33 | 5 |
| 1,2 dichloroethane | 117 | 5 |
| Chloroform | 220 | 100 |
| Tetrachloroethylene | 17 | none |
| Trichloroethylene | 4.1 | 5 |

These six known and probable carcinogens also were found in groundwater beneath the Landfill in concentrations exceeding the U.S. EPA Ambient Water Quality Criteria established under the Clean Water Act for the protection of public health; those criteria are designed to minimize the risk of cancer due to lifetime ingestion of drinking water. These reported levels of concentrations of hazardous waste constituents likely understate the actual concentration levels because of the dilution that results from excessively long sand and gravel packs on many of the monitoring wells.

Fluctuations in detections of chemicals and their concentration is not uncommon in groundwater monitoring. Hazardous waste constituents may migrate in "slugs", causing changes in detected concentration levels as the slugs pass monitoring wells. Differences in sampling and analytical techniques also may account for some fluctuations.

Pursuant to authority delegated to him by the Administrator of the EPA, the Regional Administrator has determined that 1,1 dichloroethane, chloroform, phenols, carbon tetrachloroethylene, creosols, acetone, benzoic acid, toluene, trichloroethylene, and naphthalene have been released from the Four County Landfill into the environment. These substances are hazardous wastes or hazardous waste constituents within the meaning of 40 C.F.R. § 261.30 *et seq.*

Based on the evidence presented at trial, the court concurs with the Administrator's finding. As set forth in Part I–C–3–a of this opinion, since 1980 the Landfill has accepted hazardous waste containing the constituents found in the groundwater. The presence of these hazardous waste constituents in the concentrations found is virtually inexplicable on any theory other than release from the Landfill.

1,1 dichloroethane, 1–2 dichloroethane, 1,1,1 trichloroethane, 1,1,2 trichloroethane, chloroform, carbon tetrachloride, and 2,4,6 tricholophenol are industrially produced substances. They do not occur naturally in groundwater. Acetone, cresol, toluene, and naphthalene are produced by refining process on petroleum or coal. They would not be expected to occur naturally in groundwater within glacial deposits.

EWC presented the expert testimony of biochemist Dr. Robert Harris, who testified that the Landfill's monitoring wells had

**48.** Dr. Harris noted that most of the Task Force's findings related to well 26 and speculated that those findings may have resulted from a precursor to well 26 having been drilled through existing waste. He further testified, however, that his opinion was tentative, and that a detailed evaluation should be conducted with respect to the resulting contamination's horizontal and vertical extent and origin and with respect to needed remedial measures. Such a study would entail the drilling of additional wells.

**49.** Carbon tetrachloride is associated with liver cancer; chloroform is associated with kidney cancer and bladder cancer; 1,2 dichloroethane is associated with kidney cancer.

lesser amounts of organic constituents than commonly might be found in public drinking water. The issue for resolution here, however, is whether there has been a release, not the extent of such a release or the immediate threat such a release might pose. *See United States v. Clow Water Systems,* 701 F.Supp. at 1355–1356. EWC also presented evidence from several witnesses concerning the existence of open dumps in the Landfill's vicinity, but no credible evidence in the record supports an inference that items placed in those dumps contained the chemicals found in the groundwater beneath the Landfill. Based on the record before the court, release from the Landfill more probably than not is the source of the constituents.

This release has resulted in the contamination of groundwater underlying the Landfill and the potential contamination of nearby private drinking wells. This release requires corrective action to protect human health and the environment.

## V. STOP'S CLAIMS

STOP's first four claims mirror the EPA's first through fourth claims; at final argument, STOP's counsel informed the court that STOP's ninth claim alleged nothing beyond the EPA's third claim. The court has set forth all evidence and findings concerning those claims in the discussion of the EPA's claims. Six of STOP's claims (the sixth and the tenth through the fourteenth) allege that hazardous waste constituents have migrated off-site from the Landfill through groundwater, surface water and wind dispersal. STOP's eighth and seventeenth claims were dismissed at the close of STOP's case-in-chief. STOP's three remaining claims (the fifth, seventh and sixteenth) allege various other violations of regulatory provisions under RCRA. Because of the overlap of evidence, the court addresses the claims concerning release into the environment together.

### A. Release into the Environment

 In the previous section, the court found that hazardous waste constituents have been released into the groundwater beneath the Landfill. Because the EPA does not (and need not, for purposes of entitlement to a corrective action order) maintain that those constituents have migrated off the Landfill site, the court made no findings as to the extent of the constituents' migration. STOP, however, contends that hazardous waste constituents that have escaped into the groundwater beneath the Landfill have migrated off-site. No direct evidence supports that contention, a point STOP virtually concedes. Testing of residential wells in the area of the Landfill has disclosed no hazardous waste constituents. STOP argues, however, that indirect evidence supports an inference that hazardous waste constituents have left the Landfill's boundaries through the groundwater.

STOP also contends that hazardous waste constituents have left the Landfill site through the air. STOP's sixth claim relates to the application of "cover", meaning a covering of some non-hazardous material such as soil, to deposited waste. STOP contends that EWC repeatedly has failed to cover hazardous wastes on the Landfill premises allowing hazardous wastes to disperse into the air, soil, and surface waters. STOP further contends that EWC has not maintained adequate cover over completed disposal areas allowing migration of liquids through the closed portion, increasing erosion and drainage problems and undermining the integrity of the cover. STOP also maintains that uncovered waste and dust from loads have been released into the air, soil, and surface waters in and around the Landfill, and that EWC has used reckless disposal practices such as allowing trucks to track wastes on- and off-site and allowing transference of hazardous waste to all areas of the Landfill.

Under this claim, STOP alleges violations 40 C.F.R. § 265.302(d) [50], 40 C.F.R.

---

**50.** The owner or operator of a landfill containing hazardous waste which is subject to dispersal by wind must cover or otherwise

manage the landfill so that wind dispersal of the hazardous waste is controlled.
40 C.F.R. § 265.302(d).

§ 265.310,[51] and 40 C.F.R. § 265.31.[52] STOP also contends that the defendants implicitly have violated 40 C.F.R. § 265.15(a) and (c).[53]

STOP's fifth claim also alleges a release into the air through a fire. Because the evidence on that claim relates more to the fire than to the release, the court addresses that claim separately.

Finally, STOP contends that hazardous waste constituents have been released through surface water. In their eleventh through fourteenth claims, STOP challenges the Landfill's system for handling surface water, both "run-on" (water that enters the Landfill property that must be prevented from making contact with hazardous waste) and "runoff" (which is surface water or rain water than comes into contact with the waste management area). STOP maintains that EWC has failed to design, operate, construct, and maintain

the adequate runoff control system required by RCRA regulations. STOP also contends that EWC has allowed leachate from active cells to leave the cell areas and mix with runoff collected in the retention basins. EWC points to a NPDES–permitted retention basin in the northeast portion of the Landfill[54], but STOP alleges that EWC allowed uncontrolled discharge of runoff through the northeast retention basin before the NPDES controls were installed and operated properly.

STOP further contends that EWC has not maintained the design capacity of the southwest retention basin and has failed to design, construct, operate, and maintain a run-on control system required by RCRA regulations. Finally, STOP contends that EWC has discharged pollutants into unpermitted areas due to these failures. STOP contends that these failures constitute a violation of 40 C.F.R. § 265.302.[55]

51. (a) At final closure of the landfill or upon closure of any cell, the owner or operator must cover the landfill or cell with a final cover designed and constructed to:
(1) Provide long-term minimization of migration of liquids through the closed landfill;
(2) Function with minimum maintenance;
(3) Promote drainage and minimize erosion or abrasion of the cover;
(4) Accommodate settling and subsidence so that the cover's integrity is maintained; and
(5) Have a permeability less than or equal to the permeability of any bottom liner system or natural subsoils present.
(b) After final closure, the owner or operator must comply with all post-closure requirements contained in §§ 265.117 through 265.-120 including maintenance and monitoring throughout the post-closure care period. The owner or operator must:
(1) Maintain the integrity and effectiveness of the final cover, including making repairs to the cover as necessary to correct the effects of settling, subsidence, erosion, or other events;
(2) Maintain and monitor the ground-water monitoring system and comply with all other applicable requirements of Subpart F of this part;
(3) Prevent run-on and run-off from eroding or otherwise damaging the final cover; and
(4) Protect and maintain surveyed benchmarks used in complying with § 265.309.
40 C.F.R. § 265.310.

52. Facilities must be maintained and operated to minimize the possibility of a fire, explosion, or any unplanned sudden or non-sudden

release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment.
40 C.F.R. § 265.31.

53. (a) The owner or operator must inspect his facility for malfunctions and deterioration, operator errors, and discharges which may be causing—or may lead to: (1) Release of hazardous waste constituents to the environment or (2) a threat to human health. The owner or operator must conduct these inspections often enough to identify problems in time to correct them before they harm human health or the environment.
\* \* \* \* \* \*
(c) The owner or operator must remedy any deterioration or malfunction of equipment or structures which the inspection reveals on a schedule which ensures that the problem does not lead to an environmental or human health hazard. Where a hazard is imminent or has already occurred, remedial action must be taken immediately.
40 C.F.R. § 265.15(a), (c).

54. As is discussed in greater detail below, EWC obtained a permit in 1986 to operate a National Pollutant Discharge Elimination System pursuant to 33 U.S.C. § 1369(b)(1)(F).

55. (a) The owner or operator must design, construct, operate and maintain a run-on control system capable of preventing flow onto the active portion of the landfill during peak discharge from at least a 25–year storm.
(b) The owner or operator must design, construct, operate and maintain a run-off

### 1. Dust and "Cover"

STOP presented the testimony of numerous witnesses concerning the release of hazardous waste through dust emanating from the Landfill.

David Koepper worked for Indiana's environmental agency for eight years. He filed several reports concerning his observations of dust and lack of cover at the Landfill. He performed inspections at the Landfill ten to twelve times a year. He testified and reported that on a trip to the Landfill on April 28, 1988, a windy day, he could feel grit hitting his face and could smell waste. (STOP Exh. 72). Mr. Koepper had noted problems with dust and cover on numerous earlier inspections at the Landfill. During a March 28, 1988 inspection, Mr. Koepper noted that EWC was not applying daily cover, but noted no wind dispersal. (STOP Exh. 69). Mr. Koepper's August 12, 1987 inspection disclosed a problem with dust control during the dumping of waste. (STOP Exh. 62). On June 1, 1987, Mr. Koepper noted a dust release while a truck was dumping, and Mr. Wilkins told him that the working area of the cell then in use was not being covered daily; Indiana sent Mr. Shambaugh a violation letter based on Mr. Koepper's June 1 observations. (STOP Exh. 48 and 49). On December 18, 1986, it appeared to Mr. Koepper that hazardous waste was not being covered properly. (STOP Exh. 36). During an inspection on December 18, 1986, Mr. Koepper noted that waste was tracked across a sloped area over which water would flow into the runoff pond; Mr. Koepper reported that Mr. Shambaugh said the area would be bermed and redirected to control the problem. (STOP Exh. 42).[56]

On April 30, 1987, Indiana wrote Mr. Shambaugh to report Mr. Koepper's December 18, 1986 finding that trucks were tracking considerable material (which may have been mud) off-site and reminding Mr. Shambaugh of Environmental Waste's obligation to decontaminate trucks before they leave the site and to clean up, and dispose of as hazardous waste, any material that may be carried off-site. (STOP Exh. 45).

Other warning letters came before that. On October 24, 1986, Indiana sent the Landfill a warning letter stating, among other things, that during inspections in February and March, 1986 Indiana inspectors had observed dust on on-site and off-site roadway being tracked off-site on the trucks used to transport the dust. (STOP Exh. 29). On January 23, 1987, Indiana sent the Landfill a letter of warning stating, among other things, that during an October, 1986 inspection vehicles working on the leachate control system were driving through waste, contaminating other soil. (STOP Exh. 35).

The Landfill had had earlier problems with cover. Until August, 1985, the Landfill was under the aegis of Indiana's solid waste management regulatory program, which required application of daily cover. On March 20, 1985, state agency inspector David Koepper noted working space at the Landfill without cover.[57] On May 23, 1985, Mr. Koepper reported several areas of exposed waste in the Landfill's northwest corner. (STOP Exh. 10). By a consent decree entered into in August, 1985 (STOP Exh. 15), the Landfill withdrew its request

---

management system to collect and control at least the water volume resulting from a 24-hour, 25-year storm.

(c) Collection and holding facilities (e.g., tanks or basins) associated with run-on and run-off control systems must be emptied or otherwise managed expeditiously after storms to maintain design capacity of the system. 40 C.F.R. § 265.302.

**56.** Mr. Koepper's report also stated that daily cover had not been applied, but that he found no wind dispersal.

**57.** Mr. Koepper wrote in his report:

(2) The wet/winter area next to the on-site road has several areas which need to be covered more completely. A few small areas are not covered at all.

(3) There are some spots on the NW corner (area fill from last year) that have waste showing thru. One drum of Hydroxide sludge was on top and had spilled out also.

 \* \* \* \* \* \*

(5) The on-site road has what appears to be Electric Arc Furnace dust on it. This is probably unavoidable because of the way the dust sticks to vehicles.
STOP Exh. 8.

for a solid waste management permit and agreed to accept no further solid waste. That consent decree noted that four inspections in early 1983 had disclosed that daily cover was not being applied.

During its June, 1986 inspection of the Landfill site, the EPA Task Force observed waste escaping as fugitive dust during the dumping of a load of hazardous waste. (EPA Exh. 4, p. 18).

Ken DeRolf, who works in the state agency's Office of Air Management, testified that on February 25, 1988, while on one of his five investigatory trips to the Landfill, he saw fugitive dust emissions crossing a road adjoining the Landfill from vehicles travelling on an unpaved haul road. He conceded that he took no samples from the air or from the haul road. He also conceded that the Landfill responded to his observation, and the response was deemed satisfactory.

Aaron Foster, the former Landfill lab technician [58], made notes of dust entering the air as dusty loads were dumped at the Landfill during 1988. His notes reflect the receipt of a truckload of unbagged dusts and the assurance of the truck driver that loads of dust were accepted at the Landfill in an unbagged condition.

Kathryn Dittmeyer, a STOP member, presented a videotape she made of the Landfill's operations on October 13, 1988. (STOP Exh. 97, third segment). That videotape depicted a cloud of dust arising as a truck dumped material at the Landfill; the dust moved from west to east across the road adjoining the Landfill. She taped the Landfill's operations on numerous occasions [59] and testified that the dust she saw on October 13 was not unusual. She conceded she took no samples to disclose the character of the dust.

Dixie Sefchek is president of STOP. She testified that she has seen waste uncovered for weeks at a time at the Landfill (although she offered no dates) and that she has smelled what she believes to be toxic fumes from the Landfill.

Donald Bowen, a STOP member, took many photographs of what he believed to be exposed, uncovered waste at the Landfill. Mr. Bowen took such photographs virtually on a daily basis from July 28 to August 8, 1987. (STOP Exh. 51A–E, 52A–B, 53A–C, 54A–C, 55A–B, 55E, 56A, 56C–I, 58A–C, 59A–B, 60B–C). Those photographs appear to depict hazardous waste that remained exposed throughout the period, although EWC consultant Michael Johnson denied that they so show. Mr. Bowen took additional photographs of exposed waste in the spring of 1988.[60] (STOP Exh. 73A–K, 75A–D).

Mr. Bowen testified that while he has seen waste packed down by heavy equipment, he had not seen waste being covered at the Landfill until just before the court's visit to the site at the beginning of trial. Carol Lewis, a resident of Rochester, Indiana, corroborated Mr. Bowen's testimony. She testified that she saw no cover before November, 1988, except that when a working cell was completed the cell would be covered. Only once did she see waste covered immediately.

---

**58.** STOP also presented the testimony of another former Landfill employee. Kent Thomas, who worked as a mechanic and equipment operator at the Landfill from December, 1986 to June, 1988, testified concerning dumping procedures at the Landfill. He told of his observations of dust wafting into, and immediately affecting, trees surrounding the Landfill; seeing metal particles in the air; observing skin rashes on Landfill employees; unreported incidents of waste falling from trucks as they bounced along the roads; and failure to cover exposed waste.

The court did not, however, find Mr. Thomas to be a credible witness. In light of the apparent exaggeration in his testimony and his failure to have reported things he claims to have seen,

the court believes that his antipathy toward EWC—not as a neighbor who believes his health is threatened, but rather as a disgruntled former employee—has colored his recollection of events to the extent his recollection is unreliable.

**59.** Ms. Dittmeyer testified that STOP members videotape the Landfill's operations on a daily basis.

**60.** Mr. Bowen testified that he has taken photographs of the Landfill forty to fifty times, and that the photographs offered into evidence are but a small portion of those he has taken.

Mrs. Lewis and her husband, Thomas, built a home between the Landfill and Kings Lake. Mr. Lewis, a STOP member, testified that considerable dust reaches his home from the direction of the Landfill. Since 1987, Mr. Lewis testified, his windows on the Landfill side could stand to be washed every day and he now must dust inside his home twice a week instead of monthly as he used to do. He testified that the dust is gritty. Mr. Lewis could offer no evidence of the chemical composition of the dust that plagues him.[61]

EWC presented opposing evidence. Dr. Robert Jacko of Purdue University conducted air sampling at the Landfill on May 26, 1988, a day of brisk winds and very low relative humidity. He took samples from a location downwind from an active cell. Based on the chemical analysis provided by a laboratory Dr. Jacko chose, he concluded that the particular concentrations in the air at and near the Landfill were well within established limits for the protection of human health and that his findings do not suggest the existence of an ambient air problem at the Landfill. (EWC Exh. HH, JJJ).

Walter Block worked at the Landfill at the time Dr. Jacko performed his tests. Mr. Block testified that Landfill employees knew an air sampling test was to be conducted that day and were instructed to be very careful not to create dust. Tasks at the Landfill took five times longer to complete that day than on other days, and fewer than the usual number of dusty loads were received at the Landfill that day.

Doyle Flory, the Landfill's field superintendent, testified that EWC covers dusty material with sludge to prevent wind dispersal; he did not explain what was in the sludge. He testified that most of the hazardous waste received at the Landfill is in the form of sludge, rather than dust.

The Landfill's company doctor, Brian Holm, performs annual physical examinations on Landfill employees. His examinations include testing for heavy metals in employees' blood. He testified that none of his findings have been such as to concern him; everyone has fallen well within normal limits for heavy metals.

### 2. Surface Water: "Run-on" and "Runoff"

Jean King lives in Culver, Indiana, about five miles from the Landfill. On September 27, 1986, while driving past the Landfill, she noticed that a considerable amount of surface water appeared to have departed the Landfill site. She believed the water had originated in the area of cell A. Mrs. King and her husband flew in a plane over the Landfill, and she took photographs that she believed corroborated her belief that water had flowed from the working area of cell A into an adjacent wetland area and then across the road adjoining the Landfill. She believed her photographs confirmed that water from the working area had crossed the containment berm into a runoff area. More than two inches of rain had fallen before Mrs. King made her observations; a 24–hour, 25–year storm would exceed four inches.

Dixie Sefchek[62] testified that she saw the same thing as did Mrs. King on September 27, 1986, although she conceded

---

**61.** Patsy Clark, a STOP member and spouse of a STOP official, testified that she travels past the Landfill periodically during her day-to-day activities. Before May, 1987, she would become ill after passing the Landfill with her car windows open. She would vomit upon her return home. After the fourth or fifth occurrence, she associated her illnesses with the smell from the Landfill.

For several reasons, the court attributes little weight to Mrs. Clark's testimony. First, she testified that she participated in STOP's daily surveillance of the Landfill by videotaping the site eight to ten times, a course of action quite

inconsistent with a belief that proximity to the Landfill renders her ill. Second, the court cannot determine that her reaction (even assuming, as Mrs. Clark does, a connection with the Landfill) was due to dust rather than odor. Some odor would seem to be inherent in an ongoing landfill operation, even if waste is covered at the close of each day. Surely, waste must be exposed while it is being deposited into the Landfill.

**62.** In addition to serving as the only president STOP has had, Mrs. Sefchek also has a pending personal injury lawsuit against EWC.

that she did not know whether the waste was covered at the time of her observations. Robert Lancaster, a STOP officer, testified that he also saw the events Mrs. King described; he testified that the working face was not covered on September 27, 1986. EWC consultant Michael Johnson disagreed; he testified that the waste was covered on the day of Mrs. King's photos, and that the water shown in the photos had not contacted hazardous waste.

Mr. Johnson also testified that Mrs. King's photographs show the surface water being diverted to the Landfill's NPDES control system; that testimony is improbable, however, in light of an EWC document admitted into evidence. Mr. Shambaugh outlined the developments surrounding that permit in a November 20, 1986 letter to the Indiana environmental agency:

On December 1, 1983, a completed application for a water pollution control facility construction permit as required by 330 IAC 3-2, and an application for a NPDES permit utilizing EPA forms 3510-1 etc. was [sic] submitted to the Indiana Stream Pollution Control Board. A construction permit was issued by the Stream Pollution Control Board. A construction permit was issued by the Stream Pollution Control Board in November, 1984 and in compliance with the permit construction began on October 30, 1985. The NPDES permit was a necessary requirement in the proper management and control of runoff which would be collected from a 24 hour, 25 year storm.... Weather and site conditions permitting construction and grading operations for the run off control system continued through 1986. The final placement of culverts and valves, etc. depended upon the final issuance of the permit. Remember, one cannot discharge from an NPDES structure without a valid NPDES permit. If Four County had completed all construction phases and

collected runoff without the existence of a valid NPDES permit, the site would have been in violation NPDES regulations. An NPDES permit was issued on September 24, 1986 by the Indiana Department of Environmental Management.... Four County landfill received written notice of the permit issuance on Friday, September 26 and began immediately to complete final grading operations, opening culverts and valving systems to meet the requirements of the issued permit. Rains during the next few days hindered work (7.75 inches from September 24 through October 7, 1986), but the fully integrated NPDES control system was in place and on line by October 8, 1986. Since that date there have been no uncontrolled discharges of runoff waters at the Four County Landfill.

EWC Exh. AA–10. On the date of Mrs. King's observations, then, the Landfill's NPDES control system was not complete, and Mr. Shambaugh himself mentioned problems caused by the rain that fell during the days encompassed by Mrs. King's observations.

The Landfill's run-on control system consists of two holding basins, one in the northeast corner of the facility, the other in the southeast. According to the system's design, any precipitation that falls in an area that has received or will receive hazardous waste goes to one of the basins. Water is pumped from the southwest basin around the facility's perimeter to the northeast basin, from which it is discharged into the neighboring wetlands north of the Landfill property pursuant to the NPDES permit. No separate NPDES permit has been sought for the southwest basin because it is an integral part of the system that discharges from the northeast basin.[63]

Surface water problems had been observed frequently before the NPDES permit was granted. Stuart Miller inspected

**63.** The administrative order in Cause N–128 required EWC to obtain a NPDES permit for the southwest basin. EWC consultant Michael Johnson testified that within thirty days of that order EWC explained to the Indiana agency why such a permit was unnecessary, and the

Indiana agency made no objection. The court need not determine whether EWC's explanation constitutes compliance with the order in Cause N–128; as stated elsewhere, the court deems this action one to enforce RCRA regulations, not the state administrative order.

the Landfill in March 1983, as an inspector for the Indiana Board of Health, and reported that leachate was ponded on site at the toe of the working area. (STOP Exh. 3). Mr. Koepper and another state inspector reported that, on February 16, 1983, run-on was not being diverted from the active portion of the Landfill and that runoff from the active portion was not being collected. (STOP Exh. 4). Mr. Miller testified that when he inspected the Landfill in April, 1983, he saw leachate ponded near the working area and saw leachate being pumped off-site. *See* STOP Exh. 5. He concedes that he did not test what he believed to be leachate and that an administrative consent decree addressed his reports on his observations.

Mr. Koepper inspected the Landfill again in March, 1985 and reported, "Run on into the working area is not controlled at present. There are plans to cut a diversion trench around the area in the near future. The run off from about ¼ to ½ acre runs into working area at present." (STOP Exh. 8). A year later, Mr. Koepper reported, "Runoff was contacting waste at the working face and exiting the site via a cut made in the southwest runoff basin. Runoff from the on-site road contamination would also eventually leave the site from one of the two pond discharges." (STOP Exh. 19). That report led to the issuance of a notice of violation by the Indiana agency (STOP Exh. 29), but that notice was never resolved.

Surface water problems at the Landfill also have been noted after the NPDES system became operative. An October, 1986 inspection by Mr. Koepper (after the NPDES system theoretically was in operation) led to a letter of warning to the Landfill alleging that the leachate control system did not separate leachate and general contamination from the working cell from runoff from cell A, leading the agency to forbid the discharge of any liquids from cell A through the NPDES system. (STOP

Exh. 35). Following a December, 1986 inspection, Mr. Koepper reported,

The major problem was the threat that runoff could come in contact with the exposed waste. The waste is outside the leachate collection system and could lead to runoff contamination if it is not covered. It appeared that the area had not been worked that day and that it had been uncovered since at least the day before....

It does seem that Cell A leachate is now being collected from the entire north half of the cell and that no attempt at separating runoff from leachate is being made in the active cell. This was confirmed by Mr. Mike Johnson during a phone call ...

STOP Exh. 39; *cf.* STOP Exh. 36.

In a February, 1987 inspection, Mr. Koepper noted exposed waste that could create a leachate flow problem in the event of rain. (STOP Exh. 42).

Mr. Lancaster videotaped the Landfill in November, 1988, following a rain measured at 1.22 inches. His videotape, admitted into the evidence as the first portion of STOP Exhibit 97, appears to show torrents of rain water coursing from the Landfill property, apparently unencumbered by any control system.[64]

STOP presented the testimony of Donald Steffeck, a contaminant specialist employed by the U.S. Fish and Wildlife Service. Mr. Steffeck conducted a study of fish and wildlife in areas surrounding the Landfill for purposes of comment on EWC's application for an NPDES permit. Mr. Steffeck concluded that several contaminants have migrated from the Landfill to adjacent media. Although organic contaminants were not found at elevated levels in organisms living near the Landfill, several inorganic compounds (including manganese, aluminum, zinc, cadmium, mercury, and nickel) were found in such organisms at higher levels than in organisms in areas unaffect-

---

**64.** STOP also presented the testimony of Kent Thomas, who said that when he worked at the Landfill he would see leachate go over dikes within the working cells; heavy rain would wash the dikes away. He also saw dust and torn plastic from trucks that brought hazardous waste blown into water that went into surface water holding tanks. As noted in note 58, *supra*, however, the court did not find Mr. Thomas to be a credible witness.

ed by the Landfill. The levels of such inorganic compounds were considered elevated and at least cautionary for consumption by predators. The highest elevations were found in organisms living in the wetlands north of the Landfill; those wetlands now receive surface water runoff from the Landfill.

Through cross-examination and the expert testimony of George Parker, Thomas Kuczek, Dr. Anne Spacie, Dr. James Gammon, and Dr. Leslie Hutchinson (EWC Exh. PP–9), EWC strongly challenged Mr. Steffeck's study, methodology, and conclusions. Certainly, his study was far from conclusive. He operated under cost and time constraints to which he testified. Mr. Steffeck conceded that his study was a survey, not a detailed analysis, and agreed that a more thorough study would produce more detailed data. EWC's experts pointed out those things that render the study imperfect; some offered suggestions of what should have been done. It remains, however, that EWC's experts did not do those things, either; only Mr. Steffeck came close. His study is challenged, perhaps impeached, but not contradicted.

### 3. Indirect Evidence of Release

While the EPA simply sought to prove that knowledge about the groundwater flow at the Landfill is inadequate, STOP presented the testimony of Dr. Henk Haitjema, a hydrologist, who offered opinions concerning the rate of flow of the groundwater beneath the Landfill. Dr. Haitjema considered information about the areas surrounding the Landfill as well as data relating directly to the Landfill. He concluded that the records concerning the direction of groundwater flow at the Landfill are consistent with the general northeasterly to north-northeasterly flow in the

region.[65] Based on regional information concerning permeability, Dr. Haitjema's computer modelling led him to conclude that a single, well-connected aquifer zone exists beneath the Landfill and that groundwater from beneath the Landfill would reach the Tippecanoe River in five to sixteen years. Residences in and north of DeLong, Indiana would be in the path, although the aquifer's heterogeneous nature could lead a contaminant plume elsewhere. Dr. Haitjema conceded that no contamination has been detected in residential wells along that path[66], but noted that contaminant plumes may be travelling through a portion of the aquifer that those residential wells do not tap. From Dr. Haitjema's testimony, STOP argues that it reasonably may be inferred that the contamination in the groundwater beneath the Landfill has migrated beyond the Landfill's boundaries in the two to three years since its detection.

After the trial began, EWC retained Dr. Ronald Turco to study soil samples from on and near the Landfill for toxic metals that might have migrated from the waste deposited at the Landfill. Michael Johnson took the samples from depths and at locations Dr. Turco instructed. Dr. Turco looked for trends suggesting migration; such trends would consist of higher levels near the Landfill and lower levels as distance from the Landfill increased. Airborne metals do not travel great distances. Dr. Turco testified that he found no trends in the metals. He found elevated levels of some metals near roads, which he deemed consistent with automobile emissions and traffic. The roadside readings for chromium, lead, silver, copper, and zinc were all at their highest on the road along the Landfill, however. Dr. Turco believed that the levels of metals that he found in the soil on and around the

---

**65.** Dr. Haitjema's testimony on this point is not inconsistent with the EPA's contention, and the court's finding, that EWC has not determined the direction of groundwater flow beneath the Landfill. Dr. Haitjema referred to regional flow patterns, but more must be known for groundwater monitoring purposes. To determine location of upgradient and downgradient wells, the direction of flow beneath and surrounding the waste management area must be known.

**66.** Dr. Robert Harris, an EWC witness, testified that he had reviewed off-site residential well testing data and found nothing disclosing contamination representing a health concern or any contamination of residential well caused by the Landfill's operation. No direct evidence contradicted this evidence.

Landfill were consistent with what one would expect to find in soil in Indiana.

### 4. Conclusion

The issues must be defined before resolving them. First, the court does not view that the design or construction of the Landfill's NPDES system as being at issue; those issues properly are addressed through the NPDES permitting procedures. If EWC has failed to control runoff through the operation and maintenance of a run-on and runoff control system or systems, however, it has violated 40 C.F.R. § 265.302. The issue is not the system's design and construction; the issue is the system's operation and maintenance. The distinction is a narrow one, but another view of the case would immunize EWC from application of 40 C.F.R. § 265.302 by virtue of its NPDES permit, regardless of its post-permitting operation or maintenance.

Second, the court does not view EWC as subject to any requirement of "daily cover". STOP notes that the agreed administrative order in Cause N–128 requires application of daily or intermediate cover to deposited waste. This suit, however, is not one to enforce the state administrative order; it is a suit alleging violations of RCRA and federal regulations promulgated under RCRA. The administrative order and the events leading to it are relevant on the issue of penalty, but the court cannot deem them relevant to whether EWC's failure to cover hazardous waste breached RCRA regulations. The standard by which EWC is to be judged is not the administrative order, but rather 40 C.F.R. § 265.302(d) which required it to "cover or otherwise manage the landfill so that wind dispersal of the hazardous waste is controlled."

As noted above, STOP contends that hazardous waste constituents have migrated from the Landfill site through groundwater, surface water, and air. While the court found in Part IV–D of this memorandum that hazardous waste constituents have been released into the groundwater beneath the Landfill, the court cannot agree that those constituents have left the Landfill site through the groundwater.

Dr. Haitjema's testimony certainly warrants an inference that contaminated groundwater has left the Landfill site, but, without more, that inference is insufficient to constitute proof by a preponderance of the evidence. Contamination simply has not been found in residential wells surrounding the Landfill. As Dr. Haitjema testified, the absence of contamination in residential wells does not wholly refute the possibility that a contaminant plume has left the Landfill, but it is not EWC's burden to disprove that possibility. STOP bears the burden of proof and has failed to meet that burden with respect to groundwater.

STOP has, however, convinced the court that it is more likely than not that hazardous waste constituents have left the Landfill site through surface water and air. Viewed separately, each item of STOP's proof is insufficient to meet that burden. Mr. Steffeck's report had shortcomings; those who saw dust took no air samples (and Dr. Jacko, who took air samples, saw little dust); eyewitness testimony may have been shaded by the bias that led the eyewitnesses to join STOP. The Indiana inspectors who observed uncovered waste, dust, and inadequate surface water control, however, were not shown to share such bias, and Mr. Steffeck's conclusions were uncontradicted. That evidence, coupled with the sheer number of incidents reported by admittedly partial witnesses, leads the court to conclude that hazardous waste constituents, albeit in concentrations that may pose no immediate threat to human health to date, have left the Landfill through air and surface water.

EWC did not manage the Landfill so as to control the wind dispersal of hazardous waste as required by 40 C.F.R. § 265.302(d); EWC did not operate and maintain a run-on control system and a runoff management system in compliance with 40 C.F.R. § 265.302(b) and (c).

### B. Ignitable Waste

 STOP's sixth claim alleges that the Landfill has accepted and disposed of reactive or ignitable wastes that caused a

spontaneous ignition at the Landfill and constituted an unplanned release of hazardous constituents into the air. STOP contends that EWC violated 40 C.F.R. § 265.17(a)[67] and 40 C.F.R. § 265.31.[68]

STOP relies on the testimony of Aaron Foster and Kent Thomas concerning events in February or March and June, 1988. Kent Thomas worked as a mechanic and equipment operator at the Landfill from December, 1986 to June, 1988. Mr. Thomas testified that in February or March, 1988, the Landfill received a load from a generator named Chem–Met and that the load spontaneously caught fire. Mr. Thomas said that he, Mr. Flory, and others put the fire out with a fire extinguisher and it ignited again. Mr. Thomas testified that he and the others buried the load in hazardous waste. Mr. Thomas described the material as a grey-green sludge with pieces of shredded barrels; he said it smelled of paint thinner. Mr. Thomas did not report the incident.

Mr. Foster worked as a lab technician at the Landfill from late May to early August, 1988. He inspected each arriving truck and took samples for testing to confirm the correctness of the manifest identifying the truck's contents and to detect free liquids. Mr. Foster had no training in chemistry apart from his instruction on how to perform the tests required by the Landfill's waste analysis plan. Unbeknownst to his employers, he kept a diary (STOP Exh. 78) during his employment.

Mr. Foster testified that on June 21, 1988, the Landfill received a brown garbage bag with a note identifying its contents as black oxide. Mr. Foster tested the material and concluded it satisfied the Landfill's waste analysis plan. Three days later, he saw what he believed to be the same material, partially covered, in the rear of another truck; the oxide was not listed on that truck's manifest. On June 27, Mr. Foster checked a truck with plastic drums covered with Saran Wrap and containing an orange and tan substance. Mr. Foster approved the load for deposit at the Landfill. He later heard that some "bubbling" was occurring at the dumping site. He mixed the orange and tan substance with some of the black oxide, and it bubbled profusely.

The court cannot find any violation on the basis of Mr. Foster's testimony. He did not see the "bubbling" incident at the site; he simply related what others told him. While those statements were admissible in evidence, the court simply cannot attribute sufficient weight to those statements to find, by a preponderance of the evidence, that the defendants violated 40 C.F.R. § 265.17(a) in June, 1988.

As noted in note 58, *supra*, the court did not find Mr. Thomas to be a credible witness. Even if Mr. Thomas' testimony accepted as true, however, it would be insufficient to convince the court that EWC violated 40 C.F.R. § 265.31. That regulation is not violated simply by a sporadic fire. The regulation requires the implementation of procedures designed to minimize fire. The occurrence of a single fire, quickly contained, does not persuade the court that EWC did not implement such procedures.

### C. Free Liquids

In its seventh claim, STOP contends that from late 1986 to August, 1988, the Landfill received many loads containing free liquids that were not treated by mixing or decanting, in violation of 42 U.S.C. § 6924(c):

**(c) Liquids in landfills**

or reactive waste is being handled, the owner or operator must confine smoking and open flame to specially designated locations. "No Smoking" signs must be conspicuously placed wherever there is a hazard from ignitable or reactive waste.

40 C.F.R. § 265.17(a).

---

**67.** The owner or operator must take precautions to prevent accidental ignition or reaction of ignitable or reactive waste. This waste must be separated and protected from sources of ignition or reaction including but not limited to: Open flames, smoking, cutting and welding, hot surfaces, frictional heat, sparks (static, electrical or mechanical), spontaneous ignition (e.g., from heat-producing chemical reactions), and radiant heat. While ignitable

**68.** 40 C.F.R. § 265.31 is set forth in full in note 52, *supra*.

(1) Effective 6 months after November 8, 1984, the placement of bulk or noncontainerized liquid hazardous waste or free liquids contained in hazardous waste (whether or not absorbents have been added) in any landfill is prohibited. Prior to such date the requirements (as in effect on April 30, 1983) promulgated under this section by the Administrator regarding liquid hazardous waste shall remain in force and effect to the extent such requirements are applicable to the placement of bulk or noncontainerized liquid hazardous waste, or free liquids contained in hazardous waste, in landfills.

\* \* \* \* \* \*

(3) Effective twelve months after November 8, 1984, the placement of any liquid which is not a hazardous waste in a landfill for which a permit is required under section 6925(c) of this title or which is operating pursuant to interim status granted under section 6925(e) of this title is prohibited unless the owner or operator of such landfill demonstrates to the Administrator, or the Administrator determines, that—

(A) the only reasonable available alternative to the placement in such landfill is placement in a landfill or unlined surface impoundment, whether or not permitted under section 6925(c) of this title or operating pursuant to interim status under section 6925(e) of this title, which contains, or may reasonably be anticipated to contain, hazardous waste; and

(B) placement in such owner or operator's landfill will not present a risk of contamination of any underground source of drinking water.

As used in subparagraph (B), the term "underground source of drinking water" has the same meaning as provided in regulations under the Safe Drinking Water Act. . . .

STOP further contends that the receipt of loads containing free liquids violated 40 C.F.R. § 265.314(b), (c):

(b) Effective May 8, 1985, the placement of bulk or non-containerized liquid hazardous waste containing free liquids (whether or not absorbents have been added) in any landfill is prohibited.

(c) Containers holding free liquids must not be placed in a landfill unless:

(1) All free-standing liquid (i) has been removed by decanting, or other methods, (ii) has been mixed with absorbent or solidified so that free-standing liquid is no longer observed or (iii) had been otherwise eliminated; or

(2) The container is very small, such as an ampule; or

(3) The container is designed to hold free liquids for use other than storage, such as a battery or capacitor; or

(4) The container is a lab pack as defined in § 265.316 and is disposed of in accordance with § 265.316.

STOP appears to rely on Mr. Foster's testimony that in 1988 the Landfill accepted several loads with accumulated rainwater or drums of free liquids. Michael Johnson, EWC's chief consultant, testified that EWC always mixed containerized liquids with absorbent materials. Mr. Johnson also testified that uncontainerized "free liquids" such as rainwater in truck beds were either removed from the waste and placed in leachate collection units or mixed with absorbent materials before being deposited in the Landfill; Mr. Shambaugh and Landfill field superintendent Doyle Flory concurred.

Mr. Foster testified that his concerns were ameliorated when he inquired of the EPA and was informed that the Landfill's procedures were proper. The court cannot simply accept with confidence the statement of an EPA official identified only by his first name, as Mr. Foster could do, but certain conclusions may be drawn. First, Mr. Foster was reassured by information that mixing the liquids (containerized or non-containerized) with absorbents satisfied RCRA regulations. From this, the court infers that Mr. Foster had no basis to believe that EWC was not mixing the liquids with absorbents. Accordingly, the court accepts Mr. Johnson's testimony that

such mixture always was done.[69]

Second, although neither the statute nor the regulation would seem to allow landfills to accept non-containerized free liquids after November 8, 1985 (and Mr. Foster testified to events that occurred in 1988), the meaning of "free liquids" presents some ambiguity. 40 C.F.R. § 260.10 defines "free liquids" as liquids which readily separate from the solid portion of a waste under ambient temperature and pressure. That rainwater in the bed of a truck transporting hazardous waste constitutes a "free liquid" is not readily apparent from that definition. The statement of an unidentified mid-level EPA official is hardly entitled to the full weight of the deference a court is to pay to the interpretation of a statute or regulation by the agency charged with its enforcement, see *Environmental Protection Agency v. National Crushed Stone Ass'n*, 449 U.S. at 83, 101 S.Ct. at 307, but the EPA offered no challenge to that construction.

In light of the ambiguity of the regulation defining "free liquids" and the slight evidence concerning the EPA's interpretation of that term as excluding rainwater in truckbeds to the extent 42 U.S.C. § 6924(c) and 40 C.F.R. § 265.314(b) otherwise would forbid a hazardous waste facility from accepting such loads after November 8, 1985, the court concludes that STOP has not shown that EWC violated these provisions by accepting such truckloads in 1988. In light of Mr. Johnson's uncontradicted testimony concerning EWC's handling of containerized free liquids, the court finds that STOP has failed to show that EWC violated 42 U.S.C. § 6924(c) and 40 C.F.R.

§ 265.314(c) by accepting containerized free liquids in 1988.

### D. Handling of Barrels

In its tenth claim, STOP contends that Landfill personnel have handled barrels containing hazardous waste in such a way as to allow the barrels to rupture and to allow the barrels' contents to spill. Many of the barrels, according to STOP, contain dry, dusty material that is left exposed to the wind and air, uncovered, and subject to dispersal. STOP contends that this conduct violates 40 C.F.R. § 265.31.[70]

Greg Sefchek videotaped the Landfill's operations on October 11, 1988 (STOP Exh. 97, second portion). The videotape shows barrels being pushed from a truck, then being moved about by a bulldozer. Mr. Sefchek testified that as he videotaped, one of the barrels split open and its contents escaped.[71] He does not know what was in the drums. Because Mr. Sefchek could not identify the drums' contents or testify to more than the single incident he videotaped, the court deems his testimony insufficient to establish a violation of 40 C.F.R. § 265.31.

### E. Unmanifested Waste

STOP's sixteenth claim alleges that on least one occasion in 1988 the Landfill failed to obtain a detailed chemical and physical analysis of representative samples of waste by receiving unmanifested waste in violation of 40 C.F.R. § 265.13(a)(1).[72] STOP appears to rely on the testimony of Clifford Aaron Foster with respect to two loads received at the Landfill in June, 1988. Mr. Foster testified that a load of black oxide dust (the dust described with refer-

---

69. Kent Thomas testified to the contrary. He said that water-laden loads always were dumped without removal of the water. He added that such trucks "usually" leaked water at the tailgate. As noted in note 58, *supra*, however, the court did not find Mr. Thomas to be a credible witness.

70. For the text 40 C.F.R. § 265.31, of see note 52, *supra*.

71. Mr. Sefchek is a member of STOP. His wife is president of STOP. He and his wife have pending state personal claims against EWC. He

videotaped the Landfill operations about fifty times.

72. Before an owner or operator treats, stores, or disposes of any hazardous waste, he must obtain a detailed chemical and physical analysis of a representative sample of the waste. At a minimum, this analysis must contain all the information which must be known to treat, store, or dispose of the waste in accordance with the requirements of this part and Part 268 of this chapter.
 40 C.F.R. § 265.13(a)(1).

ence to STOP's ignitable waste claim) was received without a manifest on June 21, 1988, and that a load of waste containing lumber had been received on June 27, 1988, although the lumber was not on the manifest.

Mr. Foster conceded, though, that he had no training in reading manifests. When a load of waste arrived at the Landfill, the truck driver would present Mr. Foster with the manifest; Mr. Foster then would note the manifest number, take samples from the load, and return the manifest to the driver. The driver would take the manifest to the office; Mr. Foster would take the samples to the laboratory and run simple, specified tests on the samples. Mr. Foster then would call the office and report his findings. Personnel in the office would compare Mr. Foster's findings to the manifests and accept or reject the load. Debra Noel and Margaret Krull were the persons who worked in the office during Mr. Foster's tenure at the Landfill. Both testified that they always wrote down precisely what Mr. Foster reported to them, and neither was aware of any instance in which Mr. Foster's report differed from the manifest.

In resolving this issue, the court has considered the possibility that both Ms. Noel and Ms. Krull testified as necessary to preserve their employment. Nonetheless, in light of Mr. Foster's lack of training in reading manifests and the office personnel's greater opportunity to compare Mr. Foster's findings with the manifests, the court finds it more likely than not that Mr. Foster simply is mistaken concerning the unmanifested loads and concludes that STOP has failed to prove a violation of 40 C.F.R. § 265.13(a)(1).

## VI. REMEDIES

The matter of remedies presents the most troubling issues in this case. Some of the issues, such as the loss of interim status and corrective action, present relatively little difficulty in light of the proven violations. The issues of the amount of civil penalties and the permanent closure sought by STOP, however, present thorny ques-

tions. No party has cited cases addressing those issues, and the court's research has disclosed none. This court appears to write on a clean slate with respect to these issues.

### A. Loss of Interim Status

▇ EWC lost its interim status to operate the Four County Landfill on November 8, 1985 because it lacked the requisite insurance and an adequate groundwater monitoring system. Having lost interim status and lacking a final permit to operate a hazardous waste facility, EWC has no legal basis to continue its operation of the Four County Landfill. *See Vineland Chemical Co. v. United States Environmental Protection Agency*, 810 F.2d 402.

EWC argues that loss of interim status is not a strict liability matter and that its good faith in attempting to comply with the regulations concerning financial responsibility and groundwater monitoring weigh in favor of a sanction short of temporary or permanent closure.

EWC argues that the court need not close the Landfill upon finding a violation of § 6925(e). That statute, EWC argues, simply is not the "strict liability" statute the EPA claims it is. EWC notes that in other instances the EPA has entered into consent decrees imposing lesser penalties upon hazardous waste facilities found to have been out of compliance with RCRA requirements on the November 8, 1985 deadline. This case did not result in a consent decree, however. Neither the EPA nor EWC has agreed to any lesser sanctions. Regardless of whatever form of prosecutorial discretion the EPA may feel it has in a situation giving rise to a consent decree, RCRA limits this court's authority. Congress has provided that hazardous waste facilities may operate only through a final permit, which EWC does not have, or interim status, which EWC forfeited by failing to comply with RCRA requirements by the November, 1985 deadline date. The EPA has elected no forbearance here; it seeks to enforce the statutory loss of interim status. The statute leaves the court

with no room for sanctions short of temporary closure on the EPA's first claim.

Further, even if the statute allowed some lesser sanction in the event of good faith certification, EWC could not prevail; its certification of compliance was not made in good faith. In Part IV–A–1–d of this opinion, the court concluded that a good faith mistake concerning the amount of insurance required by RCRA regulations is not sufficient to make the insurance adequate; in that section, the court concluded that a good faith error in a certification of compliance does not defeat the loss of interim status for lack of actual regulatory compliance on the deadline date. If good faith sufficed for either matter, however (and good faith is relevant to the issue of penalty), the court would be compelled to conclude that EWC's error concerning the requisite insurance coverage was a good faith mistake.

Indiana's regulatory agency found no insufficiency in the Landfill's insurance coverage. EWC argues that this inaction by the State agency binds the EPA by virtue of 42 U.S.C. § 6926(d), which provides, "Any action taken by a State under a hazardous waste program authorized under this section shall have the same force and effect as action taken by the Administrator under this subchapter." This argument fails because the state took no action. The lack of any state challenge, however, supports EWC's argument that it erred in good faith. EWC's insurer's reliance on the EPA "hot line" further supports the argument.

The court cannot find, however, that EWC acted in good faith in failing to install a minimally adequate groundwater monitoring system by the deadline date. The inadequacies of the Landfill's groundwater monitoring system were frequent topics of correspondence for years before EWC certified its compliance with RCRA requirements. Four weeks before EWC's certification, Indiana informed EWC of the state's belief that the Landfill's monitoring system failed to comply with the very regulations at issue.

The certification addressed both financial responsibility and groundwater monitoring. EWC cannot claim the benefit of its good faith on one issue when it did not act in good faith on the other. Were the matter one which the court must decide in determining whether the Landfill must be closed for want of interim status, the court could not find EWC's certification to have been made in good faith.

In light of the court's finding that EWC was not in compliance with financial responsibility and groundwater monitoring requirements on November 8, 1985, no basis exists for the Landfill's continued operation, at least pending final determination of its Part B application. The Landfill must be closed. EWC must be restrained from the continued storage or disposal of hazardous wastes at the Landfill and must be required to implement an amended closure plan within 180 days of approval of the closure plan as provided by 40 C.F.R. § 265.113.

### B. Corrective Action

■ The EPA has demonstrated its entitlement to an order that EWC implement a corrective action plan in light of the release of hazardous waste constituents into the groundwater beneath the Landfill. EPA Exhibit 27 constitutes the corrective action plan the EPA seeks. EWC, while unsuccessfully denying the propriety of ordering corrective action, has disputed no provision of that proposed plan. Contaminated groundwater and the soil through which it has passed present difficult problems to remedy. Time is of the essence in remedying such contamination; to await the passage of the contamination from the facility's boundaries simply compounds the difficulties. As the EPA noted during final argument, one need not await a catastrophe before ordering corrective action.

The court has reviewed the plan requested by the EPA and concludes that it is an appropriate course of conduct to order in light of the demonstrated release. Accordingly, the court will order EWC (apart from Mr. Wilkins, who no longer is an owner and was not alleged to be an operator) to under-

take the corrective steps called for by EPA Exhibit 27. Because the proposed plan requires EWC to report to the EPA frequently, the court deems it unnecessary to grant STOP's request that a special master be appointed to implement the plan.

### C. Civil Penalty

 The EPA seeks assessment of civil penalties against each of the defendants for their violations of RCRA and its implementing regulations. 42 U.S.C. § 6928(g) provides for an assessment of civil penalties in an amount not to exceed $25,000 for each day of violation. In its trial brief, the EPA appeared to argue that, pursuant to the EPA's interpretation of § 6928(g), the court should presume a penalty of $25,000 per day, to be reduced downward only upon a showing of mitigating considerations. EPA Trial Brief, at 48 n. 23 (citations omitted). The court cannot agree. The EPA properly may adopt regulations for its own administrative assessment of civil penalties; indeed, the EPA has done so. *See* 2 S. Cooke, C. Davis & B. Gentry, *Law of Hazardous Waste* § 9.01[9][b]. The EPA may not, however, impinge upon the discretion Congress has afforded the courts. In *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 791 F.2d 304 (4th Cir.1986), *rev'd on other grounds* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), the court fixed civil penalties with reference to the EPA's civil penalty policy, but did so pursuant to the parties' agreement; even at that, the court used the EPA policy only as a guideline and was not limited strictly by its terms. 791 F.2d at 316.

In *United States v. T & S Brass and Bronze Works, Inc.*, 681 F.Supp. 314, 322 (D.S.C.1988), the court succinctly set forth the standards that guide imposition of civil penalties under RCRA:

> Assessment of the amount of a civil penalty is committed to the informed discretion of the Court. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 230 n. 6, 95 S.Ct. 926, 930–931 n. 6, 43 L.Ed.2d 148 (1975); *United States v. Phelps Dodge Industries, Inc.*, 589 F.Supp. 1340, 1362 (S.D.N.Y.1984). In

exercising this discretion, the Court should give effect to the major purpose of a civil penalty: deterrence. *See United States v. Phelps Dodge Industries, Inc.*, 589 F.Supp. at 1358; *United States v. Swingline, Inc.*, 371 F.Supp. 37, 47 (E.D.N.Y.1974); *State, ex rel. Brown v. Dayton Malleable, Inc.*, 1 Ohio St.3d 151, 438 N.E.2d 120, 125 (1982).

Although the statute does not contain any guidance for the Court in determining penalties in a judicial proceeding, RCRA § 3008(a)(3) [42 U.S.C. § 6928(a)(3)] provides factors that the Administrator shall consider in fixing a civil penalty in an administrative action. RCRA requires the Administrator to take into account the seriousness of the violation and any good faith efforts to comply with applicable requirements. In the absence of other statutory guidance, the Court may give consideration to these same factors in determining an appropriate penalty.

The EPA seeks assessment of civil penalties with respect to each of its first three claims; each claim must be addressed separately.

### 1. First Claim: Loss of Interim Status

EWC has operated the Landfill illegally since November 8, 1985. It seems apparent that the illegal operation of a hazardous waste facility is among the most serious violations of RCRA; EWC has engaged in that conduct for more than three years. EWC's good faith efforts to comply with the financial responsibility requirements weigh heavily in its favor. Recognizing that no claims were made against EWC's insurance policy during the policy period encompassing November 8, 1985, the court likely would impose a minimal civil penalty had EWC lost its interim status solely due to its failure to comply with financial responsibility requirements.

As discussed above, however, the court can find no good faith in EWC's failure to comply with groundwater monitoring requirements. EWC seems to have grasped at a state administrative order that deemed its groundwater monitoring system inade-

quate (at least as an assessment system) and required improvements and brandished that order as an excuse for noncompliance. Such conduct does not constitute a good faith effort to comply with applicable federal requirements.

The court must recognize, as well, that the harm flowing from the inadequate groundwater monitoring system cannot be evaluated with confidence. It cannot be determined whether the hazardous waste constituents found in the groundwater beneath the Landfill came from waste received before November 8, 1985 or from waste illegally received thereafter. The extent of the contamination beneath the Landfill presently is unknown; whether the contamination could have been remedied more easily had it been detected earlier is a matter of speculation. This uncertainty, of course, results from the Landfill's continued operation after November 8, 1985 and from the inadequacy of the present groundwater monitoring system; accordingly, the uncertainty is attributable to EWC. All that can be said with confidence is that the groundwater beneath the Landfill has been contaminated, and that contamination has not been shown to have migrated from the Landfill's boundaries.

### 2. Second Claim: Unlined Cells

The placement of hazardous waste in unlined trenches through post-November, 1985 "lateral expansion" also is a serious violation of RCRA. Both experts who ventured an opinion at trial stated that such waste inevitably would produce leachate; nothing beneath the trenches would be likely to impede the migration of that leachate to the groundwater and the uppermost aquifer.

This violation differs from those violations discussed above with respect to EWC's culpability through the last day of violation. Unlike the financial responsibility violation, the record suggests no explanation for the violation of the new RCRA minimum technology requirements, which were adopted in the 1984 amendments known as HSWA. EWC may have been unaware of the new requirements; it may have misunderstood the new requirements;

it simply may have decided to finance the new, more expensive cells by accepting waste today and building the cells tomorrow with today's income. The record before the court offers no explanation.

Unlike the violation in certifying compliance with groundwater monitoring requirements, nothing in the record indicates that any state or federal agency made EWC aware of its violation until it was too late. Uncontradicted deposition testimony indicates that Indiana did not inform EWC that its waste management procedures violated HSWA, although state enforcement personnel knew of those procedures.

During trial and argument, EWC stressed that it has relocated into lined cells the hazardous waste that had been placed improperly in unlined trenches after May 8, 1985. Expert testimony indicated that this is but a partial cure, however: over-excavation is necessary to be certain of capturing any leachate that may have escaped from the waste before relocation. The record is silent as to whether EWC simply relocated the waste or relocated the surrounding soil that may have been contaminated. The evidence also suggests that EWC may have relocated the misplaced waste, not for remedial purposes, but in furtherance of its intention to convert its entire site into a series of double-lined cells.

EWC also argues that the cost of installing liners with leachate collection and detection systems was higher in 1986 than it would have been in 1984 and 1985, and the court should consider the increased cost of compliance in fixing the civil penalty. The heightened cost is a result of EWC's noncompliance. The court deems it inappropriate to view as mitigation a cost that EWC incurred only because it did not comply with RCRA. Further, as the EPA noted in final argument, EWC had income of $714,000 during the period of violation; compliance with RCRA would have required it to close on May 8, 1985 for want of lined cells. Further, money was tight for EWC in 1985; without the income received for waste placed in unlined cells after May 8, the cells may never have been built. When so

viewed, the payment for lined cells may have been the very purpose behind the violation. In any event, the inflationary increase in the cost of lined cells, whatever that cost may have been, would pale next to the income received through EWC's illegal use of unlined trenches. EWC engaged in this conduct for about seventeen months.

### 3. Third Claim: Present Groundwater Monitoring System

The considerations discussed above with respect to the adequacy of the groundwater monitoring system in November, 1985 apply with equal force to the penalty for the system's continuing inadequacy. The EPA informed EWC of the inadequacy of its system in light of the unknown facts about the groundwater flow and the uppermost aquifer. As early as March 20, 1984, the EPA notified EWC that the EPA did not believe that the Landfill had identified the aquifer underlying the uppermost aquifer and the presence or absence of any hydraulic connection between the two aquifers as required by regulations promulgated under RCRA.

Evidence introduced at trial indicates that some of the delay in developing an adequate monitoring system at the Landfill is attributable to Indiana's environmental agency. That agency was unrepresented at trial, so no explanation was offered for various delays that seem to have been inexplicably long. Some of the delay, however, must be laid at the feet of EWC, which proposed monitoring plans that were deemed deficient.

The EPA seeks no assessment of penalties under this claim for any day after July 28, 1988, when the Indiana environmental agency approved EWC's proposed monitoring plan. STOP seeks assessment of penalties beyond that date. Mr. Shambaugh testified that the groundwater monitoring system ultimately approved by the Indiana agency is an expensive one; it will cost approximately $300,000 to install. The cost of compliance with the law, however, does not seem a proper set-off to apply to penalties for noncompliance. Even viewing the period of violation as limited by the EPA's

request, EWC operated with an inadequate groundwater monitoring system for the better part of three years.

### 4. Amount of Civil Penalty

A civil penalty must provide a meaningful deterrence without being overly punitive; it should be large enough to hurt; it should deter anyone in the future from showing a similar lack of concern with compliance. *United States v. Phelps Dodge Industries, Inc.,* 589 F.Supp. 1340, 1367 (S.D.N.Y.1984).

In the fiscal year ending June 30, 1987, Environmental Waste had gross receipts of $2,097,904, of which $1,836,857 were receipts from waste; the net profit for that fiscal year was $266,160. In the fiscal year ending June 30, 1988, Environmental Waste had gross receipts of $10,183,273, of which $8,789,242 were receipts from waste; the net profit for that fiscal year was $2,913,109. In the first quarter of the fiscal year ending June 30, 1989, Environmental Waste had gross receipts of $2,413,771 (a thirty-four percent increase over the first quarter of the previous fiscal year), of which $2,001,516 were receipts from waste (a twenty-three percent increase over the first quarter of the previous fiscal year).

Through the last day of trial, the Landfill had operated illegally by continuing to accept and store hazardous waste with neither interim status nor a final permit for 1,173 days, and each such day constitutes a separate violation; on the EPA's first claim, EWC faces civil penalties of as much as $29,325,000. The Landfill placed hazardous waste in unlined trenches as part of its lateral expansion for 468 days from May 8, 1985 to approximately August 19, 1986; with each such day viewed as a separate violation, EWC faces civil penalties of as much as $11,700,000 on the EPA's second claim. Viewing only the period from November 8, 1985 to July 28, 1988, when Indiana approved EWC's proposal to install additional groundwater monitoring wells, EWC faces civil penalties for 773 days of violations, or as much as $19,325,000 on the EPA's third claim.

In all, then, EWC faces civil penalties totalling $60,350,000, even setting aside the

additional civil penalties STOP seeks on the EPA's third claim and STOP's additional claims. The imposition of $60,000,000 or more in civil penalties would be wholly punitive and would far exceed the scope of any proper deterrent purpose. On the other hand, this landfill should have ceased operation on May 8, 1985 when it had no lined cells in which to place hazardous waste in accordance with the law. It did not cease operation then; it continued to operate and had income of $714,000 before it began to comply with RCRA's minimum technology requirements. The Landfill should have ceased operation on November 8, 1985 when its interim status was lost. Again, it did not do so; it continued to operate, ultimately earning income in excess of $10,000,000 per year. EWC has been faced more than once with a choice between disobeying the law or continuing its operations; each time, EWC chose to disobey the law and make more money. Substantial penalties, albeit penalties well below $60,000,000, are warranted.

The Landfill should have closed for want of lined cells on May 8, 1985. Because it lost its interim status before it completed any lined cells, it never should have reopened for business. For the 1,389 days from May 8, 1985 to the completion of trial on February 13, 1989, it operated illegally and made millions of dollars while doing so. During that period of illegal operation, its failure to maintain its site properly allowed hazardous waste constituents to move into surrounding areas through wind dispersal and surface water.

In *United States v. T & S Brass and Bronze Works, Inc.*, 681 F.Supp. 314, the court imposed sanctions of $1,000 per day for considerably less egregious conduct. On a daily basis, EWC should be assessed penalties well in excess of amount imposed in *T & S Brass and Bronze Works*, but in light of the duration of EWC's illegal operation, a civil penalty of more than $2,000 per day would be overly punitive. A civil penalty of $2,000 per day of illegal violation is a modest assessment, but appropriate in light of the purposes of a civil penalty. Accordingly, in the exercise of discretion, *see Fishel v. Westinghouse Electric Corp.*, 640 F.Supp. 442, 447 (M.D.Pa.1986), the court concludes that a civil penalty of $2,778,000 should be assessed against the defendants jointly and severally.

### D. Permanent Closure

■ The EPA seeks no order of permanent closure, but STOP does. Although EWC has challenged, on several grounds, STOP's right to present various claims in this action, it has not argued that permanent closure is not an available remedy.[73] Of the few reported decisions addressing remedies under RCRA, all but one deal with injunctions requiring the violator to comply with RCRA's requirements in the future. In *United States v. T & S Brass and Bronze Works, Inc.*, 681 F.Supp. 314, the court granted a permanent injunction directing the defendant to comply with all RCRA closure and post-closure requirements. That defendant already had ceased its storage and disposal operations and apparently did not seek to continue those operations. No reported case has considered the quantum of proof that should be required to close a facility permanently, rather than simply order the facility's owners and operators to comply with RCRA in the future and/or take remedial action. *See, e.g., United States v. Charles George Trucking Co.*, 823 F.2d 685 (1st Cir.1987) (defendant ordered to disclose information pursuant to RCRA and CERCLA); *Environmental Defense Fund, Inc. v. Lamphier*, 714 F.2d 331 (4th Cir.1983) (citizens obtained injunction requiring future compliance); *United States v. Clow Water Systems*, 701 F.Supp. 1345 (S.D.Ohio 1988) (corrective action order entered on summary judgment). Plainly, though, something must be shown beyond a simple violation of RCRA. Such relief should be granted only

---

**73.** If permanent closure is an available remedy in a suit under 42 U.S.C. § 6928(a), it is available in response to a claim made by a citizens' group. 42 U.S.C. § 6972(a); *see Environmental Defense Fund, Inc. v. Lamphier*, 714 F.2d 331, 337 (4th Cir.1983) ("Provided plaintiffs are genuinely acting as private attorneys general rather than pursuing a private remedy, nothing in RCRA ... bar injunctive relief.").

in unusual, perhaps even extraordinary, cases.

Had EWC simply failed to have sufficient insurance for a period in which no claims were made, or simply failed to provide required information, as in *United States v. Charles George Trucking Co.*, 823 F.2d 685, permanent closure would be unthinkable as a remedy. Indeed, had the evidence shown nothing more than that EWC lost its interim status by failing to comply with RCRA requirements by the November, 1985 deadline, permanent closure would seem unwarranted; under those circumstances, EWC would be permitted to continue with its Part B application.

The evidence presented by STOP and the EPA, however, shows far more with respect to EWC. The record reflects that EWC has long failed to comply with various RCRA requirements, despite regular reminders and notices from state and federal regulators. The record before the court indicates that EWC responded to such reminders and notices in writing in a timely manner, but did not respond in practice in a timely manner.

Since November, 1981 (one year after the regulations became effective for interim status facilities), EWC was required to have a groundwater monitoring system at the Landfill; EWC did not begin background monitoring for the parameters specified in 40 C.F.R. § 265.92 until December 29, 1982 and did not retain ATEC, its first groundwater monitoring consultant, until April, 1983.

EWC selected laboratories to perform analyses on the self-monitoring samples taken from the monitoring wells and now argues that those laboratories' reports are unreliable.

In summer, 1984, Indiana determined significant differences existed in various categories in groundwater samples taken in May, 1984. EWC did not report those differences immediately, did not obtain additional samples to determine whether the differences resulted from laboratory error, and did not develop a groundwater assessment plan. The Indiana agency proceeded with a notice of violation that led to the agreed administrative order in Cause N–128, reached more than a year after EWC's self-monitoring detected the differences. EWC submitted a proposed groundwater assessment plan in response to that order, but Indiana found that plan to be inadequate; an assessment plan was not agreed on until July 28, 1988, three years after the agreed order and more than four years after the sampling that triggered the assessment mode.

The EPA formally requested EWC to submit its Part B application by January 31, 1984. EWC did so, but the EPA found the application deficient because, among other things, EWC had failed to characterize the uppermost aquifer. The EPA directed EWC to submit a response by May 31, 1984. That date was extended by thirty days, and EWC submitted a revised application on July 3, 1984. That application, too, was found deficient for many of the same reasons, including failure to define the uppermost aquifer, and EWC was directed to respond by August 31, 1984. After obtaining a thirty-day extension, EWC submitted its revised application on October 1, 1984. Following a conference with the EPA, EWC was directed to submit revisions to its application by December 31, 1985. By the time of the EPA Task Force Report in May, 1987, no revisions had been submitted.

EWC was forbidden from lateral expansion into unlined cells after May 8, 1985. Despite the lack of double-lined cells with leachate collection systems, EWC continued to accept hazardous waste after that date. EWC had no appropriate cells until August, 1986.

Perhaps most significantly, Indiana warned EWC repeatedly to apply cover to exposed hazardous waste. EWC did so sporadically, if at all. As a result, hazardous waste lay uncovered, allowing carcinogenic hazardous waste constituents to be swept from the site into the surrounding area by wind and surface water.

At least one example undermines trust in EWC's representations. The EPA Task Force examined the Landfill's waste analy-

sis plan in June, 1986 and found that parts of it were not being followed. The Task Force appears to have expressed concern regarding the procedures for sampling and analyzing waste in barrels, and EWC stated that it did not intend to accept barrels in the future. Yet on October 11, 1988, more than two years later, Greg Sefchek videotaped Landfill personnel pushing barrels into a working cell.

In sum, EWC has been afforded repeated opportunities to comply with RCRA requirements. It has responded by developing a dismal history of delay, mis-performance, and noncompliance. In adopting RCRA in 1976, Congress indicated part of its intent as follows:

> The existing methods of land disposal often result in air pollution, subsurface leachate and surface run-off, which affect air and water quality. This legislation will eliminate this problem and permit the environmental laws to function in a coordinated and effective way.

H.Rep. 94–1491, at 4. The owners and operators of the Four County Landfill have demonstrated an inability to operate a hazardous waste facility in sufficient compliance with RCRA to achieve that Congressional purpose. STOP has provided the court with ample reason why the Landfill should be closed. The court can find in the record too little reason to believe that lesser injunctive relief would achieve compliance with RCRA. The risk to the public of any continued operation of the Four County Landfill by EWC greatly outweighs any harm from permanent closure.

Accordingly, the court concludes that STOP has shown itself to be entitled to the injunctive relief it seeks. The defendants should be enjoined permanently from operating a hazardous waste facility at the Landfill site.

This conclusion renders moot the EPA's claims for injunctive relief under its third claim for relief.

*E. Attorneys' Fees*

In its amended complaint, STOP requested an award of attorneys' fees as part of the relief it sought. At final argument, STOP expanded its request and asked that the court order a reserve of $150,000 to pay attorneys' fees, expenses, and witness fees, plus an additional sum for appellate fees. STOP bases its request on fee provisions in RCRA and CERCLA which permit an award of attorney fees and costs in "citizen suits" brought in the district courts under 42 U.S.C. § 6972(a) and 42 U.S.C. § 9659(a). The RCRA fee provision provides that:

> The court, in issuing any final order in any action brought pursuant to this section or section 6976 of this title, may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party whenever the court determines such an award is appropriate. . . .

42 U.S.C. § 6972(e). CERCLA's fee provision is nearly identical. 42 U.S.C. § 9659(f).[74]

STOP did not, however, bring suit under 42 U.S.C. § 6972(a) or 42 U.S.C. § 9659(a). It intervened in this action pursuant to 42 U.S.C. § 9613(i), and that intervention statute does not have its own attorney fee provision. Since RCRA's and CERCLA's attorney fee provisions on their faces apply only to citizen suits, it remains to be determined whether these provisions also apply to a citizen group that intervenes pursuant to 42 U.S.C. § 9613(i).

STOP argues that attorney fees are available for "citizen suits" brought pursuant to both RCRA and CERCLA; therefore, such fees also should be available to an intervening citizen group since STOP's role in this trial was equivalent to what a citizen would do in a citizen's suit. EWC has raised no argument that § 6972(e) and § 9659(f) only apply to suits instituted under § 6972(a) or § 9659(a). Neither has it

---

**74.** To recover attorney fees under the statute, the plaintiff must be a prevailing or substantially prevailing party. A partially prevailing party should be compensated for the legal expenses he would have borne if his suit had been confined to the ground on which he prevailed plus factually related claims. *Ustrak v. Fairman,* 851 F.2d 983, 998 (7th Cir.1988).

argued that the specific statute under which STOP intervened makes no separate mention of attorney fees. EWC remains silent on this issue.

Following heavy amendment to the citizen suit provision of RCRA in 1984, Congress apparently attempted to remedy the inadvertent removal of the citizen intervention provision of § 6972 by means of the 1986 amendments to CERCLA, 42 U.S.C. § 9613(i). *See United States v. Stringfellow,* 783 F.2d 821, 829 n. 7 (9th Cir.1986), *vacated and remanded sub nom. Stringfellow v. Concerned Neighbors in Action,* 480 U.S. 370, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987). Congress clearly intended to provide for the recovery of attorney fees in citizen suits brought pursuant to § 6972 and § 9659, and Congress clearly intended to reestablish intervention as of right in government initiated actions to allow citizens to act as private attorneys general in hazardous waste cases.

Given the common concern of RCRA and CERCLA with hazardous waste and the common purpose of each Act's authorization of attorney fees to promote citizen enforcement, the court concludes that Congress intended for citizen groups intervening as a matter of right to be able to recover their costs and attorney fees.

STOP could have brought its own action against EWC, based on its separate claims, in district court under 42 U.S.C. § 6972. Had STOP done so and prevailed, attorney fees and costs would have been available. Principles of judicial economy counsel vigorously against allowing attorney fees if a citizen group expends additional judicial resources by bringing a separate action, but denying costs if the citizen group intervenes under the 1986 amendments to CERCLA. *See Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency,* 711 F.2d 431, 435–438 (1st Cir.1983) (availability of attorney fees for citizen group under Clean Water Act when specific section under which the action was brought did not provide for attorney fees). Congress was well aware of principles of judicial economy when it amended RCRA in

1984 and CERCLA in 1986. *See Hallstrom v. Tillamook County,* 844 F.2d 598, 600–601 (9th Cir.1987).

Consequently, for attorney fee purposes, an intervention under 42 U.S.C. § 9613(i) may be deemed a suit brought pursuant to the citizen suit section. Because STOP prevailed on several of its claims, it is entitled to recover its costs of litigation relating to those claims, including reasonable attorney and expert witness fees, pursuant to 42 U.S.C. § 6972(e). The court does not address whether STOP may recover all, or only some, of those costs; resolution of those issues must await STOP's submission of its claim for fees and expenses.

To hold that STOP may recover some or all of its costs of litigation is not to hold, however, that the defendants must establish a reserve to pay those costs or STOP's costs of appeal. STOP has advanced neither legal authority for ordering such a reserve (that would cover, in part, expenses not yet incurred) nor an evidentiary basis for doing so in this case. Accordingly, while the court holds that STOP is a prevailing party entitled to recover its costs, including attorney and expert witness fees, the court declines to order EWC to establish the cash reserve STOP seeks.

## VII. ORDER

For the foregoing reasons, the court finds for the plaintiff and the intervenor-plaintiffs on their amended complaints and directs that judgment be entered as follows:

A. Defendants James Wilkins, Stephen Shambaugh, Environmental Waste, Inc., and West Holding Company, and all persons operating under their direction and control, are hereby permanently enjoined from engaging, directly or indirectly, in the storage or disposal of hazardous waste at the facility known as the Four County Landfill in Fulton County, Indiana, except as specifically directed by the corrective action plan ordered below. Those defendants and all persons operating under their direction and control shall cease receiving hazardous waste for stor-

age and disposal at the Four County Landfill site immediately. The defendants shall implement an amended closure plan within 180 days of approval of the closure plan as provided by 40 C.F.R. § 265.113.

B. Defendants Stephen Shambaugh, Environmental Waste, Inc., and West Holding Company shall proceed forthwith with implementation of the corrective action plan proposed by the EPA, which is approved, attached hereto as Exhibit A, and made a part of this order.

C. Defendants James Wilkins, Stephen Shambaugh, Environmental Waste, Inc., and West Holding Company, jointly and severally, shall pay to the United States a civil penalty of $2,778,000.00 pursuant to 42 U.S.C. § 6928(g).

STOP shall be afforded sixty (60) days within which to submit its request for an award of costs of litigation, including attorney fees and expert witness fees, pursuant to 42 U.S.C. § 6972(e). The defendants shall be afforded twenty (20) days from service of that request within which to respond, and STOP shall have ten (10) days from service of that response within which to reply.

Costs shall be assessed against the defendants.

SO ORDERED.

### EXHIBIT A

### CORRECTIVE ACTION PLAN

The corrective action plan consists of eight tasks:

Task I: Description of Current Conditions
A. Facility Background
B. Nature and Extent of Contamination
Task II: RCRA Facility Investigation (RFI) Work Plan
A. Project Management Plan
B. Data Collection Quality Assurance Plan
C. Data Management Plan
D. Health and Safety Plan
E. Community Relations Plan

Task III: Facility Investigation
A. Determination of Groundwater Flow Directions
B. Determination of Groundwater Quality
C. Determination of Groundwater Contamination Sources
D. Potential Receptors
Task IV: Investigation Analysis
A. Date Analysis
Task V: Reports
A. Work Plan
B. Progress
C. Summary Report
Task VI: Investigation of Corrective Measure Alternatives
A. Feasibility Study
B. Demonstration for Alternate Ground–Water Quality
C. Control of Contamination Sources
Task VII: Implementation of Corrective Measures
A. Achieve Ground–Water Quality
B. Control Sources of Contamination
Task VIII: Reporting of Corrective Measure Implementation

### TASK I: DESCRIPTION OF CURRENT CONDITIONS

FCL shall prepare and submit a report providing the background information pertinent to the facility. The data gathered during previous investigations or inspections and other relevant date shall be included in the report.

A. *Facility Background*

FCL's report shall summarize the regional location, pertinent boundary features, general facility physiography, hydrogeology and historical use of the facility for the disposal of solid and hazardous waste. FCL's report shall include:

1. Map(s) depicting the following:
 a. General geographic location.
 b. FCL property lines, with the owners of all adjoining property clearly indicated.
 c. Topography and surface drainage (with a contour interval of 2 feet and a

scale of 1 inch = 60 feet) depicting waterways, wetlands, floodplains, drainage patterns and surface-water containment areas for the FCL facility.

d. All tanks, building, utilities, paved areas, easements and rights-of-way for the FCL facility.

e. All solid or hazardous waste disposal areas active after November 19, 1980 at the FCL facility.

f. All known solid or hazardous waste treatment, storage or disposal areas regardless of whether they were active on November 19, 1980 at the FCL facility.

g. All known past an present product and waste underground tanks or piping at the FCL facility.

h. Surrounding land uses (residential, commercial, agricultural, recreations) within ½ mile radius of the FCL property boundaries.

i. To the extent such information is available, the location of production and groundwater monitoring wells within ½ mile radius of the FCL property boundaries. These wells shall be clearly labeled and, where existing data are reasonably available, the ground and top of casing elevations and construction details shall be included.

Pertinent maps shall be of sufficient detail and accuracy to locate and report all current and future work performed or proposed.

2. A history and description of ownership and operation and solid and hazardous waste generation, treatment, storage and disposal activities at the facility.

3. Approximate dates and periods of past reportable spills, identification of the materials spills, the amount spilled, the location where spilled and, if applicable, a description of the response actions conducted (local, state, or federal response units or private parties), including any inspection reports or technical reports generated as a result of the response.

B. *Nature and Extent of Contamination.*

FCL's report shall describe the existing information on the nature and extent of contamination at the FCL facility.

1. FCL's report shall identify each location of contamination. For each such location, FCL shall provide the following information:

a. Location of the contamination on a map.

b. Hazardous waste or hazardous waste constituents, constituting the contamination.

2. FCL's report shall assess and describe the degree and extent of contamination, including:

a. Available monitoring data and the locations and levels of contamination.

b. Assessment of potential groundwater migration pathways at FCL including information on geology, pedology, hydrogeology, physiography, and hydrology.

c. Assessment of potential impact(s), if any, on human health and the environment, including information on human population and groundwater and surface water use and land uses within ½ mile radius of the FCL facility.

## TASK II: RFI WORK PLAN

FCL shall prepare a RFI Work Plan, which shall include the following plans.

### A. *Project Management Plan*

FCL shall prepare a plan that will include a discussion of the technical approaches, the RFI schedules, budget and personnel qualification, including personnel performing or directing the RFI and contractor personnel.

### B. *Data Collection Quality Assurance Plan*

FCL shall prepare a plan describing the sampling procedures, filed measurements and sample analyses to be performed during the RFI.

1. Data Collection Strategy

The strategy section of the Data Collection Quality Assurance Plan shall include the following information.

a. Description of the intended uses for the data and the level of precision, completeness and accuracy necessary for the data based on these intended uses.

b. Description of methods and procedures to be used to assess the precision, completeness and accuracy of the measurement data.

c. Description of the rationale used to obtain representative samples. Examples of factors that shall be considered and discussed include:

 i. Environmental conditions at the time of sampling;

 ii. Number of sampling points; and

 iii. Representativeness of selected samples.

d. Description of the measures to be taken to allow the following data sets to be compared to each other:

 i. RFI data generated by the FCL over some time period;

 ii. RFI data generated by an outside laboratory or consultant versus data generated by the FCL;

 iii. Data generated by separate consultants or laboratories; and

 iv. Data generated by an outside consultant or laboratory over some time period.

e. Details relating to the schedule and quality assurance information to be provided in reports should include:

 i. Periodic assessment of measurement data accuracy, precision and completeness;

 ii. Discussion of significant quality assurance problems and recommended solutions; and

 iii. Resolutions of previously stated problems.

2. Sampling

The sampling section of the Data Collection Quality Assurance Plan shall describe:

a. Selection of appropriate sampling locations and depths.

b. Conditions under which sampling should be conducted.

c. Identification of parameters to be measured in addition to all hazardous constituents at 40 CFR 264 Appendix IX.

d. Selection of the frequency of sampling and length of sampling period.

e. Measures to be taken to prevent contamination of the sampling equipment and cross contamination between sampling points.

f. Field sampling operations and procedures, including:

 i. Documentation of procedures for preparation or reagents or supplies that become an integral part of the sample (e.g., filters and absorbing reagents);

 ii. Procedures and forms for recording the exact location and specific considerations associated with sample acquisition;

 iii. Documentation of specific sample preservation methods;

 iv. Calibration of field devices;

 v. Collection of replicate samples;

 vi. Submission of field-based blanks, where appropriate;

 viii. Potential interferences present at the facility;

 ix. Field equipment listing and sample containers;

 x. Sampling order;

 xi. Decontamination procedures;

 xii. Selecting appropriate sample containers; and

 xiii. Sample preservation.

g. Chain-of-custody, including:

 i. Standardized field tracking reporting forms to establish sample custody in the field prior to and during shipment; and

 ii. Pre-prepared sample labels containing all information necessary for effective sample tracking.

3. Field Measurements

The field measurements section of the Data Collection Quality Assurance Plan shall describe;

a. Selection of appropriate field measurement locations and depths.

b. Conditions under which field measurements should be conducted.

c. Which field parameters are to be measured and where.

d. Selection of the frequency of field measurements and length of field measurements period.

e. Field measurement operations and procedures, including:

i. Procedures and forms for recording raw data and the exact location, time and facility-specific considerations associated with the data acquisition;

ii. Calibration of field devices;

iii. Collection of replicate measurements;

iv. Submission of field-based blanks, where appropriate;

v. Potential interferences present at the facility;

vi. Construction materials and techniques associates with monitoring wells and piezometers used to collect field data;

vii. Field equipment listing;

viii. Order in which filed measurements were made; and

ix. Decontamination procedures.

4. Sample Analysis

The sample analysis section of the Data Collection Quality Assurance Plan will describe the following:

a. Chain-of-custody procedures, including:

i. Identification of a responsible party to act as sample custodian at the laboratory facility authorized to sign for incoming field samples, obtain documents of shipment and verify the data entered onto the sample custody records;

ii. Provision for a laboratory sample custody log consisting of serially numbered standard laboratory tracking report sheets; and

iii. Specification of laboratory sample custody procedures for sample handling, storage and distribution for analysis.

b. Sample storage procedures and times.

c. Sample preparation methods.

d. Analytical procedures, including:

i. Scope and application of the procedures;

ii. Sample matrix;

iii. Potential interferences;

iv. Precision and accuracy of the methodology; and

v. Method detection limits.

e. Calibration procedures and frequency.

f. Data reduction, validation and reporting.

g. Internal quality control checks, including, where applicable:

i. Method blank(s);

ii. Laboratory control sample(s);

iii. Calibration check sample(s);

iv. Replicate sample(s);

v. Matrix-spiked sample(s);

vi. "Blind" quality control sample(s);

vii. Control charts;

viii. Surrogate samples;

ix. Zero and span gases;

x. Reagent quality control checks;

xi. Preventative maintenance procedures and schedules;

xii. Corrective action for laboratory problems; and

xiii. Turn-around time.

A performance audit will be conducted by US EPA on the laboratories selected by FCL. This audit must be completed and approved prior to conducting the RFI.

C. *Data Management Plan*

FCL shall develop a Data Management Plan that describes data storage procedures and outlines project-related progress reporting procedures and forms. The plan shall also provide the format to be used to present the raw data and conclusions of the investigation.

1. Data Record

The data record shall include the following:

a. Unique sample or field measurement code;

b. Sampling or field measurement location and sample or measurement type;

c. Sampling or field measurement raw data;

d. Laboratory analysis ID number;

e. Property or component measured; and

f. Result of analysis (e.g., concentration).

2. Tabular Displays

The following information shall be presented in tabular displays:

a. Unsorted (raw) data;

b. Results for each medium or for each constituent monitored;

c. Data reduction for statistical analysis;

d. Summary of data.

3. Graphical Displays

The following data, where appropriate, shall be presented in graphical formats (e.g., bar graphs, line graphs, area or plan maps, isopleth plots, cross-sectional plots or transects, three dimensional graphs);

a. Sampling locations;

b. Sampling area boundaries;

c. Geographical extent of contamination showing the levels of contamination in the display;

d. Changes in concentration of any contaminant in relation to distance from source, time or depth; and

e. Features effecting intramedium transport and potential receptors.

D. *Health and Safety Plan*

FCL shall prepare a facility Health and Safety Plan.

1. Major elements of the Health and Safety Plan shall include:

a. Facility description, including availability of resources such as roads, water supply, electricity and telephone service;

b. Description of any known hazards associated with the RFI, including an evaluation of the potential risks of such hazards;

c. Identification of key personnel and alternates responsible for site safety and protection of public health;

d. Description of protective clothing, if necessary, to be worn by personnel in work area;

e. Procedures to control site access;

f. Decontamination procedures for personnel and equipment;

g. Site emergency procedures;

h. Description of emergency medical care for injuries; and

i. Description of the health and safety training provided to facility workers.

2. The Facility Health and Safety Plan shall be consistent with the RCRA requirements for contingency plans.

E. *Community Relations Plan*

FCL shall prepare a plan for the dissemination of information to the public regarding investigation activities and results.

TASK III: FACILITY INVESTIGATION

The site investigation activities shall follow the plans set forth in Task II as approved by U.S. EPA. All sampling and analyses shall be conducted in accordance with the Date Collection Quality Assurance Plan. All sampling locations shall be documented in a log and identification on a detailed site map.

A. *Determination of Groundwater Flow Directions*

1. FCL shall conduct a program of piezometer installations to establish the directions of ground-water flow at FCL.

a. Based on data obtained from the groundwater monitoring wells and piezometers designed and installed to yield depth-specific measurements as approved by U.S. EPA, FCL shall provide the following information:

i. Water-level contour and/or potentiometric surface maps;

ii. Flow nets constructed on vertical hydrogeologic cross sections;

iii. Flow nets constructed for various elevations showing horizontal components of flow;

iv. Any temporal changes in hydraulic gradients;

v. Stratigraphic cross sections and isopach maps, and supporting narrative descriptions, identifying and delineating boundaries of all formations, or parts thereof, which exist beneath the ground surface at FCL and above the elevation of the lowermost point in the underlying uppermost aquifer.

b. FCL shall provide a description of manmade influences (pipelines, french drains, ditches, unlined ponds, septic tanks, NPDES outfalls or retention areas) that may affect the ground-water flow at the site.

## B. *Media Characterization*

FCL shall collect analytical data on groundwater and at the facility sufficient to define the extent, origin, direction and rate of movement of contamination plumes within groundwater. Data shall include time and location of sampling, medium sampled, concentrations found and conditions during sampling, and the identity of the individuals performing the sampling and analysis.

1. Groundwater Monitoring.

FCL shall conduct a groundwater investigation to characterize any plumes of contamination at the facility. This investigation shall provide the following information.

a. A description of the horizontal and vertical extent of any immiscible or dissolved plume(s) originating from the facility;

b. The horizontal and vertical direction of plume movement;

c. The velocity of plume movement;

d. The concentration in the plume(s) of each hazardous constituent listed in 40 CFR Part 264, Appendix IX;

e. An evaluation of factors influencing the plume movement.

## C. *Source Characterization*

1. FCL shall determine the source of all contaminated groundwater.
2. FCL shall describe the procedures used in making the source determination.

## D. *Potential Receptors*

With respect to the area within the ½ mile radius of the FCL facility boundaries, FCL shall collect the following data:

1. Local uses and possible future uses of groundwater.

a. Type of use (e.g., drinking water source, municipal or residential, agricultural, domestic/non-potable, and industrial); and

b. Location of groundwater users, including wells and discharge areas.

2. Human use of or access to the facility and adjacent lands, including:

a. Recreation;

b. Hunting;

c. Residential;

d. Commercial;

e. Zoning; and

3. A demographic profile of the people who use or have access to the facility and adjacent land, including age, sex and sensitive subgroups.

4. A description of flora and fauna, including any endangered or threatened species, near the facility.

## TASK IV: INVESTIGATION ANALYSIS

FCL shall analyze all facility investigation data outlined in Task II and prepare a report on the extent of contamination, at the facility, including sources and migration pathways. The report shall describe the extent of contamination in relation to background levels indicative for the area.

## TASK V: REPORTS

### A. *Work Plan*

FCL shall submit to EPA a report on Task I when it submits the Work Plan (Task II).

B. *Progress*

FCL shall provide to EPA signed, monthly progress reports containing:

1. A description and estimate of the percentage of the RFI completed;
2. Summaries of all findings;
3. Summaries of all changes made in the RFI during the reporting period;
4. Summaries of all problems or potential problems, if any, encountered during the reporting period;
5. Actions being taken to rectify problems, if applicable;
6. Changes in personnel during the reporting period;
7. Projected work for the next reporting period; and
8. Copies of daily reports, inspection reports and laboratory/monitoring data.

C. *RFI Report*

FCL shall prepare and submit to U.S. EPA a RFI Report to summarize work performed under Tasks III–IV.

D. *EPA Reports*

EPA shall be provided two copies of all reports required by this RFI.

TASK VI: INVESTIGATION OF CORRECTIVE MEASURE ALTERNATIVES.

A. FCC shall prepare and submit a report providing the results of a feasibility study for both of the following two options designed to restore contaminated groundwater to background quality or to an alternative quality, subject to U.S. EPA approval:
 1. In place treatment of contaminated groundwater.
 2. Extraction of contaminated groundwater.
B. If FCL proposes an alternate groundwater quality to background groundwater quality, such proposal shall be based on a demonstration, subject to approval by U.S. EPA, which addresses the factors set forth at 40 CFR 264.94(b). Any such demonstration shall be a component of the report of the investigation of corrective measure alternatives.

C. FCL shall also investigate and identify measures designed to control FCL sources of groundwater contamination. Such measures shall be a component of the investigation of corrective measure alternative.

TASK VII: IMPLEMENTATION OF CORRECTIVE MEASURE

A. FCL shall implement corrective measures consisting of in place treatment of groundwater, groundwater extraction or a combination of the two as necessary to bring the quality of contaminated groundwater to either background groundwater quality or any alternative quality approved by U.S. EPA.

B. *Control of Contamination*

FCL shall implement measures designated to control sources of groundwater contamination if U.S. EPA deems such measures are necessary in order to achieve the selected groundwater quality. Any hazardous waste handled in source control activities shall be managed in accordance with all applicable RCRA requirements.

TASK VIII: REPORTING CORRECTIVE MEASURE IMPLEMENTATION

FCL shall submit monthly progress reports documenting the design, construction, operation, maintenance, and monitoring of the corrective measures implemented. Such reports shall continue until selected groundwater quality is achieved.